**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS,
EASTERN DIVISION**

ISIAH STEVENSON and MICHAEL COKES, )
)
                              *Plaintiffs*, )
)          No. 17 CV 4839
              v. )
)
CITY OF CHICAGO, et al., )
                          *Defendants*. )

## <u>MEMORANDUM OPINION AND ORDER</u>

AMY J. ST. EVE, District Court Judge:

        Plaintiffs Isiah Stevenson ("Stevenson") and Michael Cokes ("Cokes") (collectively "Plaintiffs") bring this action against the City of Chicago, a municipal corporation ("City"); City of Chicago Police ("CPD") Officer Dean W. Ewing, individually and as an agent of the City of Chicago ("CPD Officer Ewing" or "Ewing"); the Village of Tinley Park, Illinois, a municipal corporation ("Tinley Park"); Tinley Park Police Department ("TPPD") Officers S.J. Tencza, J.G. Vega, S.R. Heim, T.A. Poulos, A.H. Campbell, and D.M. Walker, individually and as agents of Tinley Park (collectively "TPPD Officers"); the Illinois State Police ("ISP"); the Director of ISP, Leo Schmitz ("ISP Director Schmitz" or "Schmitz"); and ISP Trooper Brian Walker ("ISP Trooper Walker" or "Walker"). Plaintiffs bring thirteen counts against Defendants in their Second Amended Complaint (the "SAC") relating to a July 1, 2016, vehicle pursuit and resulting rollover and crash. (R. 63, "SAC.") Before the Court are three motions to dismiss different counts by the three groups of defendants, namely, City of Chicago and CPD Officer Ewing (R. 67.); Tinley Park and the TPPD Officers (R. 66.); and ISP, ISP Director Schmitz, and ISP Trooper Walker (R. 65.).

For the following reasons, the Court grants in part and denies in part Defendants' motions to dismiss with and without prejudice. The Court denies the City of Chicago's motion to dismiss the *Monell* claim as alleged in Count IX. The Court grants without prejudice the motion to dismiss the *Monell* claim against Tinley Park in Count XIII, but denies the Tinley Park Defendants' motion to dismiss the willful and wanton claims in Counts III and IV. As to the ISP Defendants, the Court grants with prejudice Defendants' motion to dismiss Counts V, VII, and XII against ISP based on ISP's Eleventh Amendment immunity. The Court grants the ISP Defendants' motion to dismiss Count V against ISP Director Schmitz in his individual capacity without prejudice. The Court denies, however, Defendants' motion to dismiss Count VI against ISP Trooper Walker. As for Counts X and XI, the indemnification and *respondeat superior* claims, respectively, the Court denies Tinley Park's and ISP's motions to dismiss these counts. The Court grants Plaintiffs leave to file a Third Amended Complaint consistent with this Opinion by no later than April 27, 2018.

## BACKGROUND

### I.     Parties

Plaintiffs Stevenson and Cokes reside in Cook County, Illinois. (SAC at ¶ 1.) On July 1, 2016, they were passengers in a gold sedan vehicle that was pursued by various law enforcement agents and crashed after being struck by another vehicle. (*Id*. at ¶ 12-15.) Defendant City of Chicago is a municipal corporation in Illinois that maintains the CPD. (*Id*. at ¶ 2.) The City of Chicago employed CPD Officer Dean W. Ewing at the time of the relevant vehicle pursuit and crash. (*Id*. at ¶ 3.) Defendant Tinley Park is a municipal corporation in Illinois that maintains the TPPD. (*Id*. at ¶ 4.) Tinley Park employed TPPD Officers S.J. Tencza, J.G. Vega, S.R. Heim, T.A. Poulos, A.H. Campbell, and D.M. Walker at the time of the relevant vehicle pursuit and

crash.  (*Id*. at ¶ 5.)  Defendant ISP is a governmental entity of the State of Illinois.  (*Id*. at ¶ 6.)

ISP Director Leo Schmitz operated this state-wide police agency at the time of the relevant

vehicle pursuit and crash.  (*Id*. at ¶ 6.)  ISP and ISP Director Schmitz employed Trooper Brian

Walker at the time of the relevant vehicle pursuit and crash.  (*Id*. at ¶ 7.)

## II.     Underlying Event: July 1, 2016 Vehicle Pursuit and Crash

According to Plaintiffs, on July 1, 2016, Tinley Park Officers Tencza, Vega, Heim,

Poulos, Campbell, and Walker responded to calls regarding an alleged armed robbery at an

Arby's restaurant in Tinley Park.  (*Id*. at ¶ 9.)  The officers began an investigation and

interviewed witnesses, consequently reporting the incident as an "armed robbery" to the police

dispatch operator, despite, as Plaintiffs allege, "no evidence that weapons were used, displayed,

or intimated during the alleged robbery."  (*Id*. at ¶ 10.)

Around 11:00 AM later that same day, a person suspected of being involved in the

Arby's robbery drove a gold sedan vehicle in which Stevenson and Cokes were passengers.  (*Id*.

at ¶ 12.)  While the vehicle was on Interstate 57 in Cook County, ISP Trooper Walker initiated a

pursuit headed toward Chicago.  (*Id*. at ¶ 13.)  ISP dispatch and Trooper Walker reported that the

pursuit was related to an armed robbery and Trooper Walker continued following the vehicle

through Chicago.  (*Id*. at ¶ 14.)  At some point, CPD joined the vehicle pursuit and around the

intersection of 124th Street and Union Street in Chicago, CPD Officer Ewing drove an unmarked

2015 Ford Explorer into the driver's side of the pursued vehicle "with great force at high speed."

(*Id*. at ¶ 15.)  The collision caused the gold sedan to roll over and crash.  (*Id*.)

## III.    Procedural Posture

On December 23, 2016, Plaintiffs filed the present lawsuit in the Circuit Court of Cook

County, Illinois ("Cook County Court") alleging claims arising out of the vehicle crash, but only

against the City of Chicago and CPD Officer Ewing.  (R. 1-2 at 12.)  Plaintiffs' First Amended

Complaint in Cook County Court, filed on June 19, 2017, included the ISP and Tinley Park

Defendants.  (R. 1-1 at 1; R. 65 at 2.)  The City of Chicago Defendants removed the case to the

United States District Court for the Northern District of Illinois on June 28, 2017.  (R. 1 at 1.)  At

that time, Plaintiffs had yet to serve the ISP and Tinley Park Defendants.  (*Id*.; R. 65 at 2.)

In their SAC, filed on September 22, 2017, Plaintiffs allege thirteen counts, including:

(Count I) willful and wanton conduct against the City of Chicago; (Count II) willful and wanton

conduct against CPD Officer Ewing; (Count III) willful and wanton conduct against Tinley Park;

(Count IV) willful and wanton conduct against the individual Tinley Park officers; (Count V)

willful and wanton conduct against ISP and Director Schmitz; (Count VI) willful and wanton

conduct against ISP Trooper Walker; (Count VII) Fourth Amendment excessive force against

Defendants CPD Officer Ewing and ISP Trooper Walker; (Count VIII) civil battery against CPD

Officer Ewing; (Count IX) a *Monell* claim against the City of Chicago; (Count X)

indemnification against all three Defendant groups; (Count XI) *respondeat superior* against all

three Defendant groups; (Count XII) a *Monell* claim against ISP; and (Count XIII) a *Monell*

claim against Tinley Park.  Plaintiffs seek compensatory damages, consequential damages,

punitive damages, attorney's fees, and all taxable costs, fees, expenses, and interest.

## IV.    Allegations of Willful and Wanton Conduct against City of Chicago Defendants

In Counts I and II, Plaintiffs allege that the City, acting by and through its duly

authorized officers, agents, representatives, and employees, including Officer Ewing, had a duty

to refrain from willful and wanton conduct that consciously disregarded the safety of the general

public, including Plaintiffs.  (SAC at ¶ 22, 26.)  Despite this duty, the City and CPD Officer

Ewing committed willful and wanton acts or omissions, including driving a vehicle at a high

speed in a residential neighborhood and crashing into the Plaintiffs' vehicle in gross disregard and indifference for the safety of others. (*Id*. at ¶ 23.) Specifically, Plaintiffs assert that CPD Officer Ewing drove a City of Chicago vehicle on a residential street at a high rate of speed without activating emergency lights or sirens, that he did not reduce his speed when entering an intersection, and that he drove into Plaintiffs' vehicle with deadly force. (*Id*. at ¶ 27.) Plaintiffs also allege that the City of Chicago failed to properly monitor and discipline its police officers on and prior to July 1, 2016, to instruct CPD Officer Ewing not to initiate or to discontinue the high speed chase, and to instruct Ewing to use alternative methods to stop the fleeing vehicle. (*Id*. at ¶ 23.)

## V.    Allegations of Willful and Wanton Conduct against Tinley Park Defendants

Next, in Counts III and IV, Plaintiffs allege that during the relevant time period, Tinley Park, via its officers, agents, representatives and employees, had a duty to refrain from willful and wanton conduct in the exercise and discharge of its duties that consciously disregarded the safety of the general public, including Plaintiffs. (*Id*. at ¶ 30, 34.) Despite their duty, Tinley Park and its officers acted with willful and wanton conduct, which included reporting and broadcasting the Arby's robbery as an "armed robbery" without information or evidence of weapons at the scene, and giving false testimony to a grand jury on July 28, 2016, to secure a criminal indictment against Plaintiff Stevenson. (*Id*. at ¶ 31, 35.)

## VI.   Allegations of Willful and Wanton Conduct against ISP Defendants

In Counts V and VI, Plaintiffs also maintain that ISP and ISP Director Schmitz, acting by and through their duly authorized officers, agents, representatives, and employees, including ISP Trooper Walker, had a duty to refrain from willful and wanton conduct in the exercise and discharge of their duties that consciously disregarded the safety of the general public. (*Id*. at ¶

38, 42.) Despite this duty, ISP, Director Schmitz, and Trooper Walker committed willful and wanton acts or omissions, including driving an ISP vehicle at a high speed through a residential neighborhood, broadcasting over various communication devices that the gold sedan carrying Plaintiffs was involved in an armed robbery in Tinley Park, and initiating and continuing a high-speed pursuit through a residential neighborhood "in the face of imminent danger." (*Id*. at ¶ 39, 43.) Furthermore, Plaintiffs contend that ISP and Director Schmitz failed to instruct Trooper Walker not to initiate or to discontinue the high-speed pursuit, and to instruct Walker to use alternative methods to stop the vehicle. (*Id*. at ¶ 39.) Also, Plaintiffs assert that the ISP Defendants published "a crash report that reflects an untruth," namely, "that the City's vehicle was struck by the vehicle that Plaintiffs rode in." (*Id*.)

## VII.    Allegations of Excessive Force and Civil Battery

In Count VII, Plaintiffs contend that the actions of CPD Officer Ewing and ISP Trooper Walker constituted excessive force against Plaintiffs, violating their rights under the Fourth Amendment to the United States Constitution and 42 U.S.C. § 1983. (*Id*. at ¶ 46.) In Count VIII, Plaintiffs allege that Officer Ewing's conduct resulted in unconsented and offensive physical contact with Plaintiffs, thus constituting battery under Illinois law. (*Id*. at ¶ 49.)

## VIII.    *Monell* Claim against the City of Chicago

In Count IX, Plaintiffs base their *Monell* claim against the City of Chicago on Officer Ewing's alleged violation of their Fourth Amendment right to be free from the use of unreasonable force, alleging that their injuries "were proximately caused by policies and practices on the part of the City which fall under the authority of the City." (*Id*. at ¶ 52, 53.) In addition, Plaintiffs state that in July 2016, the City had notice of a widespread practice that City of Chicago police officers routinely used excessive force and that the "City's excessive use of

force and willful violation of its vehicular pursuit policies is enabled by the practices of its employees." (*Id*. at ¶ 54, 55.)

Moreover, Plaintiffs state that the City has also engaged in a widespread practice of their respective employees making false and/or misleading reports, hiding and destroying evidence, failing to require official reports of police activities, and/or failing to require complete and honest reports of police activities. (*Id*. at ¶ 56.) "These practices are directly encouraged at every level of law enforcement, from the Corporation Counsel's Office, to IPRA [Independent Police Review Authority, now succeeded by the Civilian Office of Police Accountability], to IAD [Internal Affairs Department of CPD, now succeed by the Bureau of Internal Affairs], to the Cook County State's Attorneys' Office, and affect the City's relationship with its police, including but not limited to the employment contract with the Fraternal Order of Police [("FOP")]." (*Id*. at ¶ 57.) Plaintiffs further allege that the failure to require police reports to be complete and honest encourages police officers not to report the misconduct of other officers and creates a culture that enables police misconduct. (*Id*. at ¶ 58.) Specifically, Plaintiffs state that CPD Officer Ewing and other City employees falsely reported that the gold sedan in which Plaintiffs were riding as passengers struck Ewing's vehicle. (*Id*. at ¶ 59.) Plaintiffs further maintain that City police officers have a widespread practice of making false reports that gloss over mistakes in their police work. (*Id*.)

Plaintiffs further contend that the City has a widespread practice of not adequately investigating and disciplining officers "who have conducted wrongful reckless pursuits and shootings," and who have committed perjury and created false reports. (*Id*. at ¶ 60-61.) Plaintiffs list the details of six incidents of police misconduct, including some of the names of officers, victims, awards the officers received in spite of the alleged wrongdoing, and the

resolution of the matter.  (*Id*. at ¶ 61.)  Of the six incidents, three involved vehicle crashes and three involved shootings, including the highly-publicized Laquan McDonald shooting.  (*Id*.) Plaintiffs also state that "former IPRA investigator Lorenzo Davis was terminated from his employment in 2015 because he determined that several police shootings were unjustified and refused to change the conclusions in his reports."  (*Id*.)

Furthermore, Plaintiffs highlight the myriad ways that CPD protects its officers. Plaintiffs, for example, state that CPD detectives pass on information about shootings involving CPD police officers to the officers accused of misconduct as well as their lawyers so that the "CPD officers can craft false narratives about polices shootings that do not conflict."  (*Id*. at ¶ 62.)  In furtherance of this practice, CPD and IPRA permit the same counsel and FOP representatives to represent witness officers and accused officers during their official statements, and allow these individuals breaks from being on the record to keep their stories straight.  (*Id*. at ¶ 63.)  Plaintiffs also contend that CPD officers do not write down narrative reports until they and their representatives "have an opportunity to review all reasonably available evidence so that the police can tell stories that do not conflict with themselves or the evidence."  (*Id*. at ¶ 64.)

Plaintiffs allege that "[r]ather than discipline misconduct and require reporting, the City circles the wagons" and that this widespread practice flourishes "because the City directly encourages, and is thereby the moving force behind, the very type of misconduct at issue by failing to adequately train, supervise, and control officers, and by failing to adequately investigate, punish and discipline prior instances of similar misconduct, thus directly encouraging future abuses such as those affecting Plaintiffs."  (*Id*. at ¶ 65.)  As such, Plaintiffs assert that the City violated Plaintiffs' rights by maintaining policies and practices that were the moving force for the foregoing constitutional violations and that the above-described widespread

practices, so well-settled as to constitute a de facto policy of the City, existed and thrived because governmental policymakers with authority exhibited deliberate indifference to the problem, thereby effectively ratifying it. (*Id*. at ¶ 67-69.) Additionally, Plaintiffs assert that Tinley Park and ISP "have aided the City in circling the wagons." (*Id*. at ¶ 66.) According to Plaintiffs, TTPD Officer Tencza allegedly gave false testimony under oath to a grand jury on July 28, 2016 to induce a felony indictment against Plaintiff Stevenson. (*Id*.) As for ISP's involvement, Plaintiffs allege that in May 2017, "ISP responded to a subpoena in the captioned case, but omitted voluminous information covered by the subpoena." (*Id*.)

## IX.    *Monell* Claim against ISP

Next, in Count XII, Plaintiffs base their *Monell* claim against ISP on Trooper Walker's alleged violation of their Fourth Amendment right to be free from the use of unreasonable force. (*Id*. at ¶ 79.) Plaintiffs state that in July 2016 and prior, ISP had notice of a widespread practice under which its employees routinely subjected citizens, such as Plaintiffs, to the use of excessive force and these practices enabled "ISP's excessive use of force and willful violation of its vehicular pursuit policies." (*Id*. at ¶ 81-82.) According to Plaintiffs, ISP had a widespread practice of failing to require complete and honest reports of officers' activities, and of allowing its employees to make false and/or misleading reports, and to hide and destroy evidence. (*Id*. ¶ at 83.) Plaintiffs further contend that these practices were directly encouraged at every level of law enforcement, including the Illinois Attorney General's office, IPRA, and major crash investigation unit(s), and affected ISP's relationship with its officers. (*Id*. at ¶ 84.) In addition, Plaintiffs assert that the failure to require police reports that are complete and honest encourages officers not to report other officers' misconduct and creates a culture that condones and enables misconduct. (*Id*. at ¶ 85.)

Specifically with regard to the incident at issue, Plaintiffs allege that Trooper Walker and other ISP employees reported that the gold sedan in which Plaintiffs were riding as passengers struck the City's vehicle driven by CPD Officer Ewing despite the alleged falsity of this statement. (*Id*. at ¶ 86.) Plaintiffs more broadly assert that ISP has a widespread practice among its troopers of making false reports that gloss over their mistakes. (*Id*.) Also, Plaintiffs state that ISP has a widespread practice of failing to "adequately investigate and discipline officers who have conducted wrongful reckless pursuits and shootings," as well as employees who have committed perjury and created false reports. (*Id*. at ¶ 87-88.) Plaintiffs detail two vehicle crashes involving ISP occurring in May 2016. (*Id*. at ¶ 88.) Also, Plaintiffs assert that Trooper Walker and other ISP troopers assisted in providing information about the incident to CPD officers so that they could "craft false narratives" that do not conflict. (*Id*. at ¶ 89.) Similar to their *Monell* claim against the City of Chicago, Plaintiffs allege that the same counsel represent both witness troopers and accused troopers, that troopers take breaks when making statements to set their stories straight, and that troopers review all reasonably available evidence before writing the narrative report so that their "stories do not conflict." (*Id*. at ¶ 90-91.)

Plaintiffs maintain that "[r]ather than discipline misconduct and require reporting, ISP circles the wagons." (*Id*. at ¶ 92.) According to Plaintiffs, this widespread practice flourishes because ISP directly encourages this conduct. (*Id*.) They further contend that ISP fails to adequately train, supervise, and control officers, and fails to adequately investigate, punish, and discipline prior instances of similar misconduct, thus directly encouraging future abuses such as those affecting Plaintiffs. (*Id*.) Plaintiffs also allege that ISP aided in "circling the wagons" in this case by omitting voluminous information in response to a subpoena in May 2017. (*Id*. at ¶ 93.) Moreover, Plaintiffs assert that the "ISP major crash investigation report wrongly reflects

that the City's vehicle was struck by the vehicle Plaintiffs rode in." (*Id.*) Plaintiffs further allege

that on July 1, 2016, "ISP reported that an armed robbery occurred in Tinley Park without first

confirming the truth thereof." (*Id.*) According to Plaintiffs, ISP's practices were a de facto

policy and the moving force behind the alleged constitutional violations, and ISP policymakers

with authority "exhibited deliberate indifference to the problem, thereby effectively ratifying it."

(*Id.* at ¶ 94-96.)

## X.    *Monell* Claim against Tinley Park

Count XIII is a *Monell* claim against Tinley Park premised on a violation of Plaintiffs'

Fourth Amendment rights. (*Id.* at ¶ 98-99.) Plaintiffs allege that Tinley Park knew prior to the

vehicle pursuit and crash that its employees routinely filed false reports and charged crimes

without any basis. (*Id.* at ¶ 100.) Further, Plaintiffs contend that Tinley Park had a widespread

practice of willfully violating citizens' rights, and covering up the illegal acts of other police

officers and agencies by making false statements to criminally prosecute citizens, "making false

and/or misleading reports, hiding and destroying evidence, failing to require official reports of

police activities, and/or failing to require complete and honest reports of police activities." (*Id.*

at ¶ 101-103.) Plaintiffs claim that "every level of law enforcement from the local state's

attorney's office, IPRA, and major crash investigation unit(s)" directly encouraged this practice,

which created a culture that enables misconduct. (*Id.* at ¶ 103-104.)

More specifically, Plaintiffs assert that Tinley Park police officers falsely reported that

the gold sedan in which Plaintiffs were riding as passengers was involved in an armed robbery.

(*Id.* at ¶ 105.) Further, Plaintiffs allege that TPPD Officer Tencza interviewed Plaintiff

Stevenson on July 5, 2016, and later gave false testimony under oath to a grand jury resulting in

Stevenson's felony indictment on July 28, 2016. (*Id.* at ¶ 11.) Plaintiffs also allege that the three

Defendant groups, including Tinley Park, have a practice that furthers this wrongdoing by allowing: (1) the same counsel to represent witness officers and accused officers, (2) officers to take breaks during official statements so that they can set their stories straight, and (3) officers to draft narrative reports after they review all reasonable evidence so that their stories do not conflict with one another's or the evidence.  (*Id*. at ¶ 109-110.)  This widespread practice flourishes because Tinley Park directly encourages and is the moving force behind the police misconduct due to its failure to adequately train, supervise, and control officers, and by failing to adequately investigate, punish, and discipline prior instances of similar misconduct, thus directly encouraging future abuses such as those affecting Plaintiffs.  (*Id*. at ¶ 111, 113.)  As above, Plaintiffs assert that Tinley Park's practices constitute a de facto policy and thrive because governmental policymakers exhibit deliberate indifference to the problem, thereby ratifying it. (*Id*. at ¶ 114.)

## LEGAL STANDARD

"A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) challenges the viability of a complaint by arguing that it fails to state a claim upon which relief may be granted."  *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 736 (7th Cir. 2014) (referencing Fed. R. Civ. P. 12(b)(6)); *see also Hill v. Serv. Emp. Int'l Union*, 850 F.3d 861, 863 (7th Cir. 2017).  Under Rule 8(a)(2), a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  The statement must "give the defendant fair notice of what the claim is and the grounds upon which it rests."  *Bell Atlantic v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted).  A plaintiff's "factual allegations must be enough to raise a right to relief above the speculative level."  *Id*.  Put differently, a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim

to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).

When determining the sufficiency of a complaint under the plausibility standard, courts must "accept all well-pleaded facts as true and draw reasonable inferences in the plaintiffs' favor." *Forgue v. City of Chi.*, 873 F.3d 962, 966 (7th Cir. 2017); *Roberts v. City of Chi.*, 817 F.3d 561, 564 (7th Cir. 2016). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. Also, a "plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions." *Camasta*, 761 F.3d 732 at 739 (citing *Twombly*, 550 U.S. at 555).

## ANALYSIS

### I.       City of Chicago's Motion to Dismiss

The City of Chicago Defendants move to dismiss Count IX, a *Monell* claim against the City, arguing that Plaintiffs do not allege enough factual detail to plead a claim on which relief may be granted. Specifically, the City argues that Plaintiffs' SAC is merely a collection of conclusory allegations, boilerplate language, and threadbare recitations of the elements of a *Monell* claim. According to the City, Plaintiffs attempt to weave an incident involving a police pursuit into a narrative of well-publicized shootings involving CPD, among other examples. The City further emphasizes that one event does not establish a pattern, custom, or practice, and that Plaintiffs fail to sufficiently allege how the municipal conduct was the "moving force" behind the constitutional deprivation or that the action was taken with deliberate indifference.

In response, Plaintiffs argue that excessive force is excessive force, no matter what form it takes—"a gun, a fist or a vehicle." (R. 72 at 5.) They explain that their collection of police shooting and vehicle pursuit crash cases is sufficiently similar to the facts in this case to establish

a custom or practice because all of these police incidents involved excessive force and cover-ups. In their response brief, Plaintiffs quote police expert opinion testimony from *Obrycka v. City of Chicago*, arguing that CPD has not changed its policies since then.[1]

To recover under *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978), Plaintiffs must eventually show that (1) they suffered a deprivation of a constitutional right; (2) as a result of (a) an express municipal policy, (b) a widespread custom or practice, or (c) a deliberate act or decision of a municipal agent with final policymaking authority, that was; (3) the cause of their constitutional injury. *See Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 379 (7th Cir. 2017); *Kristofek v. Vill. of Orland Hills*, 832 F.3d 785, 799 (7th Cir. 2016). At this procedural posture, however, Plaintiffs do not have to *prove* every element of their *Monell* claim—they must merely *allege* a claim under the dictates of *Iqbal* and *Twombly*. *See White v. City of Chi.*, 829 F.3d 837, 844 (7th Cir. 2016) (federal courts may not apply a "heightened pleading standard" to *Monell* claims); *McCauley v. City of Chi.*, 671 F.3d 611, 616 (7th Cir. 2011) ("To state a *Monell* claim post-*Iqbal*, a plaintiff must plead factual content allowing the court to draw the reasonable inference that the municipality maintains the problematic policy or practice in question.").

Here, Plaintiffs allege that they suffered a constitutional violation in contravention of their Fourth Amendment right to be free from unreasonable force. The City of Chicago Defendants do not dispute that CPD Officer Ewing's alleged use of excessive force qualifies as a violation of the Fourth Amendment. The Court thus only discusses the second and third

---

[1] The allegations and *Monell* claim in *Obrycka*, in which the plaintiff brought a substantive due process claim based on her liberty interest in bodily integrity, are factually distinct from the highly-publicized CPD shooting cases and the specific facts of this lawsuit. *See Obrycka v. City of Chi.*, 2012 WL 601810 (N.D. Ill. Feb. 23, 2012). The case is, however, illustrative of CPD's code of silence, which, while not directly alleged here, is related to Plaintiffs' claims about collusion within and between the various law enforcement agency Defendants.

elements of Plaintiffs' *Monell* claim against the City of Chicago Defendants, emphasizing again that Plaintiffs need not prove every element at this posture of the case under Seventh Circuit law. *See White*, 829 F.3d at 844 (federal courts may not apply a "heightened pleading standard" to *Monell* claims).

###### A. Widespread Policy, Custom, or Practice

With respect to the second element, *Monell* liability attaches if a formal policy, or an informal but widespread custom or practice violates the Constitution, or if municipal policymakers were deliberately indifferent as to the "known or obvious consequences" of the custom or practice. *Gable v. City of Chi.*, 296 F.3d 531, 537 & n.3 (7th Cir. 2002). Under this standard, the City of Chicago "must have been aware of the risk created by the custom or practice and must have failed to take appropriate steps to protect" Plaintiffs. *Id.* at 537. "[D]eliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (citing *Bd. Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 410 (1997)).

The Seventh Circuit has declined to adopt any bright-line rules defining a widespread custom or practice, although it has held that one instance or even three instances in some cases were insufficient to "demonstrate that there is a policy at issue rather than a random event." *Thomas v. Cook Cnty. Sheriff's Office*, 604 F.3d 293, 303 (7th Cir. 2010) ("[T]here is no clear consensus as to how frequently [certain] conduct must occur to impose *Monell* liability [under the custom and practice theory].").  Although "[t]here is no magic number of injuries that must occur before its failure to act can be considered deliberately indifferent[,]" *Glisson*, 849 F.3d at 382, "*Monell* claims based on allegations of an unconstitutional municipal practice or custom— as distinct from an official policy—normally require evidence that the identified practice or

custom caused multiple injuries." *Chatham v. Davis*, 839 F.3d 679, 685 (7th Cir. 2016). *See also Gill v. City of Milwaukee*, 850 F.3d 335, 344 (7th Cir. 2017) ("[T]he plaintiff must demonstrate that the practice is widespread and that the specific violations complained of were not isolated incidents," by "provid[ing] examples of [other individuals in the defendant's position of municipal authority] taking actions similar to those complained of," or "plausibly alleg[ing] that such examples exist."). The Court reiterates, however, that Plaintiffs do not need to prove every element of their claim—they must only plead their *Monell* claim under federal pleading standards. *See White*, 829 F.3d at 844.

Here, Plaintiffs allege that the City of Chicago had a formal policy or an informal but widespread custom or practice of covering up police misconduct and excessive force. With regard to the formal policy, Plaintiffs do not cite, quote, or otherwise identify any official City or CPD policies that allegedly caused their constitutional violation. As for Plaintiffs' allegations that the City has a widespread custom or practice of such violations, Plaintiffs allege details of six incidents of police misconduct between 2005 and 2015—three involving high-speed vehicle crashes and three involving shootings. While Plaintiffs do not link the shooting allegations to this case, the other vehicle pursuits are similar. Plaintiffs certainly present more than one example in addition to their own July 1, 2016, incident. They have sufficiently alleged that these are not isolated events, but a pattern of the City of Chicago's custom and practice of using excessive force and covering up wrongdoing. *See Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief" is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.").

Plaintiffs successfully allege that CPD has a culture of false reporting and covering up of vehicle pursuits. Plaintiffs include four car crash incidents in their pleadings, counting the

present case, which describe instances where CPD officers allegedly lied or made a false report after another police officer used excessive force.  Plaintiffs explain that CPD's lack of accountability manifests itself in multiple ways—from false reporting and destruction of evidence to failure to adequately discipline and investigate misconduct—and they specifically allege that such actions occurred here.  As such, Plaintiffs have successfully pled a widespread custom or practice, and further have provided "enough details about the subject-matter of the case to present a story that holds together."  *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010).

### B.    Moving Force

As to the third element, Plaintiffs must eventually offer evidence that the unconstitutional policy, custom, or practice was the "moving force" behind their constitutional injury.  *See Daniel v. Cook Cnty.*, 833 F.3d 728, 736 (7th Cir. 2016); *Teesdale v. City of Chi.*, 690 F.3d 829, 833–34 (7th Cir. 2012) ("[T]o establish municipal liability, a plaintiff must show the existence of an official policy or other governmental custom that not only causes but is the moving force behind the deprivation of constitutional rights." (citations omitted)).  The City argues that Plaintiffs "do not connect the dots" between the alleged pattern or practice and Officer Ewing's actions, however, the Court disagrees.

Plaintiffs have alleged a direct causal link between the de facto policy regarding vehicle incidents and their excessive force claim.  CPD's culture plausibly assured Officer Ewing that he could use excessive force in his pursuit of the gold sedan and not worry about being meaningfully disciplined.  Plaintiffs' factual allegations are enough to raise a right to relief above the speculative level and states a claim to relief that is plausible on its face.  *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 555.  Plaintiffs explain that CPD officers feel as if they can act with

impunity because various mechanisms allow them to collude and establish a common story that protects other officers. Specifically, Plaintiffs allege that officers review evidence before writing a narrative report, and that the same counsel represents both witness officers and accused officers. CPD officers are not properly disciplined after misconduct and this culture is the moving force behind the misconduct. Plaintiffs have sufficiently pled factual details about the nature of the custom or practice, and how this de facto policy caused their alleged violation of rights. Accordingly, accepting Plaintiffs' allegations as true and drawing all reasonable inferences in Plaintiffs' favor, the Court denies Defendant City of Chicago's motion to dismiss Plaintiffs' *Monell* claim as alleged in Count IX.

## II. Tinley Park's Motion to Dismiss

The Tinley Park Defendants move to dismiss Counts III, IV, X, XI, and XIII. In doing so, Defendants attempt to shield themselves from liability under various provisions of the Illinois Local Governmental and Governmental Tort Immunity Act ("Illinois Tort Immunity Act"), 745 Ill. Comp. Stat. 10/1-101, *et seq*. The Tinley Park Defendants also argue that indemnification and *respondeat superior* claims are duplicative, and that Plaintiffs' *Monell* claim fails due to the absence of an underlying constitutional deprivation.

### A. Willful and Wanton Conduct

In Counts III and IV, Plaintiffs allege willful and wanton conduct claims against Tinley Park and the TPPD Officers. As a preliminary matter, the Court points out that willful and wanton conduct is not a separate and independent tort under Illinois law, but is treated as an aggravated form of negligence. *See Valfer v. Evanston Northwestern Healthcare*, 52 N.E.3d 319, 327 (Ill. 2016) ("Illinois law views wilful [sic] and wanton misconduct as an aggravated form of negligence, *i.e.*, a tort." (quotations and citations omitted)); *Jane Doe-3 v. McLean Cty.*

*Unit Dist. No. 5 Bd. of Directors*, 973 N.E.2d 880, 887 (Ill. 2012) ("[W]illful and wanton

conduct is regarded as an aggravated form of negligence."); *Krywin v. Chi. Transit Auth.*, 938

N.E.2d 440, 452 (Ill. 2010) ("Under Illinois law, there is no separate and independent tort of

willful and wanton conduct." (quotations and citations omitted)).

Defendants move to dismiss Counts III and IV on the ground that they have immunity to

Plaintiffs' aggravated negligence claims under various provisions of the Illinois Tort Immunity

Act.  The Illinois Tort Immunity Act shields "local public entities and public employees from

liability for ordinary negligence committed during the exercise of their duties."  *Mitchell v.*

*Special Educ. Joint Agreement Sch. Dist. No. 208*, 897 N.E.2d 352, 356 (Ill. App. Ct. 2008).

First, Defendants cite § 2-106 for the proposition that Tinley Park has absolute immunity[2] when

its employees allegedly misrepresented the nature of the Arby's robbery and allegedly gave false

testimony before the grand jury.  *See* 745 Ill. Comp. Stat. 10/2-106 ("A local public entity is not

liable for an injury caused by an oral promise or misrepresentation of its employee, whether or

not such promise or misrepresentation is negligent or intentional.").  Second, Defendants point to

§ 2-210, arguing that it immunizes them from liability for any statements made as a part of their

employment.  *See* 745 Ill. Comp. Stat. 10/2-210 ("A public employee acting in the scope of his

employment is not liable for an injury caused by his negligent misrepresentation or the provision

of information either orally, in writing, by computer or any other electronic transmission, or in a

book or other form of library material.").  Last, Defendants argue that § 4-102 "immunizes local

public entities and public employees from liability for failure to (1) establish a police department

*or* (2) otherwise provide police protection *or* (3) if police protection service is provided, for

failure to provide *adequate* police protection service," *DeSmet ex rel. Estate of Hays v. Cty. of*

---

[2] Section 2-106 by its text is not subject to the willful and wanton exception but provides absolute immunity.

*Rock Island*, 848 N.E.2d 1030, 1039 (Ill. 2006) (emphasis in original), and that the act of reporting a crime to dispatch qualifies as such a police protection service. *See* 745 Ill. Comp. Stat. 10/4-102 ("Neither a local public entity nor a public employee is liable for failure to establish a police department or otherwise provide police protection service or, if police protection service is provided, for failure to provide adequate police protection or service, failure to prevent the commission of crimes, failure to detect or solve crimes, and failure to identify or apprehend criminals.").

While the Illinois Tort Immunity Act generally grants immunity to the state government under specific circumstances, this immunity may be subject to a willful and wanton exception. *See Mitchell*, 897 N.E.2d at 356. Section 2-202 provides that: "A public employee is not liable for his act or omission in the execution or enforcement of any law unless such act or omission constitutes willful and wanton conduct." 745 Ill. Comp. Stat. 10/2-202. The Illinois Immunity Act defines willful and wanton conduct as "a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others or their property." 745 Ill. Comp. Stat. 10/1–210 ("This definition shall apply in any case where a "willful and wanton" exception is incorporated into any immunity under this Act."). "Willful and wanton conduct, as contemplated in [the Illinois Immunity Act], consists of more than mere inadvertence, incompetence, or unskillfulness." *Geimer v. Chi. Park Dist.*, 650 N.E.2d 585, 592 (Ill. 1995); *see also McDowell v. Vill. of Lansing*, 763 F.3d 762, 768 (7th Cir. 2014) (same).

Here, the SAC includes specific allegations of willful and wanton negligent conduct. To recover damages based on willful and wanton conduct, a plaintiff must plead and eventually prove (1) the basic elements of a negligence claim, namely (a) the existence of a duty of care

owed to the plaintiff by the defendant, (b) a breach of that duty, and (c) an injury proximately caused by that breach; and (2) that the defendant's conduct demonstrated "a deliberate intention to harm or a conscious disregard for the plaintiff's welfare." *Doe v. Bridgeforth*, --- N.E.3d ---, 2018 WL 1276747, ¶ 45 (Ill. App. Ct. 2018) (citations omitted); *see Lane v. Dupage Cty. Sch. Dist. 45*, 2014 WL 518445, *4 (N.D. Ill. Feb. 10, 2014) ("To state a claim for willful and wanton misconduct, which is an aggravated form of negligence under Illinois law, a plaintiff must plead the basic elements of a negligence claim *and* "either a deliberate intention to harm or a conscious disregard for the plaintiff's welfare.") (citations to Illinois cases omitted).  In their SAC, Plaintiffs state that Defendants, as a municipal entity and as individual officers, "had a duty to refrain from willful and wanton conduct in the exercise and discharge of their duties that consciously disregarded the safety of the general public, and especially Plaintiffs."  (SAC at ¶ 30, 34.)  Plaintiffs include facts that support their allegations: that the Tinley Park Defendants reported and broadcasted the Arby's robbery as an armed incident, without support for that conclusion, and that Officer Tencza gave false testimony to a grand jury.  (*Id.* at ¶ 31, 35.)  They state that these willful and wanton acts, and gross disregard and indifference directly and proximately caused their damages.  (*Id.* at ¶ 32, 36.)  Viewing the allegations as true and drawing all reasonable inferences in Plaintiffs' favor, Plaintiffs have sufficiently alleged plausible willful and wanton conduct.  Further, at this early stage of the case, Plaintiffs' SAC pleads sufficient facts "to raise a reasonable expectation that discovery will reveal evidence" supporting the applicability of Section 2–202.  *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009); *Estate of McIntosh v. City of Chi.*, 2015 WL 5164080, *4 (N.D. Ill. Sept. 2, 2015).

Moreover, Defendants have not established that any of the Illinois Tort Immunity Act provisions they cite apply or trump the § 2-202 willful and wanton exception, and shield them

from liability as a matter of law at this stage of the litigation. As courts routinely recognize, this is not an appropriate determination for a motion to dismiss because "whether the conduct is sufficiently willful and wanton is ordinarily a question of fact for the jury and rarely should be ruled upon as a matter of law." *Liska v. Dart*, 60 F. Supp. 3d 889, 906 (N.D. Ill. 2014) (citations omitted); *see Carter v. Simpson*, 328 F.3d 948, 951 (7th Cir. 2003)) ("Whether an officer acted wantonly 'is normally a question of fact to be determined by the jury.' "); *Drain v. Bauman*, 708 F. Supp. 2d 693, 709 (N.D. Ill. 2010) (*citing Chelios v. Heavener*, 520 F.3d 678, 693 (7th Cir. 2008)); *Mitchell*, 897 N.E.2d at 357.

Accepting the SAC allegations as true and drawing all inferences in Plaintiffs' favor, Plaintiffs have stated "a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678. Accordingly, the Court denies Defendants' motion to dismiss Counts III and IV.

## B.     Indemnification

In Count X, Plaintiffs allege an indemnification claim against Tinley Park. The parties agree that such a claim is "indeterminable" at this stage of the proceedings given that there has been no finding of liability. Under Seventh Circuit law, however, it does not follow that the Court should dismiss this claim before judgment becomes final. *See, e.g.*, *Vinson v. Vermilion Cty., Ill.*, 776 F.3d 924, 930 (7th Cir. 2015) (reinstating a claim "dependent on the validity" of other claims in a Fourth Amendment search case); *Wilson v. City of Chi.*, 120 F.3d 681, 685 (7th Cir. 1997) ("It does not follow that Wilson could not proceed under section 9–102 [indemnification statute] until the judgment against Burge became final."). As such, the count stands. The Court denies Defendants' motion to dismiss Count X against Tinley Park.

## C. *Respondeat Superior*

In Count XI, Plaintiffs allege that Tinley Park is liable under *respondeat superior* for the actions of its employees if the TPPD Officers are found liable under the alleged state law claims. Defendants argue that this count is duplicative of the indemnification claim, but do not cite any legal support for this argument. Defendants are correct that § 9-102 of the Illinois Immunity Act codified the *respondeat superior* doctrine when it established *respondeat superior* liability by a local public entity for employees' tort judgments or settlements for compensatory damages while acting within the scope of employment. 745 Ill. Comp. Stat. 10/9-102; *see Doe v. City of Chicago*, 360 F.3d 667, 668 (7th Cir. 2004) (agreeing that 745 ILCS 10/9–102 codifies the *respondeat superior* doctrine). Indemnification and *respondeat superior*, while related theories of liability, are not identical—and therefore are not duplicative. *See, e.g.*, *Vinson*, 776 F.3d at n. 4 (discussing indemnification and *respondeat superior* as separate theories of recovery); *Wright v. City of Danville*, 675 N.E.2d 110, 118 (Ill. 1996) (same). Accordingly, the Court denies Defendants' motion to dismiss Count XI against Tinley Park.

## D. *Monell* Claim

In Count XIII of the SAC, Plaintiffs allege a *Monell* policy claim against Tinley Park. Defendants argue that there must be a constitutional deprivation or injury for Plaintiffs to successfully allege a *Monell* claim and Plaintiffs only bring state law claims against the Tinley Park Defendants, namely willful and wanton conduct, in Counts III and IV. The Court agrees that Plaintiffs have not alleged a constitutional violation underlying the *Monell* claim against Tinley Park and grants Defendants' motion to dismiss Count XIII without prejudice.

### III.     Illinois State Police Defendants' Motion to Dismiss

The ISP Defendants move to dismiss Counts V, VI, VII, X, XI, and XII of the SAC.  ISP first argues that it is immune from suit under the Eleventh Amendment.  Relatedly, ISP argues that Plaintiffs' state law claims against Trooper Walker and ISP Director Schmitz violate the state's sovereign immunity.  Further, ISP asserts that Plaintiffs fail to state a plausible Fourth Amendment excessive force claim against Trooper Walker, and in the alternative, that Trooper Walker is entitled to qualified immunity.

#### A.     Eleventh Amendment Immunity

The Eleventh Amendment "bars actions in federal court against a state, state agencies, or state officials acting in their official capacities."  *Council 31 of the Am. Fed'n of State, Cty. & Mun. Emps. v. Quinn*, 680 F.3d 875, 881 (7th Cir. 2012).  "State agencies are treated the same as states for purposes of the Eleventh Amendment."  *Tucker v. Williams*, 682 F.3d 654, 658 (7th Cir. 2012).  ISP is an agency of the State of Illinois, and thus entitled to Eleventh Amendment immunity.  *See id.* at 659; *Carr v. Illinois State Police*, 2017 WL 5989726, *3 (N.D. Ill. Dec. 4, 2017) ("The Eleventh Amendment applies to the Illinois State Police as an agency of the State of Illinois").  Nonetheless, Eleventh Amendment immunity is not automatic.  *See Council 31*, 680 F.3d at 882 ("[E]ven when properly raised, sovereign immunity is not absolute immunity.") There are three exceptions to the Eleventh Amendment immunity: (1) congressional abrogation by amendments passed after the Eleventh Amendment; (2) state consent to suit in federal court; and (3) the doctrine articulated by the Supreme Court in *Ex parte Young*, 209 U.S. 123 (1908).  *Nunez v. Indiana Dep't of Child Servs.*, 817 F.3d 1042, 1044 (7th Cir. 2016).  Plaintiffs attack ISP's Eleventh Amendment immunity on the second ground, arguing that ISP waived its immunity when it voluntarily submitted itself to federal jurisdiction, namely, by electing to

proceed in federal court rather than seeking remand to state court after the City of Chicago Defendants removed this action.

No binding precedent directly resolves this immunity waiver question in a similar scenario, specifically, where a state agency is sued in state court but before it is served, the co-defendants remove the case to federal court, and the state agency brings a motion to dismiss on immunity grounds rather than filing a motion to remand. The Supreme Court, however, generally instructs that the "test for determining whether a State has waived its immunity from federal-court jurisdiction is a stringent one." *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 675 (1999) (quoting *Atascadero State Hospital v. Scanlon*, 473 U.S. 234, 241 (1985)). "[T]he court must be highly confident that the state really did intend to allow itself to be sued in federal court." *Nunez*, 817 F.3d at 1044-45. Indeed, waiver must be "stated by the most express language" as to leave no doubt. *Id*. at 1044 (quoting *Edelman v. Jordan*, 415 U.S. 651, 673 (1974)).

While "[c]onstructive consent will not overcome the presumption of Eleventh Amendment immunity," *Nunez*, 817 F.3d at 1044, "affirmative litigation conduct" may waive Eleventh Amendment immunity. *See Lapides v. Bd. of Regents of Univ. Sys. of Ga.*, 535 U.S. 613, 620 (2002). In *Lapides*, the Supreme Court held that "removal is a form of voluntary invocation of a federal court's jurisdiction sufficient to waive the State's otherwise valid objection to litigation of a matter (here of state law) in a federal forum." *Lapides*, 535 U.S. at 624. The *Lapides* ruling "prevents the unfair circumstance in which a state removes a case, thereby invoking a federal court's jurisdiction, and then claims that the Eleventh Amendment bars the federal court from hearing the dispute." *UWM Student Ass'n v. Lovell*, 266 F. Supp. 3d 1121, 1131 (E.D. Wis. 2017) (citing *Beaulieu v. Vermont*, 807 F.3d 478, 485–86 (2d Cir. 2015)).

Nevertheless, as the Seventh Circuit teaches, when determining a state's waiver of Eleventh Amendment immunity, "the crucial considerations are the voluntariness of the state's choice of forum and the functional consequences of that choice." *Bd. of Regents of Univ. of Wisconsin Sys. v. Phoenix Int'l Software, Inc.*, 653 F.3d 448, 462 (7th Cir. 2011).

Here, the ISP Defendants did not consent to removal because Plaintiffs had not served the ISP Defendants until after the City of Chicago Defendants removed this action to federal court. With this in mind, it is well-settled that the waiver of Eleventh Amendment immunity must be clear. *See Coll. Sav. Bank*, 527 U.S. at 680 ("The whole point of requiring a 'clear declaration' by the State of its waiver is to be certain that the State in fact consents to suit."). Thus, Plaintiffs' contention that ISP's failure to move to remand under 28 U.S.C. § 1447(c)—assuming that the ISP Defendants had a legal basis to do so—was a clear declaration of Eleventh Amendment immunity waiver is simply too attenuated under the circumstances. To clarify, the Supreme Court in *Lapides* and the Seventh Circuit in *Board of Regents* focused on the voluntary, active nature of the state's consent to proceed in federal court. In *Board of Regents*, for example, the Seventh Circuit held that "[w]aivers by litigation conduct depend on whether the state has made a voluntary change in behavior that demonstrates it is…taking advantage of the federal forum." *Id*. at 462. As discussed, ISP did not make a voluntary, active decision to litigate this action in federal court nor are the ISP Defendants taking advantage of the federal forum for any unfair purpose or advantage as contemplated by *Lapides* and its progeny. *See Lapides*, 535 U.S. at 620 (Eleventh Amendment waiver does not rest on "State's actual preference or desire, which might, after all, favor selective use of 'immunity' to achieve litigation advantages."). As such, ISP has not waived its Eleventh Amendment protection under the circumstances,[3] and therefore,

---

[3] Because removal did not deprive ISP of Illinois sovereign immunity (as opposed to Eleventh Amendment immunity), ISP is also protected by the state sovereign immunity under 745 Ill. Comp. Stat.

the Court grants ISP's motion to dismiss Count V (willful and wanton conduct) and Count XII (*Monell*) brought against ISP in its official capacity with prejudice.

**B.     Indemnification and *Respondeat Superior***

Defendants also move to dismiss Counts X and XI, Plaintiffs' indemnification and *respondeat superior* claims, respectively. Their sole argument for the dismissal of both claims—articulated in one summary sentence—is that ISP has Eleventh Amendment immunity and therefore all claims against it fail, including Counts X and XI.  Defendants do not provide any reasoning or authority in support.  It is well established that "perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority[] are waived." *Steen v. Myers*, 486 F.3d 1017, 1021 (7th Cir. 2007) (citing *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991)).  As such, the Court denies Defendants' motion to dismiss Counts X and XI.

**C.     Willful and Wanton Conduct Claims Against Individual ISP Defendants**

While the Court dismisses Count V against ISP as a state agency with prejudice because of Eleventh Amendment immunity, Plaintiffs also allege willful and wanton negligent conduct in Count V against ISP Director Schmitz, and willful and wanton negligent conduct against ISP Trooper Walker in Count VI.

In their motion to dismiss, the ISP Defendants argue that Schmitz and Walker are protected from suit in this Court by operation of the Illinois State Lawsuit Immunity Act ("Illinois Lawsuit Immunity Act").  745 Ill. Comp. Stat 5/0.01, *et seq*.  The Illinois Lawsuit Immunity Act provides that, with listed exceptions, "the State of Illinois shall not be made a defendant or party in any court."  745 Ill. Comp. Stat. 5/1.  One of the listed exceptions is the

---

5/1. *See Murphy v. Smith*, 844 F.3d 653, 656 (7th Cir. 2016) (Under § 5/1, "the State of Illinois shall not be made a defendant or party in any court.").

Illinois Court of Claims Act. 705 Ill. Comp. Stat. 505/1, *et seq.* Defendants cite § 505/8(d) of

the Illinois Court of Claims Act for the proposition that the Illinois Court of Claims is the only

court with jurisdiction to hear the state tort case. 705 Ill. Comp. Stat. 505/8 (The Court of

Claims "shall have *exclusive* jurisdiction to hear and determine the following matters: (d) [*a*]*ll*

claims against the State for damages in cases sounding in tort, if a like cause of action would lie

against a private person or corporation in a civil suit…") (emphasis added). As such, "state law

tort claims that are brought against the state of Illinois in federal court shall be dismissed for lack

of subject matter jurisdiction." *Baltimore v. Illinois Dep't of Children & Family Servs.*, 2011

WL 1118845, *5 (N.D. Ill. Mar. 25, 2011).

Under the *Erie* doctrine, "state rules of immunity govern actions in federal court alleging

violations of state law." *Benning*, 928 F.2d at 775, 779; *see Omosegbon v. Wells*, 335 F.3d 668,

673 (7th Cir. 2003). Defendants are correct that the Illinois Lawsuit Immunity Act "prohibits the

State of Illinois from being named as a defendant in any court, with limited exceptions," among

them the Illinois Court of Claims. *Murphy v. Smith*, 844 F.3d 653, 661 (7th Cir. 2016) (Manion,

J., concurring), *cert. granted*, 138 S. Ct. 42 (2017), and *aff'd*, 138 S. Ct. 784 (2018); *see*

*Sorrentino v. Godinez*, 777 F.3d 410, 415 (7th Cir. 2015); *Brooks v. Ross*, 578 F.3d 574, 579 (7th

Cir. 2009). Further, Defendants correctly apply the Illinois Lawsuit Immunity Act to their case

as "Illinois courts treat suits against a public employee in his [or her] official capacity as suits

against the state." *Nelson v. Miller*, 570 F.3d 868, 885 (7th Cir. 2009); *see also Will v. Michigan*

*Dep't of State Police*, 491 U.S. 58, 71 (1989) ("[A] suit against a state official in his or her

official capacity is not a suit against the official but rather is a suit against the official's office.");

*Garcia v. City of Chicago, Ill.*, 24 F.3d 966, 969 (7th Cir. 1994) ("The Eleventh Amendment

prohibits federal courts from deciding suits brought by private litigants against states or their agencies, and that prohibition extends to state officials acting in their official capacities.").

A claim against a state official, however, is a claim against the state only "when there are (1) no allegations that an agent or employee of the State acted beyond the scope of his [or her] authority through wrongful acts; (2) the duty alleged to have been breached was not owed to the public generally independent of the fact of State employment; and (3) where the complained-of actions involve matters ordinarily within that employee's normal and official functions of the State." *Murphy*, 844 F.3d at 658 (citations omitted). When all three factors are present, "it is as if the action is brought against the state directly and sovereign immunity applies." *Hampton v. City of Chicago*, 349 F. Supp. 2d 1075, 1078 (N.D. Ill. 2004). On the other hand, when a state agent violates a constitutional or statutory law, or acts in excess of his or her authority, state sovereign immunity affords no protection to that agent. *See Murphy*, 844 F.3d at 655; *Richman v. Sheahan*, 270 F.3d 430, 441 (7th Cir. 2001); *Smith v. Burge*, 222 F. Supp. 3d 669, 696 (N.D. Ill. 2016); *Leetaru v. Bd. of Trs. of Univ. of Ill.*, 32 N.E.3d 583 (Ill. 2015); *Healy v. Vaupel*, 549 N.E.2d 1240 (Ill. 1990). "This exception is premised on the principle that while legal official acts of state officers are regarded as acts of the State itself, illegal acts performed by the officers are not." *Leetaru*, 32 N.E.3d at 596.

To avoid the exception to sovereign immunity, Defendants cite two outdated cases for the argument that Plaintiffs can only bring their claims in the Illinois Court of Claims because Defendants' acts were all by virtue of their state employment. First, they cite the Illinois Supreme Court case *Currie v. Lao*, 592 N.E.2d 977 (Ill. 1992), for the proposition that the only applicable inquiry for whether sovereign immunity protects a state agent is whether the official breached a duty imposed on him or her solely by virtue of his or her state employment. The

Illinois Supreme Court has ruled on this issue since *Curie*, most recently in *Leetaru*, 32 N.E.3d 583, which builds off of *Healy*, 549 N.E.2d 1240. The Illinois Supreme Court in *Leetaru* recognized the exception to the Illinois Lawsuit Immunity Act and the Illinois Court of Claims Act that a state agent's actions are not immune and can be brought outside of the Illinois Court of Claims if the agent violates constitutional or statutory law, or acts in excess of his or her authority. *Id*. at 595-596. Second, Defendants cite the Seventh Circuit case *Magdziak v. Byrd*, 96 F.3d 1045 (7th Cir. 1996), for the proposition that both the Seventh Circuit and the Illinois Supreme Court have ruled that the Illinois Court of Claims is the only proper forum for torts resulting from police vehicle pursuits. While not discussing a police vehicle chase, in *Murphy*, 844 F.3d 653, the Seventh Circuit again recognized the framework discussed by the Illinois Supreme Court in *Leetaru*. The Court does not find *Magdziak*—over 20 years old—persuasive, especially in light of the Seventh Circuit's more recent discussion of immunity issues, albeit not specifically in the police car chase context. Defendants do not cite any other case for the blanket principle that officers conducting a vehicle pursuit are always immune from suit in courts other than the Illinois Court of Claims.

The Court, therefore, returns to the framework set out by the Seventh Circuit in *Murphy*. The Court reviews Plaintiffs' allegations against the two individual ISP Defendants separately.

### 1.    ISP Trooper Walker

With regard to ISP Trooper Walker, the Court need only address the wrongful acts factor from *Murphy* because this issue is dispositive: Plaintiffs successfully allege that Defendant Walker engaged in wrongful acts that strip him of immunity as a state agent under the Illinois Lawsuit Immunity Act and allow Plaintiffs to sue him. Specifically, Plaintiffs' SAC meets the

federal pleading standard in alleging that Trooper Walker acted beyond his authority.[4]  Plaintiffs

allege aggravated negligence under Illinois law, namely a defendant's breach of a duty of care

owed to a plaintiff that proximately caused the plaintiff's injury, and a deliberate indifference or

conscious disregard for the plaintiff's welfare.  *Lane*, 2014 WL 518445 at *4; *Doe*, 2018 IL App

(1st) 170182, ¶ 45.  The SAC states that Trooper Walker had a duty to refrain from willful and

wanton conduct in the exercise of his duties.  (SAC at ¶ 42.)  He allegedly initiated the car chase

and continued to drive an ISP vehicle at high speeds through a residential neighborhood, did not

use alternative means to stop the golden sedan, and broadcasted that the golden sedan was

carrying armed robbers.  (*Id*. at ¶ 43.)  Plaintiffs further allege that Trooper Walker engaged in

these acts "in gross disregard and indifference for the consequences," and that these acts were a

direct and proximate cause of their injuries.  (*Id*. at ¶ 44.)

Accepting the SAC allegations as true and drawing all inferences in Plaintiffs' favor, in

pleading the aggravated negligence tort, Plaintiffs have pled actions by Walker beyond his

authority.  Plaintiffs allege that Walker was acting without authority and thus his actions do not

qualify as state conduct.  *Leetaru*, 32 N.E.3d at 596.  Plaintiffs have stated "a claim to relief that

is plausible on its face," *Iqbal*, 556 U.S. at 678, and in enough factual detail for the Court to find

that Trooper Walker is not protected by state sovereign immunity.  As such, the Court denies

Defendants' motion to dismiss Count VI.

### 2.      ISP Director Schmitz

To the extent Plaintiffs are suing Director Schmitz in his official capacity, the Court

dismisses the claim with prejudice.  *See Will*, 491 U.S. at 71 ("[A] suit against a state official in

his or her official capacity is not a suit against the official but rather is a suit against the official's

---

[4] In their response brief, Plaintiffs only argue that Defendants acted beyond the scope of their authority.  The Court likewise limits its discussion and does not address constitutional or statutory law violations.

office."); *Nelson*, 570 F.3d at 885 ("Illinois courts treat suits against a public employee in his [or her] official capacity as suits against the state."). With regard to an individual capacity claim against Director Schmitz, Plaintiffs have failed to state a claim. The SAC alleges that Director Schmitz had a duty to refrain from willful and wanton conduct in the exercise of his duties. (SAC at ¶ 38.) Plaintiffs allege that Director Schmitz breached this duty by failing to instruct or order Trooper Walker not to initiate or to discontinue the high-speed pursuit of the golden sedan, failing to instruct or order Trooper Walker to use alternative methods to apprehend the vehicle, and publishing a false crash report, among other acts or omissions. (*Id*. at ¶ 39.) These allegations, however, fail to plausibly allege that Director Schmitz acted beyond the scope of his authority through wrongful acts, the first *Murphy* factor. The SAC's does not even allege that Director Schmitz was aware of the vehicle pursuit or reviewed the police report. Further, Plaintiffs' claims against Director Schmitz are all based on Trooper Walker's actions: ISP and the director acted "by and through their duly authorized officers, agents, representatives and employees, especially Trooper Walker." (*Id*. at ¶ 38, 39.) Plaintiffs do not make any factual allegation in support of their claims against Director Schmitz specifically. Accepting the allegations in the SAC as true and drawing all inferences in Plaintiffs' favor, Plaintiffs have not alleged a plausible claim against Director Schmitz in his individual capacity. For these reasons, the Court grants the ISP Defendants' motion to dismiss Count V without prejudice.

### D. Excessive Force

In Count VII, Plaintiffs allege a Fourth Amendment excessive force claim against ISP Trooper Walker in his individual capacity. *See* 42 U.S.C. § 1983. In their motion to dismiss, the ISP Defendants argue that Plaintiffs have failed to state a plausible claim under the federal pleading standards because Trooper Walker did not use any force—excessive or otherwise—in

relation to the collision between CPD Officer Ewing's vehicle and the gold sedan in which

Plaintiffs were passengers. In particular, the ISP Defendants assert that Trooper Walker's

conduct did not amount to a seizure to support an excessive force claim, because a seizure is "a

governmental termination of freedom of movement through means intentionally applied."

*Brower, v. County of Inyo*, 489 U.S. 593, 596-97 (1989); *United States v. Mendenhall*, 446 U.S.

554, 553 (1980) ("a person is 'seized' only when, by means of physical force or a show of

authority, his freedom of movement is restrained.").

Indeed, Plaintiffs do not plausibly allege that ISP Trooper Walker's conduct contributed

to the July 1, 2016, vehicle collision or that he used excessive force. Plaintiffs, for example, do

not allege that Trooper Walker lured Plaintiffs' vehicle into the crash or made any sort of

maneuver in his vehicle to cause a crash or enable CPD Officer Ewing to drive into their vehicle.

*See, e.g.*, *Mays v. City of E. St. Louis, Ill.*, 123 F.3d 999, 1000 (7th Cir. 1997). Plaintiffs' factual

details fall short of alleging a seizure to support Plaintiffs' excessive force claim. While

Plaintiffs are entitled to all reasonable inferences in their favor, their allegations do not "present a

story that holds together." *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010); *see*

*Catinella v. Cty. of Cook, Ill.*, 881 F.3d 514, 516 (7th Cir. 2018). Accordingly, the Court

dismisses Plaintiffs' excessive force claim against ISP Trooper Walker in Count VII without

prejudice. Because the Court is granting Plaintiffs leave to re-allege this claim, the Court does

not address Defendants' argument that Trooper Walker is entitled to qualified immunity at this

time.

E.     *Monell* **Claim**

In Count XII, Plaintiffs allege a *Monell* claim against ISP. In addition to ISP's Eleventh

Amendment immunity, it is well-established that *Monell* applies only to municipalities, not

states.  *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 70 (1989) ("States are protected by the Eleventh Amendment while municipalities are not…and we consequently limited our holding in *Monell* to local government units which are not considered part of the State for Eleventh Amendment purposes."); *Joseph v. Bd. of Regents of Univ. of Wis. Sys.*, 432 F.3d 746, 748–49 (7th Cir. 2005) ("The Court has been clear, however, that *Monell*'s holding applies only to municipalities and not states or states' departments.").   Because ISP is an arm of the state and not of a municipality, Plaintiffs' *Monell* claim against ISP fails.  Accordingly, the Court grants Defendants' motion to dismiss in this respect and dismisses this claim with prejudice.

## CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part Defendants' motions to dismiss.


**Dated:** April 13, 2018                                       **ENTERED:**

                                                                _____
                                                                **AMY J. ST. EVE**
                                                                **United States District Court Judge**