| | |
|---|---|
| IN THE UNITED STATES DISTRICT COURT | |
| FOR THE NORTHERN DISTRICT OF ILLINOIS | |
| EASTERN DIVISION | |

1
2

ISIAH STEVENSON and                )
3   MICHAEL COKES,                      )
                                     )   Docket No. 17 C 4839
4               Plaintiffs,           )
                                     )   Chicago, Illinois
5      v.                            )   August 4, 2022
                                     )   10:06 a.m.
6   CITY OF CHICAGO, an Illinois      )
    municipal corporation, and       )
7   Chicago Police Officer DEAN W.    )
    EWING, Star #8653,                )
8   individually,                     )
                                     )
9               Defendants.           )
    _____
10  JUANITA ARRINGTON, as             )
    Independent Administrator of     )
11  the Estate of RONALD ARRINGTON,   )
    deceased,                         )
12                                    )   Docket No. 17 C 5345
                Plaintiff,            )
13                                    )
       v.                            )
14                                    )
    CITY OF CHICAGO, an Illinois      )
15  municipal corporation, et al.,    )
                                     )
16              Defendants.           )

17          TRANSCRIPT OF PROCEEDINGS - Final Pretrial Conference
               BEFORE THE HONORABLE THOMAS M. DURKIN
18
    APPEARANCES:
19
    For Plaintiffs          MR. PAUL LUKA
20  Stevenson and Cokes:    MR. ROBERT J. TERRACINA
                            Mendoza Law, P.C.
21                          120 South State Street, Suite 400
                            Chicago, Illinois  60603
22
                            ELIA E. CARRIÓN
23                        Official Court Reporter
                       United States District Court
24              219 South Dearborn Street, Room 1432,
                       Chicago, Illinois 60604
25                          (312) 408-7782
                     Elia_Carrion@ilnd.uscourts.gov

1    APPEARANCES (Continued:)

2    For Plaintiff          MR. JAMES D. MONTGOMERY
     Arrington:             James D. Montgomery & Associates, Ltd.
3                           33 West Monroe Street, Suite 1375
                            Chicago, Illinois  60603
4

5    For Defendant          MS. MARION MOORE
     City of Chicago:       City of Chicago Department of Law
6                           Federal Civil Rights Litigation Division
                            2 North LaSalle Street, Suite 420
7                           Chicago, Illinois  60602

8
     For Defendant          MR. ANDY M. HALE
9    Ewing:                 MR. SHAWN W. BARNETT
                            MS. BARRETT BOUDREAUX
10                          Hale & Monico, LLC
                            53 West Jackson Boulevard, Suite 337
11                          Chicago, Illinois  60604

12
     Also Present:          MS. HANNAH BESWICK-HALE
13                          (Hale & Monico, LLC, Law Clerk)

14

15

16

17

18

19

20

21

22

23

24

25

1    (Proceedings heard in open court.)

2    THE CLERK:  This is Case No. 17 CV 4839, Stevenson v.

3    City of Chicago, and 17 CV 5345, Arrington v. City of Chicago.

4    Could I please ask that counsel present on behalf of

5    Plaintiffs Stevenson and Cokes state their names.

6    MR. LUKA:  Good morning, Judge.  Paul Luka for the

7    Plaintiffs Stevenson and Cokes.

8    MR. TERRACINA:  Good morning, Your Honor.

9    Robert Terracina for the Plaintiffs Stevenson and Cokes.

10    THE CLERK:  And on behalf of Plaintiff Arrington.

11    MR. MONTGOMERY:  Good morning, Your Honor.

12    James Montgomery, Junior, on behalf of Plaintiff Arrington.

13    THE CLERK:  And on behalf of the City of Chicago.

14    MS. BOUDREAUX:  Good morning.  Barrett Boudreaux on

15    behalf of Defendant Dean Ewing.

16    MR. BARNETT:  Good morning.  Shawn Barnett on behalf

17    of Defendant Ewing.

18    MS. MOORE:  Good morning.  Marion Moore on behalf of

19    the City of Chicago.

20    MR. HALE:  Good morning.  Andy Hale on behalf of

21    Defendant Ewing; and then we also have our law clerk, my

22    daughter, Hannah Beswick-Hale, with us, too.

23    THE COURT:  All right.  Welcome.  Good morning.

24    Okay.  Let's go off the record for a minute.

25    (Off-the-record discussion.)

1      THE COURT:  Let's go back on the record.

2      I had denied the plaintiffs' bifurcation motions in a

3 minute order dated July 12th and said I'd give a more thorough

4 oral ruling at the final pretrial conference.

5      Plaintiffs originally sought bifurcation of the

6 liability and damages phases of the trial, with separate

7 juries empaneled for both.  In the alternative, they proposed

8 bifurcating the two cases -- Arrington on the one hand,

9 Stevenson and Cokes on the other -- for trial.

10     Plaintiffs' primary concern was that evidence they

11 consider relevant only to collateral matters or damages will

12 unfairly prejudice their liability cases, or vice versa.

13     Defendants opposed bifurcation and requested the

14 Court consolidate both matters for trial.  They said

15 bifurcation would prejudice defendants by adding additional

16 costs, forcing Ewing to undergo needless duplicative

17 cross-examination, and create a risk of inconsistent verdicts.

18 They also argued that consolidation, not bifurcation, would

19 promote judicial economy.

20     Bifurcation is the exception, not the rule.  That's

21 *Trading Technologies International, Inc., v. eSpeed, Inc.*,

22 431 F.Supp.2d 834, page 836 (Northern District 2006).

23     Bifurcation is rarely warranted in a case such as

24 this one where all the claims stem from the same incident,

25 involve a common set of facts, and essentially involve the

1    same parties.  Considerations of judicial economy strongly

2    favor simultaneous resolution of all claims growing out of one

3    event.  That's *Ikerd v. Lapworth*, 435 F.2d 197, 204

4    (7th Cir. 1970).

5         Much of the allegedly prejudicial evidence plaintiffs

6    identify is simply unfavorable to their case.  That's not a

7    reason to shield the jury from that evidence or alter the

8    structure of the trial.  Genuinely inadmissible evidence may

9    be excluded for other reasons.

10         Concerns that the jury may consider evidence for

11   improper purposes are routinely mitigated through the use of

12   limiting instructions, motions *in limine*, and rulings under

13   the Rules of Evidence -- Federal Rules of Evidence.  *Rodriguez*

14   *v. City of Chicago,* 429 F.Supp.3d 537, 543 (Northern District

15   2019).

16         The Court and the parties are capable of crafting

17   appropriate instructions, and juries are presumed to follow

18   instructions issued to them.  *United States v. Linwood*,

19   142 F.3d 418, 426, (7th Cir. 1998).

20         So that's the ruling -- the oral ruling on the

21   bifurcation motion.

22         Okay.  My typical practice --

23         Let's go off the record again.

24      (Off-the-record discussion.)

25         THE COURT:  Let's go on the record.

1    We had earlier ruled that certain documents that --
2    or witnesses who were disclosed through Tinley Park, which is
3    now no longer in the case, was effectively notice also to
4    the -- notice to the two sets of plaintiffs.
5    There were two names that are the subject of
6    Plaintiff Arrington's motion for partial reconsideration, of
7    Minute Order 277, and those are Regina Decarlo and John Gross.
8    The Defendant City has represented that those names were
9    disclosed in the context of witness statements to plaintiffs.
10   They weren't turned over to one plaintiff and not the other,
11   but disclosed to both plaintiffs.
12   Have I correctly stated the record?
13   MR. BARNETT:  Yes, Your Honor.
14   THE COURT:  Correct, from plaintiffs' side?
15   MR. MONTGOMERY:  Yes, with the -- I'd like to make an
16   addition, if I might.
17   THE COURT:  Go ahead.
18   MR. MONTGOMERY:  Both sides in this case have agreed
19   to and have asserted motions *in limine* as to undisclosed
20   witnesses, and so I just want to make that clear to the Court
21   as well.
22   THE COURT:  Well, these were disclosed in the sense
23   they were listed on the list of witnesses in the pretrial
24   order.  Correct?
25   MR. BARNETT:  Yes, Your Honor.

1    THE COURT:  All right.  Mr. Montgomery, would you

2  have taken these depositions if you had had further notice of

3  that during the discovery period?

4    MR. MONTGOMERY:  Yes, Your Honor.

5    THE COURT:  All right.  Well, I'm not going to

6  prevent you -- do you have control over these witness on the

7  defense side?

8    MR. BARNETT:  No, Your Honor.  They're both

9  independent civilians.

10    THE COURT:  All right.  And one is -- well, they both

11  worked for -- Regina Decarlo is just a person who was on the

12  street at the time.  Correct?

13    MR. BARNETT:  I believe she was a worker at the

14  Jimmy John's or one of the other restaurants right there.

15    MR. MONTGOMERY:  Subway.

16    THE COURT:  Subway?  Okay.

17    And Gross worked for Arby's?

18    MR. BARNETT:  He worked for a surveillance -- some

19  type of security firm.  I'm not sure which firm, Your Honor.

20    THE COURT:  Have you attempted to interview him?

21    MR. MONTGOMERY:  No, Your Honor.  We literally just

22  got their information last week, and we don't have contact

23  with them.

24    THE COURT:  Well, technically you've had their

25  information for years; but...

1      MR. MONTGOMERY:  Well, I just mean the disclosure.
2  You're right, Your Honor.
3      THE COURT:  Well, if -- Decarlo actually gave a
4  statement?
5      MR. BARNETT:  Her statement is contained in the
6  police report, is the summary of her statement.
7      THE COURT:  All right.  And have you identified where
8  that is on a Bates number to plaintiffs' counsel?
9      MR. BARNETT:  Yes, I identified the range of
10  Bates numbering that includes those disclosures and their
11  statements.
12      THE COURT:  And how about Gross?  Is there a
13  statement related to his pulling of the surveillance photos at
14  Arby's?
15      MR. BARNETT:  There is a police report that documents
16  the interaction that the Tinley Park officer had with him and
17  the recovery of the surveillance video.
18      THE COURT:  And you gave those Bates numbers to
19  plaintiffs' counsel?
20      MR. BARNETT:  I did, Your Honor.
21      THE COURT:  All right.  Well, I'm not sure -- we have
22  a lot of ground to cover on whether all of that is relevant
23  anyway.  But if it is relevant, these -- the events that led
24  up to the crash that started this whole chain of events, I
25  think there's been enough disclosure.  I can't compel them to

1 be deposed this early, but if there is contact information,

2 you're free to contact them. I may, if I feel it's necessary

3 to give you a -- have you interviewed them?

4 MR. BARNETT: I've spoken with them over the phone,

5 Your Honor.

6 THE COURT: Spoken with what?

7 MR. BARNETT: I've spoken with them over the phone;

8 yes, Your Honor.

9 THE COURT: All right. Any indication they'd speak

10 to plaintiffs' counsel?

11 MR. BARNETT: I told them they can -- per the rules,

12 they can speak with whoever calls them. They don't have to,

13 but they can. It's their choice.

14 THE COURT: All right. But they spoke to you?

15 MR. BARNETT: They did.

16 THE COURT: All right. I may compel them just

17 through -- not an order, but just saying the judge wants you

18 to talk to the plaintiffs' counsel, too. Just tell them the

19 truth, but they have a right to talk to you, too.

20 So why don't you tell them that.

21 MR. BARNETT: Yes, Your Honor. I will call them and

22 let them know that they might be receiving a call from the

23 plaintiffs' counsel.

24 THE COURT: And the judge is asking that they talk to

25 plaintiffs' counsel; do nothing more than tell the truth. And

1    we go from there.

2              MR. BARNETT:  Yes, Your Honor.

3              THE COURT:  The plaintiffs' counsel was not on your

4    call when you talked to them?

5              MR. BARNETT:  I'm sorry?

6              THE COURT:  Plaintiffs' counsel was not on the call

7    when you talked to them.  Correct?

8              MR. BARNETT:  No, they were not.

9              THE COURT:  All right.  Then, you know, plaintiffs'

10   counsel doesn't have to talk to them with you on the call

11   unless the witnesses insist.

12             MR. BARNETT:  Yes.

13             THE COURT:  If they say I'll talk to them as long as

14   you, defense counsel, is on the phone, they have that right.

15   But I'm going to try and minimize any claim of unfairness on

16   this and let you talk to them and have you encourage them to

17   do it.  If they still refuse, let me know.  I may talk to

18   them.

19             MR. BARNETT:  Yes, Your Honor.

20             THE COURT:  Okay.  And encourage them.

21             MR. BARNETT:  I will, Your Honor.

22             THE COURT:  Very good.

23             Okay.  So that's the ruling on the motion to

24   reconsider; it's denied.  I'm not going to bar them, but I

25   think I've ameliorated some of the prejudice that may have

1  come from the -- some confusion over disclosures made by

2  various parties that are no longer in the case and the fact

3  that we have two sets of plaintiffs.

4       Okay.  I'd like to go through right now the -- well,

5  I'm going to jump around a little bit.

6       On motions *in limine*, my view has always been

7  consistently in the years I've been a judge -- which hasn't

8  been that long, but long enough where I'm comfortable with the

9  practice -- if a person is testifying and they have a

10  conviction or a conviction that is ten years or less from the

11  time they testify and it's either a conviction or when they

12  get out of jail is ten years or less, under almost all

13  circumstances, I allow that witness to be cross-examined with

14  that conviction as long as it's a felony.  And I instruct the

15  jury that it's only to be used for purposes of evaluating the

16  credibility of the witness, not for any other purpose.

17       But that is the pretty standard practice as far as

18  I'm concerned with me -- and with most judges, I believe.  And

19  it follows Rule 608 -- 609, rather:  Misdemeanors that deal

20  with matters of honesty -- I have the exact language here --

21  if they involve a dishonest act or false statement or not

22  quite as clear-cut, and I'll -- we'll deal with that as we get

23  to each one of them; you can explain it.

24       But as a general rule, you should know if it's a

25  felony where they've been convicted or got out of jail within

1    ten years of when they testify, it generally comes in.  If

2    it's over ten years, it generally stays out.  And that's --

3    deals with a number of the different motions *in limine*.

4         And I'll give an appropriate limiting instruction.

5    Even at the time the witness is cross-examined, if it turns

6    out -- I think this applies to a couple of the plaintiffs if

7    it turns out that they are cross-examined.

8         You may want to bring it up on direct if you know

9    it's coming in, take out the sting; but if you wait -- if you

10   want a limiting instruction right after that is brought out,

11   say ladies and gentlemen, that has nothing to do with the

12   facts of the case, but it does have to do with the credibility

13   you attach to this witness.

14        I may phrase it more eloquently, but it'll be a -- an

15   instruction that makes it clear that it doesn't go to anything

16   other than the credibility they decide to give to that

17   witness.

18        All right.  Let's go off the record for a minute.

19        (Off-the-record discussion.)

20        (A recess was had from 11:55 a.m. to 12:05 p.m.)

21        THE COURT:  I want to make one correction to a ruling

22   I made earlier about the number of peremptories.  I've heard

23   enough this morning where it's clear to me that the separate

24   plaintiffs really are separate parties, if not on liability

25   issues, certainly on damage issues.  There's different damages

1   each are seeking, different methods of -- well, different

2   types of damages each are seeking.  So I'm going to give three

3   peremptories to each plaintiff -- each set of plaintiffs:

4   three to Arrington, three to Stevenson/Cokes.  18 U.S.C. 1870

5   allows that.

6           I don't view the City as a separate entity in this

7   case.  They really are nominal.  I'm not even sure they're

8   going to remain in the case for purposes of -- for any

9   purpose, at least in front of the jury.  We'll get to that,

10  but I don't view the City as a separate entity in the same way

11  I view the plaintiffs.

12          So three each for the plaintiffs, three for the

13  defendants; that equals nine.  And with ten jurors, we need

14  19 eligible jurors who have not been challenged for cause and

15  are not COVID-positive.

16          And if it turns out that we are not going to be able

17  to pick a jury because you exercise all six of yours on the

18  plaintiffs' side and defense exercises all three, we may have

19  to consider less than ten jurors, which is a risk.  And if it

20  means we can't proceed with -- we have to proceed with less

21  than eight, then we may want to rethink -- I may have to

22  rethink your -- your full allotment of three each.

23          I think everyone wants to try this case and move

24  forward with it.  And so the three is -- each is conditional

25  on our being able to seat a jury if you exercise all of yours

1   and defense exercises all of theirs.

2          Okay.  Secondly, on this joint enterprise issue, we

3   did receive a motion for judgment as a matter of law filed by

4   the plaintiffs to -- where there is no -- to find that there's

5   no joint enterprise.  Both legally and factually, that type of

6   finding doesn't apply to arguably criminal conduct and that

7   factually there's nothing to support it.

8          I would benefit from a written response by the

9   defendants.  A lot of -- not a lot, but there's been some

10  ambiguity or possibly, you know,

11  we-will-let-you-know-at-the-appropriate-time type of argument

12  about some of your -- why you believe there's a joint

13  enterprise.

14         Now, now is the time to put up -- put it up.  And I'm

15  not saying put up and shut up, but put it up in a legal filing

16  so I can fairly evaluate this.

17         No reasonable person could believe that the evidence,

18  if there is evidence of joint enterprise that I allow in,

19  isn't prejudicial to the plaintiffs.  It may be that can't be

20  avoided.  And I do agree with the plaintiffs that if I allow

21  this in, conditioned on proving up a joint enterprise, and

22  then if I find there isn't as a matter of law, tell the jury

23  to disregard it, that's going to be a difficult thing for the

24  jury to do.  Not impossible, but difficult.

25         And I think -- I want to be sure if I allow this

1   evidence in that I believe there is a good faith proffered

2   basis based on facts to allow it.  And I don't have enough of

3   a feel for this case.  I'm learning some things right now, for

4   instance, about this -- you know, the car supposedly,

5   you know, being parked in one area, somehow a person -- I

6   had -- didn't realize it was a person who was carrying $1,300

7   in cash for a bank delivery and that there was a -- how you

8   described what this witness Decarlo was going to say.  Those

9   are facts I wasn't aware of.

10      Apparently, the plaintiffs weren't either, but they

11  certainly are things that I need to have fleshed out to make

12  an intelligent ruling, given the prejudicial nature of this

13  evidence if it comes in.  So I'm going to want a written

14  ruling -- written response from the defendants to the motion

15  filed by the plaintiffs for judgment as a matter of law on

16  this issue.

17      You can tell me sometime today how much time you need

18  to do it.  I don't want it, you know, Tuesday morning.  That

19  won't do me any good.  And I think the sooner you provide it,

20  the sooner I can evaluate it, give you a ruling, and you can

21  all plan how you're going to try your case accordingly.

22      Okay.  Any questions on those two issues while we're

23  on the record?  First, from plaintiffs.

24      MR. MONTGOMERY:  No questions from Arrington,

25  Your Honor.

1        MR. TERRACINA:  None at this time for Stevenson and
2    Cokes.
3        THE COURT:  And defendants?
4        MR. BARNETT:  No, Your Honor.
5        MS. BOUDREAUX:  No, Your Honor.
6        THE COURT:  Okay.  Thank you.
7        All right.  Back off the record.
8      (Off-the-record discussion.)
9        THE COURT:  Let's go back on the record.
10        There is a motion *in limine* to exclude the testimony
11   of a John Gross, who was going to lay a foundation for a
12   surveillance camera that picked up a parking lot of -- the
13   view from the parking lot of a Taco Bell.  And I just viewed
14   the video, heard arguments from counsel.  Plaintiffs believe
15   that Mr. Gross can lay a proper foundation; defendants have
16   objected to it because there are gaps in it which --
17        MR. BARNETT:  I apologize, Your Honor.
18        THE COURT:  I'm sorry.  Defendants believe that Gross
19   can lay the foundation for it.  Plaintiffs object to it
20   because there's gaps in it.  There's also a -- because of the
21   gaps, there's a portion of the tape that shows the gold
22   Pontiac speeding away quickly, which they think is misleading.
23        In the end, provided Gross can lay a proper
24   foundation, I'm going to allow the video in.  If I allow it in
25   on relevance on the joint enterprise issue -- which I haven't

1   decided -- but if I do allow the joint enterprise evidence to

2   come in, this tape is not so misleading that it is

3   inadmissible.  Any challenges to the choppiness of the

4   video -- which, by the way, is very clear, I'll note -- but

5   the choppiness of it with gaps in time, if Gross can explain

6   it and it's not based on any manipulation or human

7   intervention meant to remove certain parts of it that was done

8   intentionally, then I'll allow it in.

9           He's going to have to lay a foundation before the

10  jury can hear it.  If the cross-examination relating to that

11  foundation indicates a gap that makes it unreliable, then I'll

12  exclude it.  But as I saw it right now, if he has an adequate

13  explanation for it, I don't think the -- what is portrayed is

14  so misleading that it can't be the subject of

15  cross-examination.  So that motion *in limine* is denied subject

16  to foundation being raised by Gross.

17          Okay.  Off the record again.

18      (Off-the-record discussion.)

19          THE COURT:  Let's go back on the record.

20          The original -- I'm going through the various

21  witnesses that each side is intending to call, and some of

22  them relate to motions *in limine* that have been filed.

23          Tinley Park Officer Stan Tencza is going to be called

24  by the defendants to lay the foundation for a videotaped

25  statement made by Plaintiff Stevenson after he was arrested.

1    Correct.

2              MR. BARNETT:  Yes, Your Honor.

3              THE COURT:  All right.  And are you going to play

4    that in -- do you intend to play that in full or parts of it?

5              MR. BARNETT:  In all likelihood, it would be portions

6    of it, Your Honor.

7              THE COURT:  How long is it?

8              MR. BARNETT:  The entire audio -- the entire video

9    recording of Mr. Stevenson is approximately 25, 30 minutes

10   long.

11             MR. TERRACINA:  It's roughly 33 minutes long.

12             THE COURT:  Okay.  And if I allow it in and you're

13   playing parts of it, consult with plaintiffs' counsel to make

14   sure what you picked is not selective and that they have a

15   right to make sure that a complete statement to put anything

16   you want to put in is added in context.  So make sure you

17   consult with them about what you're going play.

18             You're going to have a transcript for it?

19             MR. BARNETT:  We can have one created.

20             THE COURT:  You don't have to, but I don't know the

21   quality and fidelity of the video.  Many times, people have

22   transcripts.  But if it's clearly audible, you're not required

23   to put a transcript in.  I just was asking, more than anything

24   else.

25             MR. BARNETT:  I do believe that it's clearly audible,

1    or at least most of it is.

2         THE COURT:  Okay.  Now, what's the objection to

3    Tencza putting in -- being a witness and putting in the

4    statement of Stevenson?

5         MR. MONTGOMERY:  We both have objections.

6         THE COURT:  Go ahead.  I'll hear from Stevenson

7    first.  Then I'll hear from Arrington.

8         MR. TERRACINA:  So in Will County, before a grand

9    jury, Detective Tencza provided the statement that there was a

10   plan to share proceeds as between the occupants of the

11   vehicle.

12        Upon attorney for Stevenson at that point in time

13   receiving the actual interrogation footage and finding out

14   that that statement was never actually made, a motion to quash

15   the indictment was filed.  At that point in time, Will County

16   State's Attorney Christopher Koch withdrew the robbery charges

17   and, instead, created a plea agreement that allowed the

18   plaintiffs to accept an agreement for a Class A misdemeanor

19   theft for the knowing receipt of property of Janice Farrell

20   after the fact.

21        And so it is our concern that Detective Tencza, given

22   his prior fraud upon the Court, would potentially repeat such

23   statements and would put the -- or put the plaintiffs into a

24   position where to cure it we would have to prejudice

25   ourselves.

1          THE COURT:  Let's stop right there.

2          Are you going to -- is Tencza going to do anything

3    other than lay a foundation for the statement made by

4    Stevenson?

5          MR. BARNETT:  If -- if he would be offered for

6    anything, it would have nothing to do with the actual

7    grand jury proceeding.

8          THE COURT:  He's not going to repeat the fact it was

9    an armed robbery.  Correct?

10         MR. BARNETT:  No, Your Honor.  I'm not sure --

11         THE COURT:  Or repeat the allegation was an armed

12   robbery.  I guess it's not a fact.

13         MR. BARNETT:  Well, I think the -- I think their

14   concern is -- the plaintiffs' concern is that he may have

15   misrepresented something to the grand jury.  I think that's

16   absolutely irrelevant.

17         THE COURT:  Well, if he -- one, if -- there's no

18   judicial determination that there was a false statement made

19   to the grand jury.  Correct?

20         I saw the motion to dismiss, but there's no judicial

21   determination on it.

22         MR. TERRACINA:  I believe that the charges were

23   withdrawn before the judge was able to rule on it.

24         THE COURT:  All right.  Then -- understandably.  I

25   kind of follow the time period on that.

1          What is your concern?  You want to cross him on what
2     you believe was a false statement made to the grand jury?
3          MR. TERRACINA:  We believe that he potentially acts
4     as a Trojan horse to be able to include elements of joint
5     enterprise that are unsupported by the actual doctrine of
6     joint enterprise; that he creates the room for the jury to
7     believe that a robbery occurred when it, in fact, never did.
8          THE COURT:  Well, let me stop you.
9          MR. TERRACINA:  Insofar as Stevenson and Cokes are
10    concerned.
11         THE COURT:  All right.  I -- if he's laying a
12    foundation for a videotaped statement of the plaintiff and
13    that's it, so be it.  If you raise the issue of crossing him
14    on the fact that he made a false statement to the grand jury,
15    apparently, or your allegation is he made a false statement to
16    the grand jury that it was an armed robbery and -- what, that
17    was supposedly based on Stevenson's statement and it's not
18    contained in the statement?
19         MR. TERRACINA:  Your Honor, what he stated is that
20    there was a conspiracy to commit robbery, that there was an
21    agreement as between the members.
22         MR. MONTGOMERY:  To share proceeds.
23         THE COURT:  I see.  Is he going to testify to that?
24         MR. BARNETT:  I was not anticipating having him
25    testify to that, Your Honor.

1    THE COURT:  Well, there's your answer.  I'm not going
2    to bar him to lay a foundation for a videotape.

3            Is there more, Mr. Montgomery?

4            MR. MONTGOMERY:  Just on that point -- I've got
5    others; but on that point, he shouldn't testify that these
6    guys were, based on this tape, involved in a robbery either
7    'cause there was no judicial determination of that.

8            THE COURT:  Well, was he going to be testifying about
9    anything other than laying a foundation for a videotape
10   statement?

11           MR. BARNETT:  No, Your Honor, not that -- that was
12   not our intent.  Our intent was to have him lay foundation for
13   the audio -- for the video-recorded statement.  And if the
14   convictions are admissible, those are -- you can take judicial
15   knowledge of those.  We weren't going to have a witness come
16   in and testify as to the facts underlying the theft
17   convictions.

18           THE COURT:  Okay.  Well, it sounds like, at least as
19   far as Stevenson and Cokes are concerned, your fears are
20   unfounded.  He's just laying a foundation.  He's not going to
21   try and slip in anything about a conspiracy or anything beyond
22   a foundation, a simple foundation for a tape-recorded
23   conversation.

24           You may even stipulate to the foundation, and it may
25   be unnecessary to call him.  With counsel just explaining this

1   is a statement Stevenson made after he was arrested, you may

2   not even need him as a witness.  But that's -- again, I can't

3   force stipulations, but you may consider that if that's the

4   only purpose he's being called.

5           Mr. Montgomery, what was your objection?

6           MR. MONTGOMERY:  My objection, obviously he's not a

7   party in my case.

8           THE COURT:  Right.

9           MR. MONTGOMERY:  And so I would ask the Court, if

10  this evidence is allowed, for a limiting instruction with

11  respect to my case.  That's the first thing.

12          THE COURT:  Does he say anything in his statement

13  about Arrington?

14          MR. MONTGOMERY:  Well, so this is only relevant,

15  obviously, if joint enterprise comes in.  And even if he

16  doesn't say -- he does say things about Arrington.  He says

17  actually things like he didn't know Arrington.  He didn't even

18  know him by his name, didn't even know his name; met him, you

19  know, just a few months before.

20          But the harm -- the threat of harm is if this comes

21  in as, you know, a fact, it could be attributed to all

22  plaintiffs, whatever he says.  Now, the -- I anticipate what

23  the defense want to bring in is that Stevenson said that

24  Stevenson knew Jimmy Malone as a getaway driver.  And the

25  defendants made that fact claim in the motions for summary

1  judgment.  And even there when the Court read it, the Court
2  was of the impression that it could be attributed to all three
3  of them.

4         And so I -- I just think that is terrible harm to
5  Arrington and Cokes to -- for a statement like that to come in
6  and then spread to all.

7         I have one final, which I think is the most germane
8  of all my objections, and that is this is effectively
9  testimony that could -- that -- of events that occurred in the
10 presence of someone, a party who is deceased, and falls
11 squarely under the Dead Man's Act, everything that's stated on
12 this tape.

13        And while I know counsel in their response to our
14 motion said when there are State and Federal claims, federal
15 rules decisions apply, that is only with respect to the
16 testimony that applies to federal claims.  This applies
17 only -- only to the state affirmative defense.

18              MR. BARNETT:  Your Honor, if I may respond?
19              THE COURT:  Go ahead.
20              COURT REPORTER:  Can you speak directly into the mic?
21              MR. BARNETT:  Yes.

22        The case law is black letter.  When you have a set of
23 facts and it goes to both Federal and State claims, the
24 Federal Rules of Evidence apply.  The Dead Man's Act does not
25 apply in this proceeding because they have brought a Fourth

1   Amendment claim, including the allegations that -- you know,
2   all of the facts are so intertwined, you can't separate them.
3   So under binding case law, the Dead Man's Act does not apply.
4           THE COURT:  I'm not going to rule on that today.  I
5   read your briefs.  I haven't read all the cases, so I'm not
6   going to rule on that.  But you'll get a ruling on that
7   sometime early next week.
8           MR. MONTGOMERY:  That's a misstatement of the cases
9   that they provided, Your Honor.  I just --
10          THE COURT:  Well, that's -- and fair enough.  You
11  both provided me with case law.  I'll read it, and I'll make a
12  my ruling on it.
13          MR. MONTGOMERY:  I just haven't had a chance -- I
14  didn't have a chance in writing to reply to theirs because
15  theirs was in response and you didn't want replies.
16          THE COURT:  I'll give you a chance to reply to the
17  Dead Man's Act issue.
18          MR. MONTGOMERY:  Thank you.
19          THE COURT:  So we'll talk -- that's number two on our
20  list of additional briefs we're getting in; short ones, but
21  I'll give you a chance to respond to that because there was a
22  lot of law raised by both sides on that.  And that's fair.
23          I can give a limiting instruction if you believe that
24  the statement of Stevenson is unfair as it applies to
25  Arrington.  Now, I don't know the law on -- as I sit here --

1  on whether or not it's a -- if I find joint enterprise, this

2  will be admissible as a co-conspirator statement.  Typically,

3  those are not usually postarrest statements.

4         I can give a limiting instruction, but this is not a

5  criminal case where we have a *Bruton* issue.  Stevenson's going

6  to be on the stand.  You can cross-examine him about the

7  statement if you want to.  You can ask him, what did you mean

8  by that, what did you mean by that?  He's an available witness

9  to you to cross-examine.

10        Go ahead.

11        MR. TERRACINA:  Your Honor, would you also apply that

12  same limiting statement to Cokes?

13        THE COURT:  Yeah.  Cokes has a similar -- well, Cokes

14  just took the Fifth, apparently.  Right?

15        MR. TERRACINA:  Yes.

16        THE COURT:  No statement at all?

17        MR. TERRACINA:  He did not make a statement.

18        THE COURT:  All right.  Are you moving to bar him

19  taking the -- offering him taking the Fifth?

20        MR. TERRACINA:  I'm just seeking to apply the same

21  limiting instruction that would be applied to Arrington to

22  Mr. Cokes.

23        THE COURT:  Yeah, I think I -- that appears

24  appropriate.

25        Any objection to that by the defendants?

1          MR. BARNETT:  Not to any limiting instruction,

2     Your Honor.

3          THE COURT:  Yeah, I think a limiting instruction that

4     if a person makes a statement, that it --

5          Off the record.

6          (Off-the-record discussion.)

7          THE COURT:  Let's go back on the record.

8          What I've just related to the parties is I will -- if

9     there is no separate admissibility of these admissions against

10    other defendants because of some joint enterprise idea or a

11    co-conspirator statement idea or theory, then there will be an

12    appropriate limiting instruction given at the time of the

13    admission of those statements that they're not attributable

14    and should not be considered as evidence -- as evidence

15    against the other defendants.

16         So Stevenson's statement can't be considered against

17    Cokes and Arrington; Cokes' statement can't be considered

18    against Stevenson and Arrington.

19         And there's no objection to those limiting

20    instructions by the defendants.  Correct?

21         MR. BARNETT:  No, Your Honor.

22         THE COURT:  All right.  And, Mr. Montgomery, you

23    wanted to raise something?

24         MR. MONTGOMERY:  Yeah, just one last thing.

25    Of course, we don't know which pieces of this interview

1    counsel intends to present.

2         THE COURT:   Yeah.  And I think it was on the record,

3    but I told them that they should review the portions they wish

4    to offer with plaintiffs' counsel, with all plaintiffs'

5    counsel, and make sure there's no parts of it if they've

6    removed it -- it's usually solved by putting it all in -- but

7    if they remove part of it, in fairness, if they want the rest

8    of it in the -- you should discuss that with them.  And if you

9    can't reach an agreement, bring it to me and I'll decide it.

10        MR. BARNETT:   Yes, Your Honor.

11        THE COURT:   So we have two -- excuse me -- two things

12   that are due.  One is I need a statement from the defendants

13   as to the motion for a directed finding on joint enterprise,

14   the issue of joint enterprise.  And I need a reply by

15   Mr. Montgomery on the Dead Man's Act issue.

16        And you should suggest the dates you want to provide

17   those to me.  I'll put page limits on it, too.  There's no

18   need at this point to be overly -- overly verbose on these

19   issues, but you should suggest a date for that when we're off

20   the record.

21        Off the record one more time.

22        (Off-the-record discussion.)

23        (A recess was had from 12:40 p.m. to 1:38 p.m.)

24        THE COURT:   Let's go on the record.

25        Start again, please.

1       MR. LUKA:  I was present at the hearing in
2  Will County in the underlying criminal case, and there was
3  discussion had wherein the prosecutor was aggressive
4  initially.  And Mr. Spataro, who represented Isiah Stevenson,
5  asked the judge to view the video.  And he went back and
6  viewed the video; and after he did, he made a comment to the
7  effect of there's a problem here; maybe you should talk
8  amongst yourselves.  And that's how the plea arose.

9       THE COURT:  All right.  Well, there's no judicial
10 finding of perjury by the officer, which would be something
11 that obviously would be cross-examinable.  It doesn't sound
12 like they're going to do anything other than use him to lay a
13 foundation to offer a statement.  So I didn't -- you may have
14 even have a stipulation to it, but I...

15      MR. LUKA:  I think that's correct.  I was speaking to
16 Your Honor's point about the facts in the record.

17      THE COURT:  Fair enough.

18      MR. LUKA:  And -- and why that was the case.

19      THE COURT:  Okay.  Very good.

20      All right.  Let's go through the motions *in limine*.
21 Let's do plaintiffs' omnibus motions *in limine*, which is
22 Document 351.  And we have a response filed by defendants.

23      Okay.  The motion to bar evidence of gang activity or
24 gang argument about Stevenson and Cokes and Arrington and
25 Malone is agreed to by defendants.  Correct?

1          MS. BOUDREAUX:  Correct.

2          MR. BARNETT:  Yes.

3          THE COURT:  The next one is to admit -- to admit

4    records and findings of COPA regarding Defendant Ewing's

5    disregard for the safety of others.

6          What is the argument -- well, what was the COPA

7    investigation, which would be a good place for me to start?

8    What was investigated?  What was the finding?  What's the

9    status of it?

10          MR. BARNETT:  Your Honor, the COPA investigation --

11    oh, I'm sorry.

12          The COPA investigation was as to whether or not

13    Officer Ewing violated any internal policies, and they did

14    find that he did violate two internal policies.  And the COPA,

15    the Civilian Office of Police Accountability, recommended a

16    90-day suspension.

17          Officer Ewing is grieving that.  It has not been

18    finalized, and it is still going through the administrative

19    process.

20          THE COURT:  All right.  And do you -- is it your

21    intent to try and -- oh, go ahead.

22          MR. MONTGOMERY:  We would describe the full fact

23    investigation differently.  It was a -- it was a -- they did

24    determine that there was a rules violation, but it wasn't --

25    it was an inquiry to determine whether Officer Ewing violated

1    his duties of due regard to the public.

2         THE COURT:  All right.  And what's the basis for

3    admissibility there?

4         MR. TERRACINA:  So the basis of admissibility can be

5    found in 803(8)(A)(iii), which states that the findings of a

6    lawfully ordered investigation -- or a lawfully conducted

7    investigation are permissible to be admitted when those

8    findings actually speak towards factual matters involved, if

9    those factual findings actually also extend to conclusions

10   based off of those factual findings.

11        THE COURT:  Well, 803 deals with admissibility on

12   hearsay issues.  What's the relevance of this?

13        MR. TERRACINA:  So the relevance of this is that the

14   nature of the investigation that was conducted was into the

15   general matter of Ewing's disregard of public safety.  It is

16   the same standard that would be applied to potentially a

17   negligence claim.

18        And in case law that would talk about actual 403

19   admissibility and relevance on this issue, one of the only

20   concerns -- and the only concern actually raised in their

21   response is 407 subsequent remedial measures.

22        Now, the nature of the actual investigation, the

23   underlying investigation into the facts, that's not a

24   subsequent remedial measure.  That's not a measure that would

25   take -- if taken, would have reduced the likelihood of the

1    events.

2           We do agree that the disciplinary acts that were

3    taken as a result of that, the recommendations of

4    radio communications being changed for future incidences --

5           COURT REPORTER:  Can you slow down?

6           THE COURT:  Yeah.

7           MR. TERRACINA:  -- that -- oh, sorry.

8           -- that that would, in fact, constitute a subsequent

9    remedial measure.  However, we contend that the actual

10   investigation is relevant because it's the same basis as our

11   State claims.

12          THE COURT:  All right.  And what's the response?

13          MR. BARNETT:  Your Honor, this is an internal

14   investigation.  And whether or not Officer Ewing violated any

15   internal policies is irrelevant.  It's inadmissible under

16   Rule 403 because it's unfairly prejudicial, it confuses the

17   issue, and it invades the province of the jury.

18          Now, hearsay is one thing.  And their entire argument

19   is based on hearsay.

20          THE COURT:  No, no, this -- he addressed my relevancy

21   argument, not --

22          MR. BARNETT:  Right.  And not only is it a subsequent

23   remedial measure under Rule 407, but it's also unfairly

24   prejudicial.  And in fact, what they're trying to do is --

25   they're trying to bootstrap a determination by COPA and then

1  argue to the jury that, hey, this issue has already been

2  decided on.  That invades the province of the jury.

3          It's up for the jury to weigh the evidence and to

4  make these credibility determinations and not some other

5  entity.

6          THE COURT:  Well, that's your best argument, the one

7  that is most -- in my mind, the most salient one.  The hearsay

8  argument's neither here nor there.  If it's admissible,

9  they'll find a way -- there will be a way found to get it in.

10 And the subsequent remedial measure, certainly the part about

11 changing call signals or something, whatever you had

12 mentioned, you're not even trying to offer that.

13         I am concerned, though -- and I can't believe this is

14 the first time this has come up in a case -- I am concerned

15 about a jury hearing that another deliberative body, of which

16 I don't know the procedures they follow, reaching a conclusion

17 on facts that are very similar to the conclusions they have to

18 reach.

19         And that -- I am -- and I -- frankly, you buried me

20 in motions *in limine.*  And if there's a particular case that

21 is the best case for each side on this issue, I'm happy to

22 examine it further.  But the real part I've had problems with

23 on many internal investigations is that they -- it's very easy

24 for a jury to say, well, COPA, the experts, found that he

25 violated acts; so of course he did.

1        MR. TERRACINA:  Well, Your Honor, on this particular

2   point and in the cases cited by the defendants in their

3   response, I want to point out the fact that in *Herzog*, I

4   believe -- I believe that's the case that they -- the

5   defendants may have mischaracterized, that they're -- oh, I

6   guess -- I'm sorry; let me retract that.

7        It's in *Bulger*.  In *Bulger*, there is dicta/holding.

8   It's kind of in between, which refers to this idea that when a

9   lawful -- or an investigation is conducted pursuant to an

10  external governmental body, that it is intended to sidestep

11  any public policy concerns regarding the admissibility; that

12  when this Chicago City -- or -- yes, municipal -- City Council

13  is asserting ordinances that require particular investigations

14  to be conducted by IPRA/COPA, that that cannot be constituted

15  as a public policy exception to the introduction of such

16  material.

17       And if you would like, I've actually prepared -- we

18  were seeking -- we were going to seek leave to file a reply to

19  the responses.  If you would like, Your Honor, I have that

20  prepared right now.  I can present that to the parties here

21  and now.

22       THE COURT:  Sure.

23       MR. BARNETT:  Your Honor, if I may, just on that

24  point, Bulger is an Illinois case.  As I stated in our

25  response, Illinois cases are immaterial when it comes to

1   admissibility in Federal Court.  And those cases cited says
2   that in -- under Illinois standards, these types of internal
3   investigations and the conclusions are not admissible.

4           And as set forth not only in my response, but also in
5   defendants' motions in limine, specifically Nos. 11, Docket
6   No. 344, No. 11, and No. 14, we affirmatively move to bar the
7   COPA investigation as well, in which we do cite federal cases
8   which do hold that these types of internal investigations are
9   inadmissible under Rules 401 and 403 because they -- they are
10  unfairly prejudicial and they do confuse the issue and that it
11  invades the province of the jury.

12          And, Your Honor, whenever a COPA finding is --
13  whenever COPA makes a finding of the actions of the officers
14  are justified, the plaintiffs are the first ones to jump up
15  and down and move to bar it.

16          MR. TERRACINA:  Well, Your Honor, on that particular
17  point, the cases I believe the defendants are referring to are
18  all justified shootings.  And the fact-by-fact analysis within
19  a justified shooting is just entirely incomparable here.

20          Right now, what we're discussing is largely
21  negligence and willful and wanton.

22          THE COURT:  Well, does either side have a case that
23  deals -- not with the investigation, but a finding?  'Cause at
24  least the -- candidly, I've got to jump into these cases.  But
25  do you have one where an actual finding of inappropriate

1  conduct by an officer has been offered by the plaintiff and
2  allowed in under 403?

3  MR. TERRACINA:  Not exclusively.  But if you were to
4  point your attention to *Bruce v. City of Chicago*, a case that
5  is also cited by the defendants, in that case, Judge Dow, he
6  opens a portion of his -- or dissection of the matter
7  presented to examine this idea of whether or not *Thompson*
8  closes the door definitively to this.

9  In his analysis, he states to the extent that
10 Thompson leaves the door open, it is only slightly ajar, and
11 then refers to the idea that it is permissible in instances
12 where punitive damages are sought.

13 THE COURT:  Okay.

14 MR. BARNETT:  Yeah, but that's -- that's for the
15 general orders, Your Honor.  That's not for the finding of
16 COPA, the deliberative body.

17 THE COURT:  Yeah.  *Thompson* deals with general
18 orders, which I think you often get in to determine whether or
19 not punitives are appropriate -- you being the plaintiffs put
20 that in -- and argue that a person violated some general
21 order.

22 And that's when the instruction is made that this is
23 a case about constitutional deprivation, alleged
24 constitutional deprivation, and that a violation of an order
25 is not the same as violating someone's constitutional rights

1    but is evidence you can consider in determining whether or not
2    a constitutional violation has occurred or whether or not
3    punitive damages ought to be imposed.
4            This is different.  This is a finding by a different
5    body -- which is what I think you're offering -- a finding by
6    a different body that the defendant violated rules of the
7    Chicago Police Department after an investigation and some --
8    presumably some deliberation.
9            That, to me, seems different than just saying -- than
10   an allegation through questioning that a person violated an
11   ordinance or violated some rule.  This actually has a finding
12   attached to it.  And that to me is a critical difference.  And
13   that's why I'm asking --
14           Let's go off the record.
15        (Off-the-record discussion.)
16           THE COURT:  Let's go on the record.
17           MS. MOORE:  And this is especially in regard to the
18   prejudice here.  First of all, as Mr. Barnett mentioned,
19   although this report is -- is final and IPRA -- or COPA issued
20   its decisions, it is still up for review.  It is possible that
21   an arbitrator could overturn it, so we have that whole issue.
22           And then secondly, I think it's critical to point out
23   that IPRA and now COPA doesn't have any evidentiary standards.
24   They're -- they're able to look at pretty much anything.  And
25   they also don't have the same evidence that we are presenting

1    in this case.

2           So, for instance, there's going to be expert
3    testimony here.  That wasn't present -- the IPRA investigators
4    didn't have that accessible to them.  Off the top of my head,
5    I can't think of anything else that is -- might be barred from
6    these jurors hearing that IPRA/COPA took into consideration.

7           So not only is it a different standard in that
8    they're looking to determine whether a general order was
9    violated, but they're looking at different evidence.  And that
10   really adds to the prejudice here.

11          THE COURT:  No, I understand.  That's why I asked the
12   question, because I don't know what standard of proof -- is it
13   a preponderance standard?  Is it clear and convincing?  Is it
14   none of the above?  I don't know what the standard of proof is
15   for COPA.  I don't know whether hearsay is admissible.  I
16   don't know whether -- who the deliberative body is, what the
17   rules of evidence are for them.

18          Those are all issues I'll keep in mind.  It's been
19   raised by -- as an objection by defendants.  And there's an
20   enormous amount of prejudice with a finding by some body that
21   is not a jury, that is not -- there's no collateral estoppel
22   effect or it's not a plea of guilty which is, you know,
23   something judicially accepted with a third-party body if the
24   issues they decide are pretty similar, at least in flavor, to
25   what has to be decided by a jury.

1          MR. TERRACINA:  Your Honor, if I might add, I would

2     state that I don't believe that this can be fairly

3     characterized as a third party, given that the City of Chicago

4     is in fact a defendant and IPRA/COPA is an arm of the City.

5          THE COURT:  Okay.  Well, I meant third party in the

6     sense they're a -- not in the legal sense of who's a party to

7     the case; but they're a different body making the finding, a

8     different adjudicative body making a finding as opposed to a

9     legal adjudicative body like a jury or a judge.

10          And that's -- that was my point.  But I -- your

11    point's taken, and I understand it.

12          Okay.  Off the record.

13      (Off-the-record discussion.)

14          THE COURT:  Back on the record.

15          No. 3 is to bar evidence of pursuit and other facts

16    not known to Ewing.  Well, I think that depends on the joint

17    enterprise ruling.  If I view there was a joint enterprise, I

18    think it all comes in.  It may not come in as to -- well, it

19    comes in on the issue of whether there was a joint enterprise,

20    which deals with whether or not the occupants of the car other

21    than Malone could've been contributorily negligent towards

22    this accident.  If that doesn't come in, really the key issue

23    is what Ewing knew when he was driving.

24          Have I stated the positions of the parties correctly

25    based on my ruling?  Or am I missing something?

1          This is your motion, so I'll hear from plaintiffs.

2          MR. MONTGOMERY:  Well, from the standpoint of the

3   plaintiff, the joint enterprise is completely disconnected

4   from the constitutional claim that is the basis of this

5   motion.  In other words, there's no relationship whatsoever.

6          So even Ewing's role here doesn't relate to joint

7   enterprise at all.  Ewing's role and whether or not he

8   violated the constitution falls only under the federal claim,

9   the 1983 claim.  And so that's what we were trying to separate

10  through the motion and -- and be clear that Ewing could not --

11  the jury should not take into consideration for the

12  constitutional claim any of the facts relating to the State

13  claim.

14         THE COURT:  I see.  That helps clarify your motion.

15  Thank you.

16         Any objection to that by defendants, where if we --

17  this can be cured with limiting instructions and with the

18  final instructions?  But it would appear, if you agree -- if

19  you agree -- that simply we say that what was in Ewing's mind,

20  what he knew, what he was exposed to through radio

21  transmissions and observations he made, goes to whether or not

22  he acted willfully and intentionally to accomplish what they

23  believe was a constitutional violation.

24         MR. BARNETT:  I think there are two issues,

25  Your Honor.

1       One is that obviously the -- the motivation that the
2    officer has and the facts known to his are relevant to the
3    Fourth Amendment, but -- whether or not it was violated.
4    However, I think there's also an issue that, as Your Honor
5    just said, it's -- the pursuit is relevant to joint
6    enterprise.

7       It's also relevant for several other reasons.  One
8    which we cite is the common case.  And the *Whitehead v. Bond*
9    case is that removing these facts, even if Your Honor were to
10   find that joint enterprise does not apply, removing the
11   pursuit just leaves an absolute conceptual void in the
12   entirety of the situation.

13      It would just -- this case does not begin with the
14   Pontiac going northbound on Union and the -- the Ford going
15   eastbound on 124th.  There's a lot of other issues there.

16      First, for example, the plaintiffs are going to say
17   that they, you know, had opportunities to exit the vehicle
18   prior to the chase or that they never chose to.  It's all
19   for -- that's also for impeachment.

20      But this -- this whole thing and the way that the --
21   that the Pontiac was fleeing also goes to the intent aspect of
22   the Fourth Amendment claim.  If Officer Ewing had no idea
23   where that Pontiac was, how could he intentionally ram it?
24   And so it would be relevant for the jury to see here's what's
25   happening in real time; here's what the Pontiac is doing;

1    here's what Officer Ewing is thinking that the Pontiac is

2    doing.  And so that would all be relevant.  And it would just

3    leave such a chronological and conceptual void in the story to

4    just remove the entire pursuit.

5          THE COURT:  Well, sometimes the juries don't hear the

6    whole story because if they heard the whole story, it would be

7    unfairly prejudicial.  That doesn't -- the idea that -- well,

8    I've said what I said.  It doesn't necessarily mean it all

9    comes in just because it completes the story.

10         If it's unfairly prejudicial and there's no

11    evidentiary basis for it other than completing the story, then

12    it often stays out.  And the void exists, but that's the

13    nature of evidence sometimes, where it's arguably relevant to

14    complete the story but overly prejudicial.

15         I agree with plaintiffs that on the constitutional

16    violation, the -- what Ewing was aware of is the relevant

17    piece of evidence.  And even if I let in joint enterprise

18    evidence, the only evidence that the jury should consider as

19    to Ewing's -- as to the Fourth Amendment claim ought to be

20    what was in his mind.

21         I don't understand why the rest of it that he's

22    unaware of would affect whether or not he committed an

23    intentional constitutional tort.  That's the way I see it.

24         And what I'm finding on this is, depending on my

25    ruling, the jury's going to be getting a lot of hopefully not

1  too confusing instructions and limiting instructions.  But
2  they're going to be -- hear certain evidence against some
3  plaintiffs and not others.  They're going to hear certain
4  evidence that goes to certain of the claims and not others.
5  And that's going to be incorporated both in instructions
6  and in limiting -- instructions at the end of the case and
7  limiting instructions when the evidence comes in.  But I agree
8  with the plaintiffs here, I don't know -- I haven't heard
9  anything --

10        MR. BARNETT:  I -- I think we can agree that,
11  you know, if this -- if this evidence comes in, they should be
12  given a jury instruction that they're only to consider what
13  Ewing knew at the time as to the Fourth Amendment claim.

14        THE COURT:  All right.  You're agreeing with
15  plaintiffs?

16        MR. BARNETT:  On that -- on that point, yes,
17  Your Honor.

18        THE COURT:  All right.  And on limiting instructions,
19  I'm going to rely upon the parties.  I'm -- you need to tell
20  me when you think a limiting instruction is appropriate.  You
21  each have your own position on when it's appropriate, and --
22  and I'm -- and also, who has the incentive to offer a limiting
23  instruction.

24        I'm going to be relying on the parties to do that.
25  And if you don't, you waived it.  I'm not going to be policing

1  the trial to say, isn't this where you thought you were going

2  to offer a limiting instruction?  You need to do it, or you

3  waive it.  So keep that in mind on both sides.

4           MR. MONTGOMERY:  Thank you, Your Honor.

5           THE COURT:  All right.  No. 4 is to bar references or

6  admission of the plea agreement of Plaintiffs Michael Cokes

7  and Isiah Stevenson.  These are misdemeanor theft -- they were

8  pleas to misdemeanor theft.  Correct?

9           MR. TERRACINA:  That is correct.

10          THE COURT:  Possession of stolen merchandise.

11          And what's the basis of offering it by the

12  defendants?

13          MR. BARNETT:  Your Honor, for one, that we would --

14  we would argue that it could be considered a crime of

15  dishonesty.

16          But another is that the plaintiffs are going to come

17  up on the stand and deny having any knowledge of the robbery

18  and deny having any proceeds from the robbery on their person.

19          THE COURT:  Do you expect them to so testify?

20          MR. TERRACINA:  Well, with the exception of -- I

21  believe that defendants characterized the testimony that is

22  expected in a slightly mischaracterized fashion.

23          Mr. Cokes will testify that he had recently received

24  money from unemployment.  That will be stated.  The money that

25  was supposed to be part of this plea agreement was in the

1 vehicle.  It was on the corpse of Mr. Malone.  And as a result
2 of that and some of the confusion of what was going on before
3 the judge in Will County, as well as the fact that due to the
4 actions of the defendant which resulted in the death of
5 Mr. Malone and Mr. Arrington, the surviving occupants of the
6 vehicle, Isiah Stevenson and Michael Cokes, were actually
7 facing felony murder charges.

8         And so as a result, just because of -- by the sheer
9 presence of the money on the corpse of Malone, once the --
10 well, once the fraudulent statement by Tencza had come out,
11 once Christopher Cokes realized that he had a problem, they
12 were in a position where now they have to offer this
13 agreement.

14         It is our position that the agreement itself in the
15 nature that the defendants seek to use it as evidence for a
16 joint conspiracy does not evidence -- provides no evidence of
17 that point.  It doesn't speak at all to the idea of dishonesty
18 either.  There is no element in what they pled to, Class A
19 misdemeanor theft for property of less than $500, of
20 Janice Farrell, not of Taco Bell -- or Arby's -- there is very
21 little to connect any of this to robbery.

22         And the idea that it would be used, then, to lay the
23 foundation for robbery under a joint enterprise theory in that
24 light is entirely prejudicial, especially including the fact
25 that it doesn't necessarily evidence a joint enterprise.

1  It -- at least in terms of imputed negligence within joint
2  enterprise.

3         The doctrine of imputed evidence and joint enterprise
4  doesn't require criminal conspiracy; it requires a legitimate
5  business enterprise.  And so --

6         THE COURT:  Well, that's the big issue that I'm going
7  to get briefing on, whether it has to be a legitimate
8  enterprise or whether a criminal conduct engaged in by
9  multiple people can be an enterprise for purposes of -- of
10  this case or any other case.  And that's subject to the brief
11  they're going to have to file, as you've raised your issue in
12  your brief about why it shouldn't apply.

13         Is he going to get up and deny?

14         MR. MONTGOMERY:  Your Honor --

15         THE COURT:  He's not going to deny he pled guilty.
16  Correct?

17         MR. TERRACINA:  Oh, no, he won't.  There will be no
18  denial that the conviction occurred if brought out in the
19  testimony.

20         THE COURT:  And is the stolen -- is the stolen
21  property that he was in possession of the money that Malone
22  took?

23         MR. TERRACINA:  I mean, that's what -- so insofar as
24  Attorney Spataro who represented them, that's why he was
25  disagreeing to the facts within that agreement.

1    THE COURT:  Yeah.

2    MR. TERRACINA:  So the State's attorney attempted to

3    assert the idea that because of this nexus between them and

4    Malone within the vehicle, that the actions of Malone were

5    then imputable onto -- onto Stevenson and Cokes.

6    However, once that fell apart due to the revelation

7    of what happened at the grand jury, that's when -- when we

8    start getting into these actions with the State's attorney

9    particularly and the judge there.

10    So will either of them deny the fact that they were

11    convicted?  No.  Will both of them deny the fact that such a

12    conviction is evidence of robbery, at least insofar as how the

13    defendants want to characterize it for their assertion of

14    joint enterprise?  Entirely, yes.

15    THE COURT:  Well, if I let in evidence of joint

16    enterprise without the finding of it and the jury has to

17    decide, it would seem -- you know, again, if it's a fact issue

18    for the jury to decide -- that sharing of proceeds of a

19    robbery is evidence of a joint enterprise.  And if the plea

20    suggested, even though you -- your client wants to say, yeah,

21    I didn't -- that wasn't money from there, they're looking at

22    felony murder on this thing; I was going to go away forever,

23    so I took a -- I cut a deal, and I disagreed with the factual

24    basis of it, even at the time of the guilty plea.  To impeach

25    the finding of the guilty verdict, presumably he'd say that.

1          Doesn't that all just go to a fact issue of whether
2   or not the sharing of the proceeds occurred?
3          MR. BARNETT:  You --
4          THE COURT:  Well, let's -- I'll hear from -- this is
5   their motion.  I'll hear from them first, and then I'll hear
6   from the defendants.
7          MR. BARNETT:  Yes, Your Honor.
8          THE COURT:  Unless you're going to say you agree with
9   their motion.
10         MR. BARNETT:  No, Your Honor.  I was actually going
11  to put that it's actually prohibited for a plaintiff to attack
12  the -- collaterally attack the validity of a conviction.
13         THE COURT:  I know, but if you're going to use it for
14  a purpose that's -- exceeds -- a suggestion that possession of
15  stolen property with no indication that it's the stolen
16  property that was taken from the victim in this case that's
17  been referred to, just possession of it, there's -- I might
18  allow some explanation.  He can't attack it and say I didn't
19  plead guilty, but he may explain why.
20         MR. BARNETT:  Well, I would say that even the
21  explaining why is prohibited.  I mean, we cite *Viramontes*,
22  *Heck v. Humphrey*, and *Gilbert v. Cook*.
23         Anytime a plaintiff tries to explain away a criminal
24  conviction or testifies inconsistently, the Seventh Circuit
25  has said that it's proper for the District Court judge to then

1  instruct the jury that they are to take the conviction as true
2  and disregard any testimony that is inconsistent with it.

3          And that's what they're -- that's what we're
4  concerned with, that they can get up there and say, oh, yes, I
5  pleaded guilty for whatever reason, and the jury's just
6  allowed to take that.  And the jury should actually be
7  instructed that, no, they -- they pleaded guilty to this
8  crime.

9          MR. MONTGOMERY:  So two -- two responses to that,
10 Your Honor.

11         First, I believe that's with response to -- that's in
12 regard to Federal Rule 609, which this is being offered for a
13 different purpose.  It's not even being offered to prove a
14 theft.  It's being offered to prove a robbery.  And so very
15 clearly, their explanation would be germane to the purpose for
16 the offer of the evidence.

17         THE COURT:  Actually, that's a -- that's a good
18 point.  I see your point about not impeaching a guilty plea
19 when it is simply used to impeach to -- not attacking the
20 guilty plea or trying to explain it away when the guilty plea
21 is used for purposes of -- strictly for purposes of
22 determining whether or not the witness is credible.

23         You're offering this -- if I find that it's not a
24 dishonest act or a false statement, you're offering this as
25 evidence of a joint enterprise.

1      MR. BARNETT:  Yes, as evidence that they -- that they
2  did have knowingly -- they knowingly obtained unauthorized
3  control of a property belonging to the victim.

4      THE COURT:  Right.  You're going to argue that that's
5  evidence of a joint enterprise, sharing of proceeds of a
6  criminal -- of criminal conduct.

7      I'm not sure if the case is about impeaching a
8  conviction.  I'll deal with that circumstance when it's being
9  offered for a purpose other than the general credibility of a
10  witness on the stand.  Maybe it is, maybe it isn't.  I haven't
11  looked at that.

12      But I see Mr. Montgomery's point that it -- the cases
13  may all deal with 609 impeachment on credibility of witnesses,
14  not when it's offered for a separate purpose, which is to
15  prove up in this case a joint enterprise.

16      MR. BARNETT:  You know, I have to disagree with
17  Mr. Montgomery that those cases, *Viramontes* and *Gilbert*, don't
18  necessarily just apply under Rule 609.  They were -- plaintiff
19  was saying that, yes, I was found guilty of resisting arrest,
20  but I wasn't resisting arrest and the officer still beat me.

21      The -- the conviction wasn't offered under 609; and
22  the -- the issue was whether or not a plaintiff, for whatever
23  reason, can collaterally attack the validity of a criminal
24  conviction.  And the courts say, no, because you cannot
25  collaterally attack a criminal conviction in a civil lawsuit.

1    And that's what we're arguing, is that they should
2  not be able to say I was not involved in any robbery, I didn't
3  have her money on me, we didn't off -- we didn't have her
4  money in the vehicle, or anything like that when they did
5  plead guilty. And that is -- that's our concern, Your Honor.
6    THE COURT: All right.
7    MR. TERRACINA: Well, Your Honor, on this point, can
8  I add one thing? Is that the elements of the offense that
9  they pled guilty to do not map onto the elements of robbery;
10  that the use of force that's required for a finding of
11  robbery, there is no evidence of that. There is no evidence
12  of a conspiracy to commit a robbery through use of force.
13    And so to hold that the underlying conviction
14  actually is evidence of the use of force is -- it's going
15  beyond even what the underlying conviction claims to state.
16  And so at that point in time, I believe that that's a fair way
17  of -- it's not necessarily attacking that the conviction
18  occurred. It's attacking what the defendants want to
19  characterize that conviction as.
20    MR. MONTGOMERY: Moreover, Stevenson had no money on
21  him.
22    THE COURT: Why did he plead?
23    MR. MONTGOMERY: Well, but that's -- this evidence
24  would raise that question. And the answer -- the actual
25  answer, Your Honor, is they wanted out of jail. And they got

1  a deal where they had a time served conditional discharge that
2  day.  That's why they pled.
3           THE COURT:  What -- is one of the exhibits the actual
4  transcript of the guilty pleas?
5           MR. BARNETT:  The actual guilty plea and the plea
6  agreement are 344-2.  I did not attach --
7           THE COURT:  Defendants' -- 344-2 docket?
8           MR. BARNETT:  344-2 was the information for the
9  charge of theft.  And then the following page is the -- the
10 following pages are the plea of guilty, but I did not attach
11 the actual transcript of the guilty plea.
12          THE COURT:  Do you have it?
13          MR. BARNETT:  I can -- I can pull it up, or try to
14 pull it up.  And I can see if I can get it, and I can file it
15 with the Court.  Or I can provide you a copy.
16          THE COURT:  Why don't you just docket it?
17          MS. MOORE:  I believe it was attached to the summary
18 judgment filings.
19          THE COURT:  Oh, all right.  Then -- and that's -- if
20 it was, so be it.  I just don't recall.
21          Off the record.
22       (Off-the-record discussion.)
23          THE COURT:  I -- I need to make two determinations:
24 One, whether or not these come in as to dealing with honesty;
25 and as misdemeanors, whether or not they deal with a dishonest

1   act or a false statement.  And if it doesn't, whether or not

2   they come in as evidence under joint enterprise and whether or

3   not defendant's arguments that they pled just to get out of

4   jail and not -- or plaintiffs' arguments that they pled to get

5   out of jail and not because they were admitting to any conduct

6   is prohibited under the case law the Seventh Circuit has

7   spoken of about people who want to collaterally attack a

8   conviction.

9          Once again, I can't give you a ruling; but I think I

10  understand the issues better now than I did ten minutes ago.

11         Okay.  Motion *in limine* No. 5:  Bar evidence

12  regarding eight cell phones found in the gold Pontiac.  And as

13  I understand the defendants, this is -- what are they doing

14  with eight cell phones in the car?

15         MR. MONTGOMERY:  It wasn't their car, Your Honor.

16  And we don't know where those cell phones were in the car,

17  whether they were in the trunk or somewhere else.

18         THE COURT:  There should be some knowledge of that

19  based on the police reports.

20         MR. MONTGOMERY:  I don't believe there is.  And there

21  have been none that has been -- I mean, one has been

22  attributed to one person or another, but not eight.  We --

23  we -- there's just no evidence here as to who they belonged

24  to.

25         THE COURT:  And what -- is there any police report as

1    to where these were?

2         MR. BARNETT:  The photographs should have depicted

3    exactly where the -- where the cell phones were recovered

4    from.  And there should have been some -- some reports that

5    document where exactly the cell phones were recovered from,

6    whether that is the trunk, the front passenger floorboard, the

7    back seat, on the grass.  It should document all of that.

8         THE COURT:  All right.  But the -- is there any

9    challenge that the nondriving defendants had a phone where, if

10   they wanted to, could've called or somehow sought assistance?

11        You want to put this in -- you, the defendants, want

12   to put it in to show they had that ability.  Correct?

13        MR. BARNETT:  Yes.

14        THE COURT:  Eight phones sounds like these guys are

15   out robbing cell phone stores or they're drug dealers.  Eight

16   phones sounds very nefarious, and that doesn't seem -- that

17   seems overly prejudicial when you don't know if -- how they

18   got the phones or if they even knew of them or if they were

19   their phones.

20        But if you -- if the plaintiffs agree that the three

21   nondriving defendants had -- either had phones or had access

22   to phones that they could call, that both removes the

23   prejudice from the plaintiff and puts in what I think is a

24   valid reason by defendants that they had the ability to make a

25   call if they wanted -- if they thought they were trapped in

1    the car with Malone driving at unreasonable speeds.

2          MR. MONTGOMERY:  The problem with that, at least

3    from -- for Plaintiff Arrington is there's no evidence that

4    any of this had to do with what was owned by Ronald Arrington.

5    And the Court -- or --

6          THE COURT:  Well, is there any indication from the

7    phones -- did anybody find out whose phones they were?

8          MR. BARNETT:  I think that the two living plaintiffs

9    were questioned about that during their depositions.  They

10   admitted to owning one or two cell phones and denied knowing

11   about the others.  I think the fact that there were multiple

12   cell phones available means that even if Ronald Arrington

13   didn't have his own cell phone, he had access to one.

14         THE COURT:  Yeah.

15         MR. MONTGOMERY:  That doesn't mean, Your Honor, that

16   anybody would give him their cell phone.

17         THE COURT:  No, that's -- that's all argument.  I'm

18   sorry to interrupt you.

19         Here's what's going to happen.  If they admitted

20   to -- the idea of eight cell phones being found in the gold

21   Pontiac is out.  The issue with the two living plaintiffs,

22   they could admit they had one or two phones; and you can cross

23   them on whether or not they were able to use those phones if

24   they wanted to.

25         And the jury can draw any reasonable conclusion they

1    want from the fact that Arrington presumably could've borrowed

2    a phone if he wanted to or -- or he couldn't have.  That's a

3    fact issue you can all argue.  But eight phones sounds

4    nefarious, and there's no reason for that to be in evidence.

5    So that's how that will be resolved.

6            MR. BARNETT:  Yes, Your Honor.

7            THE COURT:  Bar parties and witnesses from testifying

8    in uniform.

9            Do you intend to have Officer Ewing here in uniform?

10            MS. BOUDREAUX:  No.

11            THE COURT:  All right.  And how about the other

12    officers?

13            MS. BOUDREAUX:  That will depend on their work

14    schedules, I think.  I haven't spoken to the other two about

15    it yet; but sometimes if they are out working in uniform and

16    they're coming in to testify, they will.

17            THE COURT:  Yeah.  I'm not going to -- Ewing

18    shouldn't wear a uniform because he doesn't have to.  And the

19    others, if -- if it's based on the fact that they're coming in

20    off a beat or something or off a shift and they don't have the

21    ability to change, then I'm not going to bar them from -- I'm

22    not going to make them go home and change.  And they're not

23    critical witnesses, the other officers.

24            The critical witness is Ewing, and he won't be in

25    uniform.  So the motion to bar parties and witnesses from

1  testifying in uniform is denied, given the representation
2  Ewing won't be wearing a uniform.

3        Bar argument that lawsuits increase costs.  You're
4  not going to make that argument, I assume.  Defendants?
5        MR. BARNETT:  No.
6        THE COURT:  Okay.  That's granted by agreement.
7        I'm just going through the plaintiffs' motions.  They
8  kind of jump numberwise.  But No. 11 is bar evidence of
9  parties' financial standing.
10       What is it that you're worried the defendants are
11 going to offer on financial standing?
12       MR. MONTGOMERY:  Well, it should -- this is really a
13 generalized motion, Your Honor.  And it's -- it's not targeted
14 to anything in particular, but sometimes defendants dig up
15 information about things like welfare.
16       And in the case of Arrington, you know, he -- he's
17 not making a claim for lost income; but, you know, there were
18 several questions at deposition about did he contribute money
19 and what was the source of his money and what jobs did he have
20 and all that kind of stuff.
21       But since the issue of -- the issue is not going to
22 be presented by Plaintiff Arrington that the next of kin were
23 dependent on him for an income stream, whatever his finances
24 are really are -- are not relevant.  So that's really the
25 basis of it.  It wasn't intended to be anything more than

1  that.

2          THE COURT:  All right.  And I assume you're not going
3  into --

4          MR. BARNETT:  Well, Your Honor, I think that whether
5  or not Mr. Arrington contributed to his -- the upkeep and
6  well-being of his children are -- it's relevant to damages
7  under the Wrongful Death Act.

8          Also, they put in here that they are seeking only
9  compensatory damages.  And so if they're not going to seek
10 punitive damages, then obviously financial condition of the
11 officer is not relevant.

12         THE COURT:  Right.

13         Are you seeking punitives against Ewing?

14         MR. MONTGOMERY:  We are.  That -- we are.  It was a
15 generalized motion.  It was -- you know, and we put in one of
16 our pleadings -- subsequent pleadings -- we withdrew that
17 aspect of it.

18         THE COURT:  If you're seeking punitives from Ewing,
19 Ewing gets to explain why punitives would be paid out of his
20 pocket and what financial distress that would cause him.  He
21 talks -- he can talk about working a second job and can't send
22 his kids to a private school and all the other things that
23 would happen if punitives were awarded against him.

24         But if that happens, the jury gets to learn that
25 compensatory damages are being paid for by the City.  That's

1  how I've done it in other cases.  The jury should know.  If
2  you want to open the issue of punitives and the defendant
3  wants to raise the issue of I'm too poor to pay punitives,
4  then -- which many defendants do -- then it's fair for the
5  jury to know that the City is paying compensatories.

6         If he doesn't raise poverty as to the ability to pay
7  punitives, then the jury shouldn't know the City is paying
8  compensatory.

9         Any questions about that ruling or any objections to
10 it?  First, plaintiffs.

11        MR. MONTGOMERY:  No questions.  No objections.

12        MR. TERRACINA:  No.

13        THE COURT:  Defendants?

14        MR. BARNETT:  No, Your Honor.  I think that that's --
15 as much as we disagree with that, we do believe that that
16 is -- that is the appropriate position that most courts take.

17        THE COURT:  He opens the door if he wants to say if
18 you award punitives against me, I've got to pay it out of my
19 own pocket.  Then it's fair for the jury to know the City pays
20 compensatories, but he's then free to tell the jury what the
21 consequences would be for his personal life if they awarded
22 punitives.

23        MR. BARNETT:  Yes.  And like I said, the financial
24 condition of Mr. Arrington is relevant because it does go to
25 his upbringing of the children.

1       THE COURT:  It is.  If the children are going to be

2   relying upon an actuary chart where -- what their ages would

3   be and what their father's age would be and what contributions

4   he'd make to their life, both financially -- not his loss of

5   income, but financial contributions which any parent would

6   give to a child, I don't see why Mr. Arrington's financial

7   situation shouldn't come out.

8       Because a jury shouldn't think that he -- that the

9   children, who are the ones being -- seeking damages, they

10  should understand -- the jury should understand what

11  contributions the father -- their deceased father would've

12  made to them.  And his -- his ability to make money is one of

13  those factors, it would seem.

14      I think that *Cobige* case in front of Judge St. Eve

15  that Judge Easterbrook wrote about it, I think that is

16  consistent with what I've just said.

17      MR. MONTGOMERY:  That's fine, Your Honor.  We weren't

18  going to put it in, but we will; and that's fine.

19      THE COURT:  Well, whether you put it in or not, it's

20  fair game on cross of the mothers and of Mrs. Arrington, the

21  mother.  The mothers of the children and Mrs. Arrington, the

22  mother of the deceased Mr. Arrington.

23      Okay.  13, bar -- sorry.  It's 13:  Bar evidence of

24  unrelated litigation.  It looks like that's agreed to,

25  correct, other than the criminal convictions that may or may

1  not come in?

2          MR. BARNETT:  Yes, Your Honor.

3          THE COURT:  Okay.  20:  Bar argument that plaintiffs'

4  damages request is shocking.  Personal opinion of attorneys is

5  not involved -- is not allowed, but you can argue, on the

6  defense side, that the request is unsupported by the evidence.

7          But you can't get up and say I personally find this

8  shocking that they want X million dollars or whatever it is.

9  That's not appropriate because your personal opinion is not

10  evidence.  But you can argue facts don't support a request in

11  the size plaintiffs are making.

12          So that motion is granted, but with the provisos that

13  you can make the arguments I just said you could.

14          21:  Bar argument that plaintiffs' damage request is

15  excessive in light of facts not before the jury.  They agree.

16  And that -- they being the defendants agree to that, and they

17  say the -- that applies to both parties.  Of course, it does;

18  every ruling applies to both parties.

19          No. 25:  Bar any affirmative defense not raised by

20  defendants in their answer.

21          And are there any particular affirmative defenses you

22  think they're going to raise that has not been -- that's not

23  contained in the pleadings?

24          MR. MONTGOMERY:  They've been raising affirmative

25  defenses that, at least from our standpoint, have not been in

1   the pleadings ever since they amended their pleadings during
2   the summary judgment briefings, so we don't know.  We don't
3   know.  We just -- we --
4           THE COURT:  All right.  Well, do you intend to raise
5   affirmative defenses that are not in your pleadings?
6           MR. BARNETT:  Your Honor, we agree that the
7   affirmative defenses are those raised in the operating answer,
8   primarily, contributory fault.
9           THE COURT:  All right.  That's in your answer?
10          MR. BARNETT:  Yes, it is.
11          THE COURT:  All right.
12          MR. MONTGOMERY:  But to be clear, counsel, the words
13  contributory fault I don't believe appear in the answer.  It
14  was failure to control the driver and this joint enterprise
15  and then a couple that the Court has already stricken.
16          The issue of contribute -- I'm assuming counsel used
17  the term contributory fault in regard to some other motions
18  *in limine* here because -- in terms of the way the instructions
19  are written and the motions *in limine*, we have taken the
20  position that contributory negligence offsets negligence and
21  not intentional conduct and not willful and wanton conduct.
22  And the defense wants it to offset willful and wanton conduct.
23          MR. BARNETT:  Your Honor, I believe we did -- we did
24  identify the statute that is the comparative fault or contrib.
25  We did identify that statute in Defendant Ewing's answer as an

1   affirmative defense.  And we do have case law that says while

2   counsel is correct that comparative negligence is not -- is

3   not applicable in intentional torts, it can be applicable for

4   both willful and wanton conduct and negligence and if both

5   brought under that particular statute that we cited in our

6   operating answer.

7          MR. MONTGOMERY:  The statute that they're referring

8   to, Your Honor, is a -- is that percentage setoff statute,

9   which is different than an affirmative defense.

10         THE COURT:  Well, it's in the case either way.

11  Correct?  If the --

12         MR. MONTGOMERY:  Sure, but it's not -- it's not an

13  allegation of negligence or some other type of fault that

14  would by its underlying nature be offset against willful and

15  wanton conduct.

16         THE COURT:  All right.  Do you disagree with that

17  statement?

18         MR. BARNETT:  I don't understand what argument he's

19  making.  Of course, comparative reckless conduct or

20  comparative negligence does not offset intentional bad acts.

21         THE COURT:  Right.

22         MR. BARNETT:  But it can offset both willful and

23  wanton and negligence of Officer Ewing.  And that's the

24  only -- that's the argument we're making, is that -- you know,

25  that's one of -- that's in the case, whether or not they

1   can -- they can be contributory negligence under that
2   situation.
3            THE COURT:  Well, of course it happens in every
4   negligence case.  And the law is that there's contributory
5   negligence when there's -- on a willful and wanton finding,
6   too?
7            MR. BARNETT:  Yes, Your Honor, as long as the willful
8   and wanton finding is not intentional.
9            THE COURT:  Okay.
10           MR. BARNETT:  If it's -- as long as it is reckless,
11  the Illinois appellate courts have held that contributory
12  conduct on behalf of the plaintiff can modify the -- can be
13  contributory negligence for willful and wanton conduct that is
14  reckless.
15           THE COURT:  And if there's a finding that any of the
16  three plaintiffs -- or the, you know, two living plaintiffs
17  and the deceased plaintiff through the estate is
18  contributorily negligent, it's a deduction from the damage
19  award in the amount of the contribution or -- the contributory
20  negligence; or if it's over 50 percent, it's a finding of no
21  liability.
22           Malone's negligence -- or Malone's contributory
23  negligence only comes into play if I find there's a joint
24  enterprise.  Is that correct?
25           MR. BARNETT:  I believe so, Your Honor.

1            THE COURT:  Or do we know?  Is that an issue to --

2            MR. MONTGOMERY:  So this goes to what I was saying to

3    the Court before.  Every time we try to close the door on --

4    close the lid on the affirmative defenses, that's when we get

5    "I don't know."  That -- but from our standpoint, the answer

6    is clearly, yes, the Court is correct.

7            THE COURT:  Well, if I find joint enterprise.

8            MR. MONTGOMERY:  Yes.

9            THE COURT:  If I don't find joint enterprise, then

10   Malone's contributory negligence is not something that can be

11   used as a reducer of a verdict for -- against the -- that --

12   that is won by the other three plaintiffs; nor can Malone's

13   contributory negligence, if it's over 50 percent, be a basis

14   to deny the other three plaintiffs any award.

15           I believe that's the case, unless there's a finding

16   of a joint enterprise.  Because if there is a finding of joint

17   enterprise, then the contributory negligence of all members of

18   that joint enterprise is something that can be considered by a

19   jury in reducing or for making a finding of no liability

20   against the -- for the plaintiffs.

21           Is -- I think plaintiffs have agreed with that

22   analysis, but I want to make sure defendants do.  I don't know

23   why you wouldn't, but I believe that's the -- how I've read

24   everyone's briefs, reserving of course the issue of whether

25   there's a joint enterprise.

1          MR. BARNETT:  Yes, Your Honor.  I think that's --
2   that's correct, that if there's a joint enterprise, then
3   these -- then the three plaintiffs -- then the negligence of
4   Jimmy Malone can be imputed onto those three plaintiffs.
5          THE COURT:  Right.
6          MR. BARNETT:  But they can still be liable for
7   their own tortious conduct as well.
8          THE COURT:  They always can.
9          MR. BARNETT:  Yes.
10         THE COURT:  It's just -- really, the key issue is
11  whether Malone's negligence -- and he was the driver -- can be
12  attributed to them.  And that can only happen if there's a
13  finding by a jury that there's a joint enterprise, or a
14  finding by me if -- or a finding against a joint enterprise,
15  where that's not available.
16         Does everyone agree with that?  Because if we're on
17  different pages on this, I'd like to know, because a lot --
18  this all affects the kinds of instructions we're going to get
19  to.
20         MR. MONTGOMERY:  Plaintiff agrees --
21  Plaintiff Arrington agrees.
22         THE COURT:  All right.
23         MR. TERRACINA:  And Stevenson and Cokes agree.
24         MS. BOUDREAUX:  I would say I agree with that in
25  terms of the discussion we're having about contributory fault

1    as an affirmative defense.  I think that even if -- even if

2    the joint enterprise is out of the case, there should be no

3    bar on the defendants arguing that Jimmy Malone was the

4    proximate cause of the injury -- of the incident.

5                THE COURT:  Well, sure.  That's --

6                MS. BOUDREAUX:  Okay.

7                THE COURT:  -- a factual argument, but the ability of

8    a jury to deduct from a damage award because if they find that

9    he was not the sole proximate cause, that Ewing was also

10   responsible, and that won't entitle Ewing to get a deduction

11   in contributory negligence by -- by Malone.  The only way

12   Ewing walks on something like that is if the sole proximate

13   cause of the accident is Mr. Malone.

14               Again, I'm speaking what I think the law is on this,

15   but I'm willing to accept any arguments where I've gotten it

16   wrong.

17               MS. BOUDREAUX:  We -- we agree.

18               MR. MONTGOMERY:  Yeah, we agree, obviously, except,

19   you know, subject to issues of proximate cause, but we

20   certainly agree.

21               THE COURT:  All right.  Off the record.

22           (Off-the-record discussion.)

23               THE COURT:  Plaintiffs' Motion No. 26 is to bar

24   evidence of seat belt usage.

25               Was anybody wearing a seat belt?

1      MR. BARNETT:  Your Honor, I think the evidence on

2  that is mixed.  I think one individual was --

3      COURT REPORTER:  Can you speak into the mic, please.

4      MR. BARNETT:  I'm sorry.

5      The evidence on that is kind of mixed.  I know -- I

6  believe one individual was ejected from the vehicle.  At least

7  one of the plaintiffs was likely wearing a seat belt or said

8  he didn't recall.  So I don't know if there's any definitive

9  evidence as to whether or not they were or they weren't.

10      MR. MONTGOMERY:  This was a rollover.  As Your Honor

11  probably knows, it was pretty high impact.  We -- we haven't

12  seen any definitive evidence either way.

13      THE COURT:  Well, do you object to the barring

14  evidence of seat belt --

15      MR. BARNETT:  Your Honor, we don't -- we agree that

16  any -- whether or not they were wearing it for purposes of

17  establishing negligence or damages, if for whatever reason we

18  believe that it is somewhat relevant, we will ask for a

19  sidebar before we get into that.

20      THE COURT:  All right.

21      MS. BOUDREAUX:  We -- the way it would become

22  relevant -- just because we keep saying we will tell you

23  later -- but it will become relevant if there's dispute by the

24  plaintiffs' side that they changed positions in the car, or

25  they couldn't change positions in the car because they were

 1   wearing seat belts, something of that nature.

 2          THE COURT:  All right.  Well, that'll be a fact issue

 3   if you raise seat belts as preventing them from moving around

 4   in the car.  It sounds like the evidence is mixed on whether

 5   the seat belts were even on or not.

 6          MR. MONTGOMERY:  Yeah, I think it's completely

 7   unclear.  And, you know, as the Court probably knows in -- in

 8   the back in the Court's mind is all of this type of evidence,

 9   Plaintiff Arrington believes is subject to the Dead Man's Act.

10          THE COURT:  Okay.  Well, absent -- don't raise

11   seat belt usage.  I don't want a jury to think they -- the

12   injuries were self-inflicted because they didn't wear

13   seat belts when there's no evidence whether they were wearing

14   it or not that's -- that's conclusive.

15          MR. BARNETT:  Absolutely, Your Honor.  We would

16   not -- the case law is pretty clear we cannot raise it on that

17   issue anyway.  So we do not -- we have no intention of raising

18   it, saying that they could have mitigated their damage or

19   negligence or anything relating to seat belt.

20          THE COURT:  Okay.  Plaintiffs' No. 27 is to bar

21   evidence of armed robbery transmission in the Zone 9 radio

22   messaging.

23          I -- given the prior statements I've made on all of

24   this, what's in the mind of Ewing, if he heard it -- is there

25   any doubt he heard this?

1          MR. BARNETT:  No.

2          MR. MONTGOMERY:  There's -- we can't deny it.  He

3    hasn't said he didn't hear it.  It was on the tape.  It's on

4    the transmission -- it's on the transcript.

5          The real issue is it's going to send a sideways

6    message unnecessarily to the jury, because his testimony is he

7    wasn't acting on that, per se; he was just going to the area

8    of the pursuit, and he was -- he didn't know what he would do

9    once he got to the area.

10          And so it was -- you know, armed robbery or even

11    robbery wasn't a controlling issue in what he was doing.  And

12    so with the jury confusion of armed robbery without any

13    explanation, without -- and it's gratuitous because whether --

14    you know, whether it's armed robbery or a robbery, you know,

15    the defense can still argue, you know, as I assume they would,

16    that, you know, a police officer is going to, you know, look

17    into a robbery.  There's no harm to them, but there's a lot of

18    harm to the plaintiff by the use of the term armed robbery.

19          THE COURT:  By the way, the victim is not testifying.

20    Correct?

21          MR. BARNETT:  No, Your Honor.

22          THE COURT:  Is there a reason?

23          MR. BARNETT:  We can't find her.

24          THE COURT:  That's as good a reason as I've ever

25    heard.

1            All right.  Well, I -- I'm willing to give -- does

2   defense agree there was no armed robbery?

3            MR. BARNETT:  That's correct, Your Honor --

4            MS. BOUDREAUX:  Not necessarily.

5            MR. BARNETT:  -- but I think -- I think -- well, we

6   have no evidence that it was and that they actually did have

7   an arm -- that they were armed with a firearm.  But I think --

8            THE COURT:  Which is why I asked if the victim is

9   going to testify.

10           MR. BARNETT:  Yes.  No.  I -- she -- we have not been

11   able to find her.

12            But I believe that Defendant Ewing did testify that

13   the armed robbery did influence his decision to go there

14   because he -- multiple armed suspects in a vehicle, knowing

15   that Illinois State Police or some type of outside law

16   enforcement agency tended to ride 99, or solo, that influenced

17   his decision because he would have -- in his mind, that ISP

18   trooper by himself was going to face against multiple armed --

19            THE COURT:  I'm going to let it in, but I'm going to

20   instruct the jury -- and you can do it by way of stipulation

21   or I'll tell them -- by all accounts, this was not an armed

22   robbery.  There's no evidence it was an armed robbery.

23            There was a mistake made in the transmission at some

24   point in the daisy chain of Tinley Park to Illinois State

25   Police to Ewing.  And that mistake got repeated, through no

1  fault of any parties in the courtroom, but nonetheless, it's

2  what Ewing heard.  But you should not hold that language

3  against the plaintiffs because there's no indication there was

4  an armed robbery.

5  MR. MONTGOMERY:  Thank you, Your Honor.  And may I

6  add something?

7  THE COURT:  Sure.

8  MR. MONTGOMERY:  Something just got slipped to you

9  that I -- and I -- you're trying to bring yourself up to speed

10  on this case, and I want to make sure we get it right.

11  Ewing did not know multiple people, as counsel just

12  stated, were in the vehicle.  He didn't know who was in the

13  vehicle.  And, then secondly, he didn't know ISP was involved

14  at the time of the transmission.

15  THE COURT:  Well, his -- his testimony is going to be

16  what it's going to be, but he should not be basing his

17  testimony -- because I'll give an instruction to the jury that

18  won't be helpful to him -- he should not base his testimony in

19  the jury about what he knew based on facts later learned.

20  It's got to be what he knew at the time; what was in his mind

21  when he was driving that car.

22  And if he says multiple armed robbers when there's no

23  indication he knows whether it's one or two or three or four,

24  the only way he'd know that is by the investigation after.

25  That's irrelevant, what he learned later.  And if he inserts

1   something in there that factually is impossible for him to

2   have known, there'll be a curative instruction that's not

3   going to be helpful to him at all.

4          MR. BARNETT:  And yes, we understand, Your Honor.

5   And I apologize; I -- you know, if -- I can't remember if he

6   said he knew at the time or he learned later, but he did know

7   that there was at least one occupant, and it wasn't a multi --

8   it was an armed robbery, so...

9          THE COURT:  Yeah.  And try and come up with agreed

10  language that I can give the jury about the fact that there

11  was no armed robbery.  There was a robbery; nobody's disputing

12  that.  But there was no armed robbery, and there was a mistake

13  made by parties not in this courtroom.

14         MS. BOUDREAUX:  Yeah.  Well, we'll -- we'll have to

15  really work on that language because I think it's more of an

16  instance of there's no evidence of an armed robbery.  I'm not

17  sure it wasn't an armed robbery.  I think that there is a

18  possibility they ditched the gun and that's why the gun wasn't

19  recovered.

20         THE COURT:  Maybe.  It's all speculation.  But

21  whether -- try the language out.  Try and come up with

22  language, because it is unfair to report it as an armed

23  robbery when -- how did -- how did Tinley Park learn of it as

24  armed robbery?  Did the victim actually tell somebody in

25  Tinley Park it was an armed robbery?

1          MR. BARNETT:  I think, Your Honor, the initial

2    dispatch went out and they said, is this an actual armed

3    robbery?  And they said, we're unclear, put it down as an

4    armed robbery -- or something along those lines.

5          MS. BOUDREAUX:  They said "Weapon implied, not

6    displayed."  That's what the dispatch said.

7          MR. MONTGOMERY:  Well, that's what dispatch said.

8    But dispatch spoke to the detective from Tinley Park and asked

9    him.  He didn't -- she asked him, "Is it armed?"  He didn't

10   answer.  She asked him again, "Was it armed?"  He says either

11   I don't know or it's unclear, but put it down as "armed."  So

12   that's how it came out.

13         THE COURT:  All right.

14         MR. MONTGOMERY:  And the victim made -- gave several

15   statements.  None of them involved any weapons.

16         THE COURT:  Well, work on the language.  It's not --

17   it -- my ruling is it's unfair.  If I'm going to allow Ewing

18   to hear the words armed robbery and testify that he acted

19   based on his belief it was an armed robbery and it's likely

20   not to have been -- maybe implied, maybe it was, maybe it

21   wasn't -- but there's no evidence that you can provide from

22   the victim that it was armed.

23         And all this other ambiguity back and forth between

24   the dispatcher and the detective, it's unfair to the plaintiff

25   to -- there needs to be some curative instruction because the

1    provocative nature of the words armed robbery versus robbery.

2           So the evidence is coming in, armed robbery, but

3    there needs to be a curative instruction that reflects the

4    facts of the case as people -- facts of the investigation as

5    you all know it.

6           Okay.  So that motion is denied.

7           Bar evidence of Illinois State troopers riding 99,

8    which means riding by themselves in a car.

9           Did Ewing know that?

10          MS. BOUDREAUX:  Yes.

11          MR. BARNETT:  Yes.

12          THE COURT:  From past experience?

13          MR. BARNETT:  Yes.

14          THE COURT:  And he's going to say that if Illinois

15   State Police was pursuing him, I assumed there was one person

16   in the car?

17          MR. BARNETT:  Yes.

18          MR. MONTGOMERY:  He -- he said that he did not know

19   it was Illinois State troopers.  He knew -- he just believed

20   it was an outside agency based on the -- the way the

21   transmission came in.

22          He independently, at a subsequent IPRA interview,

23   said he knows Illinois State Police ride 99.  And so after the

24   fact, he tried to justify his actions based on the

25   after-discovered information that it was indeed the ISP.  And

1    that's -- that's part of the problem with this.

2              THE COURT:  Well, again, if he believed on the spot,

3    not through later learned knowledge, later acquired knowledge,

4    that Illinois State Police was involved in it and that his

5    actions were based on his prior knowledge that Illinois State

6    Police ride one person to a car, he can testify to it.  If his

7    basis of his knowledge is something he learned postincident,

8    he can't testify to it.

9              MR. BARNETT:  Yes, Your Honor.

10             MR. MONTGOMERY:  Thank you, Your Honor.

11             THE COURT:  So bar evidence of Illinois State

12   troopers riding 99 is denied without prejudice to -- it can

13   only be brought up if he had contemporaneous knowledge of it.

14             Bar evidence of State trooper dashcam videos of the

15   Pontiac.

16             Well, certainly, the dashcam videos of the Pontiac

17   right before the crash you're not objecting to.  Correct?

18             MR. MONTGOMERY:  Correct, Your Honor.

19             THE COURT:  And you're talking about, what, on I-57,

20   the -- the --

21             MR. MONTGOMERY:  No, no.  We're talking about from

22   the top of the ramp at 127th Street after the exit on -- from

23   I-57.  That's where the chase ensued.  Once the chase ensues,

24   there is -- there is driving through neighborhoods, speeding

25   down 127th Street, speeding down Halsted, speeding through

1    124th, '5th, '6th, and Union, Wallace, Normal, alleys.  And so
2    that's what defendants want to use in this case.

3            And it's really not relevant to anything except to
4    inflame the jury over and over and over again as to what we
5    all agreed to, that Malone was negligent and reckless.
6    There's no -- nobody disagrees with that point, and everybody
7    admits that point; but to have all these videos play over and
8    over again --

9            THE COURT:  Well, over and over again, it's -- I'm
10   assuming that plaintiff wants --

11           MR. MONTGOMERY:  Well, I mean, there -- there are
12   several.  I don't mean the same video over and over again; but
13   there are probably as many as 10 to 12 segments of videos that
14   are not in proximity of time or location to the actual crash.

15           THE COURT:  How many are you going to play if you're
16   allowed to?

17           MR. BARNETT:  We would play the entirety of the video
18   at least once through the -- with the testimony of the
19   troopers up there to explain what's happening, where they are
20   located, and everything like that.

21           And portions of the clips would likely be played with
22   other witnesses such as maybe Defendant Ewing, you know.
23   But -- but we're not going to play a clip of the accident with
24   each and every witness.

25           THE COURT:  Well, how many -- you've got, what, two

1    officers, two State police that have dashcams?

2           MR. BARNETT:  Two State Police, and then there were

3    three officers inside of the vehicle who -- who portions of it

4    might be played.  Also, there might be --

5           THE COURT:  Say that again.  Three officers?

6           MR. BARNETT:  The three officers inside of the Ford.

7           THE COURT:  All right.

8           MR. BARNETT:  We might play it with their -- at least

9    a section of it with them and also with the plaintiffs.

10          THE COURT:  And did Ewing's car have a dashcam going?

11          MR. BARNETT:  It did not.

12          THE COURT:  It did not.  So what are the three

13   officers in the car going to say about -- maybe I'm

14   mistaking -- let's go off the record a minute.

15        (Off-the-record discussion.)

16          THE COURT:  Back on the record.

17          So was my ruling on the dashcam on the record?  It

18   was not, okay.

19          I'm making a finding that the dashcam video in full,

20   both of Dixon and of the other trooper -- was it Tucker?

21          MR. BARNETT:  Walker.

22          THE COURT:  -- or Walker, rather, can be played.

23          I find that the -- under 403, the relevance of the

24   evidence is outweighed -- outweighs any prejudicial impact.

25   And they are relatively short videos.  They indicate a variety

1  of times where I believe occupants of the car could -- if they

2  couldn't have gotten out of the car, they could've tried to

3  persuade Malone to slow down.  I think it's very relevant

4  evidence as to whether or not Malone was the sole proximate

5  cause of this, as opposed to Ewing, of this incident.

6          And the crash itself and the aftermath of the crash

7  shows very vividly the -- the injuries to the officers, which

8  is inconsistent with the argument which the plaintiffs will

9  make, and they're entitled to, that Ewing intentionally ran

10 into that car.

11         So for all those reasons, plaintiffs' motion

12 *in limine* No. 29 is denied.

13         Plaintiffs' motion *in limine* No. 30 is to bar

14 evidence of Stevenson's statement regarding Jimmy Malone being

15 the getaway driver.

16         Now, he made this statement during his postarrest

17 interview?

18         MR. TERRACINA:  That is correct, Your Honor.

19         THE COURT:  And what's the basis for keeping it out?

20         MR. TERRACINA:  Well, Your Honor, particularly in

21 light of the defendants' agreement to stipulate that the

22 ownership of the car is uncontestedly within Jimmy Malone's

23 possession is a bailment of his girlfriend.

24         There is very little relevance in the idea that

25 somebody knows another person may or may not have a criminal

1  background.  It isn't necessarily relevant to the idea of
2  being in somebody's car.  It doesn't provide Stevenson any
3  basis to deny the bailment that's in his possession.
4      So the idea that he said, oh, I know he's a getaway
5  driver, or something along that lines in his statement to
6  Tencza, doesn't necessarily corroborate the fact that he knew
7  that on the day in question he was going to act as a getaway
8  driver and it almost creates a propensity problem.
9      MR. MONTGOMERY:  And I would add, it's likely a
10 product of hearsay.
11      THE COURT:  All right.  Well, it's his statement.  I
12 guess the foundation is why he made the statement.
13      But what was the actual statement he made?  I don't
14 have the --
15      MR. TERRACINA:  So he -- when -- under interrogation,
16 he said, I know what he do, he -- he's a getaway driver.
17      THE COURT:  Okay.
18      MR. TERRACINA:  But that was just a generalized
19 statement that had absolutely nothing -- basically, what was
20 happening is he was being confronted with the fact that Malone
21 was suspected for a robbery.
22      And I think at that point in time, Stevenson might
23 have been putting together the pieces because he was in
24 custody.  And so I think there's almost a certain level of
25 resignation, almost a certain level of irony in the way that

1  he says it that may reinforce this idea that it -- it's not
2  necessarily him talking to the facts that happened that day;
3  it's him talking to the idea, oh, he must have gotten us into
4  this situation.

5          THE COURT:  All right.  Response?

6          MR. BARNETT:  Your Honor, those are all arguments
7  that go to the weight, not the admissibility.  It's a
8  statement by a party opponent.

9          In short, they -- they committed a robbery and put
10 the getaway driver behind the wheel.  They didn't have to do
11 that.  In fact, Arrington was the initial driver.  So the fact
12 that --

13         THE COURT:  Was Arrington driving when they -- that
14 video we saw from --

15         MR. BARNETT:  No, Your Honor -- yeah, in the
16 Taco Bell video, Arrington was the driver.  They then pulled
17 over and changed positions.  And Jimmy Malone, who
18 Mr. Stevenson admits is the getaway driver, got behind the
19 wheel of the car.  So it's probative of his knowledge.

20         And any arguments that they have, oh, well, he -- you
21 know, he was just resigned to this or, you know, it's taken
22 out of context or something like that, that's all -- that goes
23 to the weight.  And it's not unfairly prejudicial because it
24 goes to this whole joint enterprise because it demonstrated
25 that the flight from the police was a mutual endeavor and that

1  they -- after committing a robbery, they put the getaway
2  driver behind the wheel.

3        MR. TERRACINA:  Your Honor, the idea that
4  Mr. Stevenson was ever in a position to deny Jimmy Malone
5  right to -- to use a vehicle that was in his possession, that
6  was in his bailment, that would almost be verging on an act of
7  criminal -- or conversion.

8        THE COURT:  Oh, please.  I -- well, I disagree with
9  that, that part of it.

10        The question is whether his statement refers to
11  Malone being a getaway driver that day or whether Malone had
12  a -- was a person who was a getaway driver on other crimes.

13        Is there any indication based on the ambiguous
14  statement of Mr. Stevenson that it is one or the other?

15        MR. TERRACINA:  The indication would lead more
16  towards the idea that he was saying it in general, rather than
17  with any level of specificity to this particular instance.

18        THE COURT:  And Mr. Stevenson will be testifying in
19  this case.  Correct?

20        MR. TERRACINA:  That is correct.

21        THE COURT:  He can explain it.  The motion to bar is
22  denied.

23        MR. MONTGOMERY:  And, Your Honor, just to clarify one
24  thing, the only -- the quote/unquote evidence that Arrington
25  was the driver, that came from the living plaintiffs,

1  Stevenson and Cokes.

2  THE COURT:  Yeah.

3  MR. MONTGOMERY:  Well, I -- I just want to point out,

4  this is why there is a Dead Man's Act.

5  THE COURT:  In State Court, for sure.  In

6  Federal Court, that's what you're going to give me a memo on.

7  MR. MONTGOMERY:  Okay.  All right.  I just --

8  THE COURT:  No, no.  I read the two.  And you're --

9  you believe the defendants have misrepresented the case law?

10  MR. MONTGOMERY:  I do.

11  THE COURT:  So I'll give you an opportunity to give

12  your interpretation of the cases.

13  MR. MONTGOMERY:  Thank you, Your Honor.

14  THE COURT:  Okay.  But the -- Stevenson's statement

15  comes in.  You can cross-examine.  You can raise it in his

16  direct examination of Mr. Stevenson.  He can clarify it if he

17  wants.

18  Motion *in limine* No. 30 is denied.

19  Motion *in limine* 31 is to bar evidence or argument

20  that 124th Street was a preferential road, and it looks like

21  you're not opposing that.

22  MR. BARNETT:  No, we're not going to argue that.

23  Under Illinois law, it is a preferential road.

24  (Pause in the proceedings.)

25  THE COURT:  All right.  So motion *in limine* No. 31 is

1    granted by agreement.

2           Motion *in limine* 32:  Bar evidence or argument of

3    joint criminal enterprise.  And joint enterprise as against

4    Defendants [sic] Cokes and Stevenson and bar imputation of

5    Malone's driving and to Plaintiffs Cokes and Stevenson.

6           That is a hotly contested issue that's been reserved,

7    and I'm going to give the defendants a chance to respond to

8    the motion for judgment as a matter of law on that issue that

9    was filed by plaintiffs.

10          Why don't we stop there.  Judge Dow's courtroom is

11   now open.

12          Off the record.

13      (A recess was had from 3:38 p.m. to 3:56 p.m.)

14          THE COURT:  Back on the record.

15          34 is a motion to bar any evidence, testimony, or

16   argument on social media posts of Isiah Stevenson and

17   Michael Cokes.

18          And what is it that you're trying to bar?  Is there

19   any particular evidence you know -- have you talked to

20   defendants where they said they're offering something and

21   you're objecting to it?

22          MR. TERRACINA:  No.  This was just more of a general

23   motion to prevent the introduction of any type of evidence

24   that we have not received.  It was made in anticipation in

25   light of other use of social media that have been included.

1          THE COURT:  That what?

2          MR. MONTGOMERY:  And, Judge, it dovetails with a

3    document that defendants alluded to earlier in our discussions

4    today, which is an undated photo of Malone and Arrington in a

5    car, and there's a -- you know, there is kind of a posing

6    thing where one is seemingly handing money back to the other.

7          THE COURT:  Is this where one has the -- all the

8    bills in his hand, raising it and then --

9          MR. MONTGOMERY:  Yes.

10         THE COURT:  -- I think Arrington's behind him?

11         MR. MONTGOMERY:  Yes.

12         MR. BARNETT:  I do have a copy if Your Honor would

13   like to see it.

14         THE COURT:  I saw this when it was filed.  I looked

15   at the exhibit.

16         Can you lay a foundation that this had anything to do

17   with the robbery?

18         MR. BARNETT:  Your Honor, we do believe that --

19         THE COURT:  Move the mic toward you.

20         MR. BARNETT:  Oh, I'm sorry.

21         We do believe we have some circumstantial evidence.

22   It's dated July 1, 2016, which is the day of the robbery.  The

23   clothing that Mr. Malone is wearing is consistent with the

24   clothing that he is wearing on the Taco Bell surveillance

25   video.  There -- Mr. Arrington is in the rear seat of the

1    vehicle, which is where it's pretty undisputed that at some
2    point he swapped and went into the rear seat of the Pontiac.
3    I think that those are all circumstantial evidence that we can
4    lay the foundation to get these videos -- or this photograph
5    in.

6        THE COURT:  Well, how did they post it on July 1st?
7    If this is after the robbery, they seemed to be driving
8    pretty -- well, they were driving pretty crazy.  I don't know
9    how this kind of photo could be taken within minutes of the
10   robbery when most of the robbery is depicted on video.

11       MR. MONTGOMERY:  And there's nobody else in the car
12   and it's -- it's literally like ten minutes after the robbery
13   from Tinley Park.  I mean, it's just -- it's -- and we have
14   testimony in this case, Judge, that this was a picture from
15   three weeks ago.  Counsel knows that.

16       THE COURT:  Who testified to that?

17       MR. MONTGOMERY:  Ayesha -- Ayesha Battle, I believe,
18   Your Honor.

19       THE COURT:  All right.

20       MR. HALE:  Well, I mean, could I comment?  Just
21   briefly, Judge?

22       THE COURT:  Yeah.

23       MR. HALE:  I don't think it's hard.  It would take
24   five seconds to get back in the car, pull out your phone, take
25   a selfie, you're all excited, person in the back seat's

1 excited about it. That takes five seconds before they even

2 leave that parking lot, they could've posted this photo.

3 And I came across evidence, Judge -- I'm just going

4 to put it on the table because I don't want to have any claim

5 to surprise. I came across this same photo posted by somebody

6 on Facebook, last name Arrington. I think first name is

7 Pashaa. Same photos posted on July 1st, no caption. And then

8 she posted another one July 1st with a caption like something

9 about heaven, like a tribute, clearly showing -- the first one

10 was just a post, you know, that -- from that day.

11 And then later that day -- and I've got these on my

12 phone if you want to see them. Later that day, she does a

13 tribute post. I think that's pretty powerful evidence that

14 this was posted the day of the robbery. I understand their

15 side wants to argue it wasn't taken on July 1st. They're free

16 to do that. We're free to argue it was taken on July 1st.

17 And these -- all these guys were in on it; you can

18 tell by the giddiness of that photograph. There's no chaos in

19 that car like, Jimmy, why did you do this robbery that none of

20 us knew about? I mean, these guys were all in on it.

21 I'm arguing, of course, Judge, but both sides should

22 be able to present their case.

23 MR. MONTGOMERY: Judge, this photo was posted by

24 somebody named Ewol Samo. That is the person who can provide

25 the foundation for this.

1      THE COURT:  Who is --

2      MR. MONTGOMERY:  Nobody knows.  We don't know who he

3  is.

4      MR. BARNETT:  Actually, Your Honor, the --

5      THE COURT:  Well, one at a time.  We're on the

6  record.

7      Go ahead; finish.

8      MR. MONTGOMERY:  And what we have -- what we have is

9  testimony of Ayesha Battle on page 52, line 17 through

10  page 54, line 20 saying that this was a photo that had been

11  circulating on Facebook for weeks before this.

12      Part of what is in this photo is that Mr. Arrington

13  had his hand bandaged.  He had an injury weeks prior when

14  she -- she, Ayesha Battle, testified that he had cut up a --

15  some sort of Halloween costume and injured his hand.

16      The autopsy doesn't show a bandaged hand, a damaged

17  hand; it doesn't show a cut-up hand; it doesn't show any of

18  this.  This is all being made up.  And this notion that

19  more -- that only one person can pay a tribute to -- to one

20  or -- or both of these and -- is -- is ridiculous.  You know,

21  it's -- both of these are tribute photos.

22      There are not two other people in this car in that

23  photo.  So -- so what's being made up is the argument before

24  the Court right now because there is no foundation.  We have

25  testimony, I believe also from Adrina Noble, that this photo

1    had occurred beforehand.  That's the only sworn testimony in

2    this case regarding this photo.  There is no more sworn

3    testimony.  Everything else is argument.

4              MR. HALE:  Judge, can I show you the photos I've got

5    on my phone?

6              THE COURT:  Sure.  Have you shown them to plaintiffs'

7    counsel?

8              MR. MONTGOMERY:  No.

9              THE COURT:  Show them first.

10        (Pause in the proceedings.)

11             THE COURT:  We can go back on the record.

12             You have deposition testimony this was a picture

13   created before the incident.  Correct?

14             MR. MONTGOMERY:  Yes.  And that's the only testimony

15   regarding that picture in this case.

16             THE COURT:  Yeah.  And you don't have information as

17   to when that picture, the first of the two pictures --

18   obviously, the "rest in heaven" was created after he died,

19   after the crash.

20             MR. HALE:  No, Your Honor.  I went on Facebook and

21   the only photos I found of this photo -- I couldn't find any

22   earlier than July 1st.  I found July 1st.

23             Now, I understand they've got a witness who says

24   that.  I don't think that means we're stuck with it.

25             THE COURT:  Well, when foundation is shaky and the

1   prejudicial impact is enormous, that's a -- in my mind, if

2   that is displayed and it's not proceeds of the robbery in this

3   case, that's enormously prejudicial to the plaintiffs.

4          And if you can't lay a foundation that this picture

5   took place sometime between the robbery and the accident, I'm

6   not going to let it in -- and especially in light of the fact

7   that there is contrary evidence that indicates it was -- the

8   picture was taken before.

9          In addition, you know, it's not a full picture of the

10  car.  But you would expect, given the nature of the

11  photograph, to have another head or two in that picture if

12  there were other people in that car.

13         So -- and who -- was Arrington the friend of Malone?

14  I think there was testimony about who -- who was friends with

15  who?

16         MR. BARNETT:  It's -- it's all very confusing,

17  Your Honor.  I'm not sure there's any evidence as to when

18  Arrington met Malone or how close they were.  I don't think we

19  got -- we really got much of that evidence.

20         THE COURT:  All right.

21         MR. HALE:  Your Honor, I think that's fair.  I

22  understand.  I just would -- I would ask this request -- if we

23  come up with some forensic analysis that determines the times,

24  can we readdress it with you?

25         THE COURT:  You can always readdress it, like you can

1    with any motion *in limine* ruling I've made today --

2        MR. HALE:  Okay.

3        THE COURT:  -- but presently, the motion to bar the

4    social media post is granted.

5        MR. MONTGOMERY:  And may I -- thank you, Your Honor.

6        May I say for the record, this photograph has been

7    the -- in this litigation since 2018, I think.

8        THE COURT:  I haven't been, though.

9        MR. MONTGOMERY:  And we have not had any foundation

10   of it in -- in four years.

11       THE COURT:  To the contrary, it looks like the -- not

12   to the contrary, but consistently, it looks like the

13   foundation is it wasn't created on the day of the robbery; it

14   was created before the robbery.

15       MR. MONTGOMERY:  That's the only foundation we have.

16       THE COURT:  So if there's inconsistent evidence

17   that's developed, I'll hear it, but it's -- this is awfully

18   prejudicial and the foundation's too shaky at this point for

19   me to allow it in.

20       So the motion *in limine* 34 is granted.

21       Motion *in limine* 35 is to bar evidence or argument

22   that Ewing's crash was caused by radio transmission delay.

23       What is that about?

24       MR. MONTGOMERY:  The defendants have put forth the

25   theory throughout this litigation that the sole proximate

1   cause of the crash -- just like the sole proximate cause was

2   Malone -- that it was the delay that it -- in transmission

3   time that it took for the ISP officers who were in the patrol

4   cars to relay through ISPERN the callouts of the locations of

5   the chase to their dispatch, for their dispatch then to relay

6   it to the point-to-point person at OEMC, and then for the

7   point-to-point person at OEMC to relay it to the Zone 9 OEMC

8   dispatcher, who then relayed it over the air for officers

9   within the Fifth District, including Ewing, to hear it.

10          And Ewing's testimony has been that he wasn't -- it's

11  kind of been all over the board on the issue.  But he states

12  that he wasn't aware that it was being relayed, even though he

13  knew he wasn't speaking -- or hearing from -- directly from

14  patrol cars and that, of course, he knew he wasn't hearing

15  from ISP.  And -- but he -- and he's -- even though this

16  transmission speaks to have you heard from ISPERN, he

17  states -- which ISPERN is the ISP network -- he did not know

18  that ISPERN was the ISP network.

19          So he didn't really know what the delay would be, but

20  he acknowledged in his testimony he knew there would be delay.

21  And so there -- all this is is -- this is a side issue; it's a

22  sideshow.  And we're just trying to eliminate a sideshow.

23          Because it was clear that Ewing knew that this

24  information was being relayed, and he couldn't possibly know

25  how much time was transpiring between the time the patrol car

1  officers gave the callouts to the time he received it and so
2  he couldn't rely on it being instantaneous.
3        THE COURT:  Response?
4        MR. BARNETT:  I -- that argument is very confusing,
5  so it might take me a second to actually figure out what
6  they're trying to bar.
7        What Officer Ewing knew was what was relayed to him
8  over the Zone 9 dispatch.
9        THE COURT:  Yeah, let me stop right here.  What he
10 knew is what was relayed to him.  If he, in his experience,
11 knew what he was getting couldn't -- and it's a matter of
12 common sense -- was probably not instantaneous and
13 contemporaneous with the action on the ground.
14       He had to know this because he wasn't -- it wasn't
15 Chicago police chasing, and so he knew there had to be some
16 delay.
17       He's -- you're both entitled to raise with him issues
18 of whether or not the information he was getting was good
19 information, whether it was current information, and actions
20 he took based on whether or not it was good or not.
21       I don't see this as an area that either side should
22 be preventing from developing with him.  There's an argument
23 on both sides I can see.  I'm not going to make it for you,
24 but there's an argument on both sides you can make about
25 operating on incomplete information, whether that's a reason

1    he should have been more cautious, or operating on incomplete

2    information which is the reason why he acted the way he did

3    and didn't -- and acted what he thought was in the best

4    interests of his goal.

5         It's an argument both sides can make, but we're not

6    going to micromanage this trial through motions *in limine.*

7    This is relevant evidence on both sides.  If it becomes

8    redundant or if there's an argument made it's improper based

9    on it, an objection will be made contemporaneously with it and

10   I'll rule on it at the time.

11        But there's nothing about this on its face that is

12   either prejudicial or improper to note the fact, the

13   unrefutable fact that he wasn't involved in the chase, and

14   information being transmitted by the officers involved in the

15   chase is going to take a little time to get to him.  And you

16   both have OEMC people that are going to testify and talk about

17   that.

18        So I'm -- I'm not going to bar this evidence.  The

19   motion --

20        MR. MONTGOMERY:  Judge --

21        THE COURT:  And if I'm misunderstanding the argument,

22   I'm --

23        MR. MONTGOMERY:  Yeah, we weren't seeking to bar the

24   evidence argument that it was the sole proximate cause.

25        THE COURT:  Oh, well --

1          MR. MONTGOMERY:  His testimony was clear it wasn't.

2          THE COURT:  Yeah.  I'm just saying the facts of this

3  can come out.  And if there's an improper argument where they

4  try to lay blame on the vagaries of how transmissions take

5  place, I'll hear either an argument or an objection at that

6  time.

7          MR. MONTGOMERY:  Very good.  Thank you.

8          THE COURT:  So motion *in limine* 36 is denied -- or 35

9  is denied.

10          36 is the Taco Bell video.  I've dealt with that,

11  provided proper foundation is laid by the witness who -- the

12  security witness who retrieved it.

13          Motion *in limine* 37:  Bar reference to Tinley Park in

14  Zone 9 dispatch.

15          What is that?

16          MR. MONTGOMERY:  This really relates -- it -- I mean,

17  this is -- and I don't know that it's stated super clearly,

18  but this is really contingent on the Judge's ruling on joint

19  enterprise.  If the Judge rules there was no joint enterprise,

20  then Tinley Park is completely irrelevant.

21          THE COURT:  Okay.

22          MR. BARNETT:  Your Honor, there's -- that would

23  require excise -- altering the video to excising something

24  that said Tinley Park.  We knew -- it's undisputed that

25  these -- that the Pontiac was fleeing from something that

1    occurred in Tinley Park.  I think it's not unfairly

2    prejudicial and it would be burdensome and possibly confusing

3    to the jury to have a portion of an audio recording excised

4    for really no good reason.

5             THE COURT:  Well, so if -- if there's no joint

6    enterprise, a finding of no joint enterprise, or it's legally

7    improper to -- under these facts to argue there's a joint

8    enterprise, this is just merely removing the words pursuit,

9    123rd and Halsted, Tinley Park from the video?

10            MR. BARNETT:  Your Honor, I think the fact that it's

11   a pursuit from 123rd and Halsted is relevant because it

12   tells -- it informs Defendant Ewing where the chase is -- or

13   the pursuit is initially happening --

14            THE COURT:  Did he hear this?

15            MR. BARNETT:  -- and is Tinley Park is relevant --

16            What's that?

17            THE COURT:  He heard this?

18            MR. BARNETT:  Yes.

19            MS. BOUDREAUX:  Yes.

20            THE COURT:  Oh, all right.

21            MR. MONTGOMERY:  It's not the 123.  It's just the

22   Tinley Park, Your Honor.

23            MR. BARNETT:  Your Honor, that's --

24            MR. MONTGOMERY:  He knew it was a pursuit.

25            MR. BARNETT:  That's relevant because it gave

1     Defendant Ewing the knowledge that it was an outside agency.

2          THE COURT:  Motion *in limine* No. 37 is denied.

3     That's factually innocuous ultimately, and -- and there might

4     even be a reason where it gave a basis for Ewing to have some

5     type of thought process as to what was going on.  But to the

6     extent it's -- there's any prejudice to it, I don't see it.

7     But even if there were, its probative value far outweighs it.

8          Motion *in limine* 38:  Bar evidence -- any argument,

9     evidence, or innuendo about a certified copy of conviction

10     from Plaintiffs Stevenson and Cokes, as well as

11     Ronald Arrington and Jimmy Malone.

12          Well, as I said earlier, if it's a felony within ten

13     years it comes in if the witness testifies.

14          And is there really a -- going to be a challenge as

15     to the foundation as to any -- any of these convictions?  Do

16     you have certified copies of them?

17          MR. BARNETT:  Yes, Your Honor.  And so to be frank,

18     we -- I provided certified copies when I -- after I filed my

19     appearance.  So these certified copies -- these public records

20     were produced several months ago.  But both of these witnesses

21     testified as to these convictions, or portions of these

22     convictions, during their deposition.  So it's the plaintiffs'

23     own criminal convictions.

24          There can be no undue surprise or unfair prejudice to

25     actually have just certified copies of them that were obtained

1   through the public record.

2       THE COURT:  Well, are we talking about the two

3   misdemeanors that related to this event or prior felonies?

4       MR. BARNETT:  No, Your Honor.  These are actually

5   multiple felony convictions, and they are the basis of

6   defendants' motions *in limine*, Docket No. 344 at motion

7   *in limine* No. 23 and No. 24.

8       Mr. Stevenson has two admissible felony convictions

9   based on your Judge's statements, one from 2020 and one from

10  2013.  They were both felony armed violence -- one was a

11  felony count of aggravated UUW, one was an armed violence.

12      Plaintiff Cokes has a Class 3 felony conviction for

13  forgery from 2014 and a count of attempt of a Class 3 or

14  Class 4 felony misdemeanor.

15      THE COURT:  What was that for?

16      MR. BARNETT:  That was attempted forgery.  So those

17  were really just one criminal proceeding, two counts of

18  forgery in the first degree in Nebraska, which was a Class 3

19  felony, and then an attempt of a felony -- of a forgery.

20      And he also has a misdemeanor theft or conviction in

21  Missouri from 2016, which I believe he testified to in his

22  deposition that that Missouri arrest was actually for

23  counterfeiting as well.

24      The criminal conviction, Exhibit F, doesn't state

25  what the elements were, but Mr. Cokes did testify in his

1  deposition that it was for counterfeiting.

2       MR. MONTGOMERY:  Well, they're -- this is also

3  covering Arrington.  There was no evidence in this case and,

4  certainly, I didn't have any knowledge of anything having to

5  do with Arrington.  And this was disclosed June something or

6  other for the first time.  And I'm not sure of its relevance,

7  but the only information in this case regarding

8  Ronald Arrington that was produced in the past was his arrest

9  for the July 1, 2016, robbery in Tinley Park.

10       THE COURT:  Well, Arrington wasn't arrested.  He was

11  dead.

12       MR. MONTGOMERY:  Well, they arrested him

13  posthumously.

14       THE COURT:  Seriously?

15       MR. MONTGOMERY:  Detective Johnson.  Yes, very

16  serious.

17       THE COURT:  I mean, I'm sorry.  I don't mean to be

18  blithe about it, but I find that shocking.

19       MR. MONTGOMERY:  And Detective Johnson wrote -- I

20  think it was either a police officer or Detective Johnson

21  wrote on the report, understandably, my boss told me to do

22  this.

23       MR. TERRACINA:  Well, and, Your Honor, Plaintiffs

24  Stevenson and Cokes would like to also assert that the way

25  that the defendants seek to actually use this particular

1    certified copy of a conviction is as meritorious evidence.

2         Now, I understand how you're ruling in terms of

3    impeachment evidence, and I understand the purpose of it.

4    However, to allow a certified conviction of prior -- or a

5    certified copy of conviction, I think that opens up the door

6    to character propensity.  It -- it creates a very dangerous

7    problem here, particularly when the elements of robbery have

8    not been established.

9         THE COURT:  Well, how -- I'm confused.  I'll freely

10   admit.  I thought you were going to cross-examine the

11   plaintiffs on prior convictions ten years -- that are ten

12   years old or less.

13        MR. BARNETT:  Yes.

14        THE COURT:  If they admit to the prior convictions,

15   which presumably they will -- in fact, I wouldn't be shocked

16   if the plaintiffs' counsel brings them out themselves -- but

17   if they admit to them, there's no need to use a certified copy

18   of the conviction.  They've admitted to the felony, which the

19   juror will be instructed is a -- one basis for them to

20   consider the credibility of the witness.  You don't need a

21   certified copy of anything for that.

22        MR. BARNETT:  The only reason why we would have the

23   certified copy is if they deny the conviction.  If they admit

24   the conviction, there's no reason to introduce that certified

25   copy.

1       THE COURT:  All right.  So -- and what I'd like the

2   parties to address, if you have an agreement as to what the

3   permissible examination of a prior felony can be, do you

4   mention -- there's differing views on this -- but do you

5   mention the fact of the conviction; the date of the

6   conviction; what it was for?  Do you mention the punishment?

7       But I'd like to see if the parties can reach

8   agreement on what can actually be used for the

9   cross-examination, because it may come as no surprise to you,

10  but in most criminal cases, defendants that have prior

11  convictions don't testify so I don't see this a lot.

12      But if you can -- and those that do testify for the

13  government, the plea agreement comes in and it comes in for a

14  variety of reasons unrelated to the 609 issue.

15      So I would like you to reach agreement, or tell me

16  the basis of the disagreement on what the cross can be on the

17  prior conviction.

18      MR. TERRACINA:  And, Your Honor, I guess this goes

19  directly to what you're outlining:  I'm just asking for a

20  little bit of clarification with regards to earlier you

21  mentioned that if it was a felony within the last ten years,

22  that it would be admissible.

23      THE COURT:  Or they got out of jail within the last

24  ten years on that felony.

25      MR. TERRACINA:  On that question, there's case law to

1  suggest the idea that insofar as a conviction for violence as

2  asserted by the defendants, that such a conviction does not

3  support the idea that the person would be less credible; that

4  it perhaps has some limited use for the idea, but its

5  prejudicial value outweighs the limited use, typically insofar

6  as it's concerning violent offenses.

7  THE COURT:  Well, on occasion when I have had civil

8  cases where it's a prisoner plaintiff who came in and he was

9  in Stateville suing over conditions of confinement and he was

10  in for murder, I did not allow the fact it was a murder, but I

11  said he was convicted of a very, very serious felony.

12  Again, I'm going to ask you both to see if you can

13  reach agreement on the manner in which cross-examination can

14  take place on this.  But to be sure, felonies within ten

15  years -- I believe the rule is not absolute, but I find that

16  that is a permissible cross-examination point that deals with

17  the credibility of a witness.

18  MR. TERRACINA:  I understand your -- oh, I'm sorry.

19  THE COURT:  The manner in which it takes place, I'd

20  like you to meet and confer with defense counsel, see if you

21  can reach agreement on what can be asked on that.  If you

22  can't reach agreement, I'll rule accordingly.

23  MR. TERRACINA:  Thank you, Your Honor.  I do have one

24  last clarification question.

25  THE COURT:  Go ahead, sure.

1    MR. TERRACINA:  So I would also like to try to
2  introduce the idea of possession charges underneath that idea
3  of perhaps just identifying that a felony occurred, but not
4  identifying any of the nature of it.

5    THE COURT:  Well, I'm willing to see if you can meet
6  and confer.  And if you can't reach agreement, I'd like some
7  law to support what is permissible to be asked, whether it's
8  a -- the nature of the crime itself or just the fact it's a
9  felony, any characterization of it.

10    As I said, I allowed a cross on a murder, but I
11  didn't let murder come in because it really was unnecessary in
12  that case.  The jury already knew he was in jail.  They just
13  needed to know he was convicted of a felony, a serious felony.

14    So meet and confer on that and come back to me on
15  that, but that's what I'll expect to hear from you.

16    39 is bar reference to Stevenson and Cokes receiving
17  medical care while in custody.

18    Why is -- why do you want that barred?

19    MR. TERRACINA:  Well, Your Honor, the idea that they
20  received medical care while in custody implies that they were
21  in fact in custody and it opens up the door to this whole
22  robbery charge.  It -- it's a slippery slope down to -- and it
23  follows much with how even the defendants have characterized
24  other instances of evidence here, that it somehow
25  automatically suggests a robbery occurred; that it somehow

1    automatically associates the idea that accepting a plea
2    agreement for possession of $500 from Janice Farrell when, in
3    fact, there was a robbery involving Janice Farrell in her role
4    as agent of Arby's.  I mean, it opens up all sorts of avenues
5    and routes to further prejudice against the -- or create
6    further prejudice against the Plaintiffs Michael Cokes and
7    Isiah Stevenson.

8        THE COURT:  Well, a lot of this depends on whether I
9    find a joint enterprise.  If I do, the robbery comes in and
10   the words "in custody" when they received medical care is not
11   so overly prejudicial.

12       You want -- do you want to bring in the fact they
13   received medical care?

14       MR. TERRACINA:  We do.

15       THE COURT:  Well, then the good comes with the bad.
16   If there's some relevance to them receiving medical care and
17   if it's while they're in custody, which is a true fact, and I
18   decide to leave the robbery in, there's really no prejudice.
19   If the robbery's out, then -- how are you putting this in?
20   Through a witness or through documents?

21       MR. TERRACINA:  Through both.  So they were treated
22   at Christ Hospital --

23       THE COURT:  Right.

24       MR. TERRACINA:  -- which is connected to the
25   detention center and so the documents --

1          THE COURT:  It's not part of a detention center for

2    most people there.  So if -- if I keep out the robbery, then

3    it's easy enough just to say they were treated at

4    Christ Hospital and received medical care there.

5          MR. TERRACINA:  Agreed, Your Honor.  Thank you.

6          THE COURT:  And it's easy enough to excise reference

7    to the fact they were in custody at the time.

8          Nobody's going to -- it's not the jail that's right

9    next to Cook County Jail -- it's not the hospital right next

10   to Cook County Jail.  It's an independent hospital.  Most

11   people go there who are not in custody.  But a lot depends on

12   the ruling on the issue we've spoken about repeatedly today,

13   so I'll reserve on that.

14         Motion *in limine* 40:  Bar any argument, evidence, or

15   innuendo of any criminal history of Ayesha Battle.

16         That is the mother of one of the children?

17         MR. MONTGOMERY:  Yes, Your Honor.

18         THE COURT:  What is the history?

19         MR. MONTGOMERY:  She -- the actual history was there

20   were -- there was a fight in the park.  One of the males

21   point -- picked up a gun and pointed it, then they started

22   fighting.  He drops the gun; she picks it up to -- to get it

23   away from them; and, of course, then the police come and they

24   charge her.  So it's a felony gun charge.

25         MR. BARNETT:  And less than ten years, Your Honor.

1          MR. MONTGOMERY:  Yes.

2          THE COURT:  Pardon me?

3          MR. BARNETT:  Felony gun charge from less than ten

4    years.

5          THE COURT:  Well, the charge or conviction?

6          MR. MONTGOMERY:  Conviction.

7          MR. BARNETT:  It was a conviction.

8          THE COURT:  What was it?  A UUW or is that a

9    felony --

10          MR. MONTGOMERY:  UUW.  She pled to it because,

11    unfortunately, people do that.

12          THE COURT:  All right.  And it was a felony?

13          MR. MONTGOMERY:  Yeah.  And, you know, our -- our

14    position is, you know, call it -- I mean, obviously there is

15    the general rule with 609, but there's -- there's no --

16    there's no part of her testimony that's contested in this

17    case, and there's no reason to embarrass her or -- or abuse

18    her with a -- with a cross-examination, you know, with this

19    conviction.

20          And so we would --

21          THE COURT:  She's going to -- is she coming in on

22    behalf of her daughter to say that Mr. Arrington's role in her

23    daughter's life was a significant one and her daughter is

24    suffering, and you're going to seek damages --

25          MR. MONTGOMERY:  Yeah.

1          THE COURT:  -- for the daughter based on this woman's
2     testimony?
3          MR. MONTGOMERY:  Yes.  Yes, Your Honor.
4          THE COURT:  I don't know why -- you know, it's
5     embarrassing perhaps for her, but it's a felony conviction,
6     and that's the --
7          MR. MONTGOMERY:  Yeah.
8          THE COURT:  -- nature of testimony.
9          So the motion to bar the criminal conviction of
10    Ms. Battle is denied.
11         Motion to bar argument, evidence, or innuendo is
12    granted.  You can only use that for purposes of attacking her
13    credibility.
14         41:  Bar evidence or argument referring to actions or
15    inactions of the Pontiac to implied conduct or omissions on
16    the part of the plaintiffs.
17         MR. MONTGOMERY:  The -- what this is about is at
18    every juncture, the defendants, whether it's in questioning of
19    witnesses or in regard to argument, the Pontiac did this, the
20    Pontiac did that, and these are actually human activities that
21    they're referring to.  But the clear attempt is to rope all
22    three plaintiffs together in the -- in the Pontiac's action
23    when -- I mean, A, it's unfair; and B, it's -- it's
24    inapplicable to most of the situations where it's used.
25         THE COURT:  Well, you're imputing that they're going

1　to argue the same in a trial that they did in a deposition.

2　　　　MR. MONTGOMERY:  No, I'm -- I'm anticipating they

3　would.  They have done so today, and I'm anticipating they

4　would do so at the trial, and that's why the -- you know, the

5　motion *in limine*.

6　　　　THE COURT:  All right.  What arguments are you going

7　to make that --

8　　　　MR. BARNETT:  Your Honor, we're not going to imply

9　that anyone other than Mr. Malone was driving the Pontiac --

10　　　　THE COURT:  Until --

11　　　　MR. BARNETT:  -- from the time that it's --

12　　　　THE COURT:  From the time he switched with Arrington?

13　　　　MR. BARNETT:  Right, yes.  From that point on in the

14　entirety of the pursuit, there's no -- we're not going to

15　argue that anyone other than Malone was driving it, but it --

16　　　　THE COURT:  But if this motion is granted, to the

17　extent you argue collectively, you know, the Pontiac did this,

18　the Pontiac did that.  This isn't hard for the jury to figure

19　out.  There's not going to be any contest as to who was

20　driving and when.

21　　　　But if there's an argument made by defendants that

22　you think Mr. Montgomery puts everybody together in the sense

23　of who the driver was, just object and I'll correct the record

24　and point out that there's --

25　　　　MR. MONTGOMERY:  Thank you, Your Honor.

1          THE COURT: These aren't contested issues as to who

2 was driving.

3          All right. We're almost done, actually, on this set

4 of motions.

5          42: Motion to bar admission or reference to the

6 criminal records of Plaintiffs Stevenson and Cokes.

7          I think we've dealt with this, haven't we?

8          MR. TERRACINA: This is just for meritorious

9 purposes. I understand the limitation that has been applied

10 for impeachment purposes.

11          THE COURT: Right, yeah, no, it doesn't come in for

12 propensity; it doesn't come in to say they had felonies before

13 so they must have committed a felony here. This is for

14 impeachment if they testify. That is the price you pay as a

15 witness generally if you testify. And you have -- 609 allows

16 such impeachment.

17          To the extent it's discretionary on whether I allow

18 convictions in on impeachment, I'm finding now that the

19 probative value outweighs their prejudicial impact. These are

20 all critical witnesses. These are the two plaintiffs and the

21 mother of one of the other plaintiffs who is going to be

22 seeking damages.

23          The jury's entitled to evaluate their credibility,

24 and so these are -- they're obviously prejudicial, but their

25 probative value outweighs any prejudice relating to the use of

1    those convictions.

2        Okay. Off the record.

3      (Off-the-record discussion.)

4       THE COURT: Back on the record.

5       Motion *in limine* 43: Bar any argument, evidence, or

6    innuendo that the one-way driving of Malone was the sole

7    proximate cause of the deaths and injuries of the plaintiffs.

8       That's denied. That's the case. Of course, they can

9    argue it. That's -- that's their case, and you can argue that

10   Ewing was the sole proximate cause or the primary cause or a

11   part cause. That's not going to bar either side from arguing

12   who was to blame for all this. So that motion is denied.

13       Anything else that we need to put on the record

14   tonight? First, from plaintiffs.

15       MR. MONTGOMERY: No, Your Honor, not for Arrington.

16       THE COURT: Any --

17       MR. TERRACINA: Not at this moment.

18       THE COURT: And from defendants?

19       MS. MOORE: Your Honor, actually on behalf of the

20   City, I was wondering if we could resolve, if at all possible,

21   the motion *in limine* relating to the City as a named

22   defendant.

23       THE COURT: Sure.

24       MS. MOORE: Just because it will affect the logistics

25   of things for the defense team over the next couple weeks.

1        THE COURT:  All right.  Are you insistent --

2        The City is in only as a -- and we're on the record

3   now -- the City is in only as an indemnitor for Ewing.

4   Correct?

5        MR. MONTGOMERY:  On the federal claim, that's true.

6   But on the State claim, they are in as a party under

7   *respondeat superior*, and so the jury would have an

8   obligation -- they would be on the verdict form.  The jury

9   would have an obligation to make a finding in regard to the

10  City.

11       MR. BARNETT:  Your Honor, I think the only basis to

12  hold the City liable is -- are the actions of Defendant Ewing.

13  So if Defendant Ewing is found liable, then the City would be

14  found liable.  If Defendant Ewing is found not liable, he

15  would be -- the City would be found not liable.  There's no

16  other --

17       THE COURT:  There's no Monell claim here.

18       MS. MOORE:  Well, actually --

19       THE COURT:  Well, if there is, but it's been severed.

20       MR. MONTGOMERY:  It's been bifurcated.

21       MS. MOORE:  It's been bifurcated.

22       THE COURT:  Bifurcated, yeah.

23       MS. MOORE:  And counsel's exactly right, plaintiffs

24  have expressly withdrawn attempting to hold any other City

25  employees liable -- liable for any of this.  So all of it is

1   through Defendant Ewing.  So it would simply be redundant and

2   cause prejudice to keep the City on there, especially when the

3   Monell claim is actually already bifurcated.

4          THE COURT:  Why does the City -- aren't they correct

5   on respondeat superior?  Either Ewing is liable or not, and

6   the City's only on the hook if Ewing's liable?

7          MR. MONTGOMERY:  Well, my understanding is -- that's

8   true, that is correct.  My understanding is the City would

9   have to be on the verdict form.  Now, I don't know how to --

10         THE COURT:  Will you stipulate on behalf of the City

11   that if there's a verdict against Ewing, he was acting within

12   the scope of his authority and you will pay any verdict for

13   compensatory damages that you're found liability for?

14         MS. MOORE:  Yes.

15         THE COURT:  And you're putting that on the record

16   right now on behalf of the City?

17         MS. MOORE:  I'm putting it on the record.  And we've

18   admitted scope, we've admitted color of law, all of that in

19   the filings.

20         THE COURT:  All right.  I see no reason for the City

21   to be on the verdict form, then, and no reason for the City to

22   be at counsel table.  You have a stipulation that if you get a

23   judgment against Ewing, the City will cover it, because

24   they're not going to argue Ewing was acting outside the scope

25   of his authority.

1      Is that acceptable?

2          MR. TERRACINA:  Yes.

3          MR. MONTGOMERY:  Yes.

4          THE COURT:  Okay.  Very good.

5          Okay.  We will let you know the time next Friday.  I

6  have a -- I expect it'll be sometime mid-morning, but we'll

7  let you know.

8          MR. BARNETT:  Thank you, Your Honor.

9          MS. MOORE:  Thank you, Your Honor.

10          MR. MONTGOMERY:  Thank you, Judge.

11      (Proceedings concluded at 4:38 p.m.)

12                      CERTIFICATE

13      I certify that the foregoing is a correct transcript from

14  the record of proceedings in the above-entitled matter.

15  */s/ Elia E. Carrión*              *11th day of August, 2022*

16  *Elia E. Carrión*                        *Date*
   *Official Court Reporter*

17

18

19

20

21

22

23

24

25