```
 1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                          EASTERN DIVISION
      ISIAH STEVENSON and               )
 3    MICHAEL COKES,                     )
                                         )        Docket No. 17 C 4839
 4                     Plaintiffs,       )
                                         )        Chicago, Illinois
 5         v.                            )        August 12, 2022
                                         )        2:01 p.m.
 6    CITY OF CHICAGO, an Illinois       )
      municipal corporation, and        )
 7    Chicago Police Officer DEAN W.     )
      EWING, Star #8653,                 )
 8    individually,                      )
                                         )
 9                     Defendants.       )
      _____
10    JUANITA ARRINGTON, as             )
      Independent Administrator of       )
11    the Estate of RONALD ARRINGTON,    )
      deceased,                          )
12                                       )        Docket No. 17 C 5345
                       Plaintiff,        )
13                                       )
           v.                            )
14                                       )
      CITY OF CHICAGO, an Illinois       )
15    municipal corporation, et al.,     )
                                         )
16                     Defendants.       )

17       TRANSCRIPT OF PROCEEDINGS - Final Pretrial Conference
                              VOLUME 2
18            BEFORE THE HONORABLE THOMAS M. DURKIN

19    APPEARANCES:
      For Plaintiffs         MR. PAUL LUKA
20    Stevenson and Cokes:   MR. ROBERT J. TERRACINA
                             Mendoza Law, P.C.
21                           120 South State Street, Suite 400
                             Chicago, Illinois  60603
22
                             ELIA E. CARRIÓN
23                         Official Court Reporter
                         United States District Court
24              219 South Dearborn Street, Room 1432,
                         Chicago, Illinois 60604
25                           (312) 408-7782
                     Elia_Carrion@ilnd.uscourts.gov
```

```
 1   APPEARANCES (Continued:)

 2   For Plaintiff          MR. JAMES D. MONTGOMERY, JR.
     Arrington:             James D. Montgomery & Associates, Ltd.
 3                          33 West Monroe Street, Suite 1375
                            Chicago, Illinois  60603
 4

 5   For Defendant          MR. ANDY M. HALE
     Ewing:                 MR. SHAWN W. BARNETT
 6                          MS. BARRETT BOUDREAUX
                            Hale & Monico, LLC
 7                          53 West Jackson Boulevard, Suite 337
                            Chicago, Illinois  60604
 8

 9   Also Present:          MS. LAULINE GOUGH
                            (James D. Montgomery & Associates, Ltd.,
10                          Legal Assistant)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1     (Proceedings heard in open court.)

2              THE COURT:  All right.

3              THE CLERK:  This is Case No. 17 CV 4839, Stevenson v.

4     Ewing, and 17 CV 5345, Arrington v. Ewing.

5              Could I please have counsel present on behalf of

6     Plaintiffs Stevenson and Cokes state their names.

7              MR. TERRACINA:  Robert Terracina on behalf of

8     Stevenson and Cokes.

9              MR. LUKA:  Paul Luka on behalf of Plaintiffs

10    Stevenson and Cokes.

11             MR. MONTGOMERY:  On behalf of Plaintiff Arrington,

12    James Montgomery, Jr.  And I have my legal assistant,

13    Lauline Gough, here with me today, Your Honor.

14             THE COURT:  All right.  Good afternoon.

15             THE CLERK:  On behalf of the defendant, please.

16             MS. BOUDREAUX:  Barrett Boudreaux on behalf of

17    Defendant Dean Ewing.

18             MR. BARNETT:  Shawn Barnett on behalf of

19    Defendant Ewing.

20             MR. HALE:  Andy Hale on behalf of Defendant

21    Dean Ewing.

22             THE COURT:  All right.  Good afternoon, everyone.

23             Let's go off the record.

24         (Off-the-record discussion.)

25             THE COURT:  Back on the record.

1        All right.  Jurors came in today to be COVID-tested
2   and to fill out their questionnaires.  My courtroom deputy has
3   sent you the jury list and also the questionnaires.
4        At some point today -- and we can do it now or
5   later -- if you've had a chance to look these over, there are
6   a couple that are very problematic, that are almost certainly
7   cause challenges that I would grant or I'd do it on my own
8   motion.  And I think the sooner we eliminate some people from
9   the pool that are plainly unacceptable to both sides, or to
10  the Court, the better feel you're going to have for the people
11  that are coming in.
12       This, of course, does not account for anyone who may
13  come up positive today, which will -- that person or persons
14  will also be excluded on Tuesday.
15       So my courtroom deputy sent you the numbers of some
16  people that gave problematic answers.  And if you want to go
17  through that now, we can.
18       Have you all had a chance to look that over?
19       None of this precludes you, by the way, from making
20  cause challenges on anyone later.  This is just more a matter
21  of if we can cut our list down a little bit, we reduce the
22  chance of infection because we have fewer people coming in.
23       Are you in a position to do that now or do you want
24  to wait?
25       MR. BARNETT:  Defendants can do it now, Your Honor.

1    THE COURT:  How about plaintiffs?

2    COURT REPORTER:  Speak into the microphone, please.

3    MR. TERRACINA:  Plaintiffs have not had a chance to

4 fully review.

5    THE COURT:  All right.  Well, what I'd suggest we do

6 is go through them -- a full review isn't necessary for this.

7 We're just focusing on two or three.

8    And, Mr. Montgomery, you may want to pull the mic

9 over toward you.

10    Let's just look -- let's go off the record for this

11 because I have some comments that are probably best left off

12 the record.

13    (Off-the-record discussion.)

14    THE COURT:  Let's go back on the record.

15    We had an off-the-record discussion about the jury

16 pool and whether or not certain jurors should be excused for

17 cause without having them come in, given their views of the

18 parties and the situation that may be involved in this case.

19 And the parties are going to discuss that to see if they reach

20 agreement on any of it.

21    Mr. Hale has brought up -- wants to raise the issue

22 of the number of peremptories.  I've allowed each plaintiff

23 three peremptories because it's really three plaintiffs, but

24 I'm allowing three for Arrington and three for Cokes and

25 Stevenson since they're represented by separate lawyers.  You

1    can share them any way you want, frankly, if -- it's basically
2    six for the prosecution, in general; and I have no problem
3    with you sharing them in any way you can privately agree upon.

4        And I allowed defense three because the City's out of
5    the case, and they're not -- they were a nominal defendant to
6    begin with.

7        Mr. Hale, you want to be heard.

8        MR. HALE:  Yes, Your Honor.  You -- respectfully, we
9    would ask that between now and the start of trial, the Court
10   reconsider that ruling.  We feel that the plaintiffs are
11   aligned -- for purposes of liability are aligned; and giving
12   them double the amount of strikes as the defense is a
13   tremendous, tremendous advantage in the case.

14       And we're also concerned that, just looking at the
15   questionnaires, we've got some people that are very -- you
16   know, like we've already talked about, we've already
17   identified probably four or five people that look like they've
18   got some serious issues, potential cause issues.

19       We're concerned that if we're going to lose a lot of
20   for-cause people and combine that with there being nine
21   collective strikes, we -- we risk could have -- we are risking
22   having a jury of less jurors than we were all hoping for
23   potentially.  So I think for those reasons, collectively, we
24   would ask that the strikes just be three and three.

25       THE COURT:  Well, they're not going to be three and

1    three.  And if there's any reconsideration, it might be
2    reducing the plaintiffs by one or two; but it's not going to
3    be three and three.
4         They are separate parties; they brought the cases
5    separately; they have separate damages claims.  You know, and
6    really, there's three plaintiffs, effectively, not even two,
7    even though there's two sets of lawyers.
8         So the best that's going to happen if I reconsider --
9    and I'm not committing to reconsidering -- would be reducing
10   their number by one or two; but it's not going to be three and
11   three, by any means.
12        MR. HALE:  Fair enough, Your Honor.  We would -- we
13   would be -- we would accept a reduction in whatever the Court
14   feels is appropriate.
15        THE COURT:  All right.  I'll consider that.
16        Any quick argument by plaintiffs on this subject?
17        MR. MONTGOMERY:  Your Honor, I think Your Honor has
18   made the point very clear.  The only thing I would add is the
19   assumption that there's alignment with these two cases on
20   liability issues.  There is -- I -- I can tell you there is --
21   on some of the issues, there's anything but alignment; and so
22   I think the Court's instincts are correct.
23        THE COURT:  All right.  Well, I'll reconsider it; but
24   enough said.  I'll let you know when it's relevant to consider
25   it.

```
1            Okay.  Two quick things.  One is apparently the
2    victim of the robbery was found.
3            MR. BARNETT:  Yes, Your Honor.
4            THE COURT:  Have you talked to her?
5            MR. BARNETT:  Yes.  We -- we did some additional
6    searching and we were able to contact her.  And if -- if
7    necessary, she is willing to come and testify.  We did provide
8    the plaintiffs' counsel with her contact information.
9            THE COURT:  What do you mean, if she's willing to
10   testify?  Did you give her a subpoena?
11           MR. BARNETT:  If the Court rules that her testimony
12   is admissible or relevant.
13           THE COURT:  You've talked to her about the facts?
14           MR. BARNETT:  Yes.
15           THE COURT:  Was it an armed robbery?
16           MS. BOUDREAUX:  No.  There was no firearm seen.
17           THE COURT:  Okay.  Okay.  Well, I don't need to hear
18   your argument.  I don't need to hear argument on this.  She's
19   too late.  This -- I know you're new to this -- your firm is
20   new to this case, but the defendants have been represented --
21   what was it?  The City -- Corporation Counsel had the City --
22   or the -- Officer Ewing before?
23           MS. BOUDREAUX:  That's correct.
24           THE COURT:  Yeah.  This is -- however this woman was
25   found, your resources may have been more creative than those
```

1   of the City, but there's no reason she shouldn't have been

2   found.  She was found in the city -- or in the suburbs.

3   Correct?

4          MR. BARNETT:  Your Honor, her address -- her address

5   was the same on the police reports that were exchanged in

6   discovery.  And she was identified as a witness by the

7   Tinley Park disclosures.

8          THE COURT:  All right.  Well, she was never

9   identified as a witness in this case in the sense that you've

10  all been on the assumption we don't know where the victim is.

11  She was equally available -- she could have been found by the

12  Corporation Counsel and presumably would have been deposed

13  if -- it's too late, so I'm not going to allow her to testify.

14         Also, there's the issue about cross-examination of

15  the plaintiffs' expert about -- who was a former Boca Raton

16  chief.  And one relates to him apparently springing a friend

17  out of jail and he was reprimanded for that and fined $5,000.

18  Correct?

19         MR. HALE:  Actually, Your Honor, that -- the one he

20  was fined for was the one where he -- he directed an officer

21  to pull over --

22         THE COURT:  That's right.

23         MR. HALE:  -- somebody, and then the news reporter

24  could do this ambush interview.  He was fined by the -- he was

25  sanctioned by the governor.

1        THE COURT:  And the other -- what was the sanction,

2   if any, for getting a friend out of jail overnight?

3        MR. HALE:  That would have been -- that one, there

4   wasn't a sanction.  That one, what we wanted to bring out

5   was -- I mean, I don't -- I don't want to even get into that

6   incident.

7        THE COURT:  All right.

8        MR. HALE:  I wanted to bring out the fact that there

9   was this no-confidence vote of 152 to 3 before he resigned

10  because he's holding himself out as this police practices

11  expert who has risen through the ranks and is this -- you

12  know, it affects his credibility when his own department is

13  voting 152 to 3 the no-confidence vote against him.

14       THE COURT:  All right.  Response?

15       MR. MONTGOMERY:  Your Honor, obviously we disagree.

16       A, as I understand it, at least as counsel has

17  presented it to me, he has read some hearsay in a newspaper.

18  And I can tell you, at least in, you know, checking with the

19  expert, a lot of these facts are opinions and not truth.

20       And he is asking the Court to probe a witness on

21  something that doesn't directly affect or impact his

22  qualifications as an expert, his opinions, his experience, his

23  opinions -- any of the traditional areas of impeachment based

24  on incomplete and inaccurate hearsay.

25       Particularly with the issue about a no-confidence

1    vote from a Union, that was a political vote.  So now we're

2    going to bring political issues into the courtroom in dealing

3    with a witness like this.  And I -- I -- if the Court were

4    ever to consider what we consider fairly outlandish attempts

5    to impeach an expert witness, we would ask that he be able to

6    explain what the actual truth is so the jury can hear it

7    rather than -- rather than this newspaper supposition.

8            THE COURT:  All right.  I have heard enough argument,

9    unless you have something briefly to respond.  But I've heard

10   enough on both sides to rule.

11           MR. HALE:  We're ready, Your Honor.

12           THE COURT:  This is covered by Rule 608(b).  I can

13   allow cross-examination and questions on cross under 608(b) if

14   they're probative of character for truthfulness or

15   untruthfulness of the witness.  None of this deals with the

16   truthfulness of the witness.  Now -- so I'm barring it under

17   608(b).

18           However, if plaintiffs hold this witness out as the

19   next coming of Bill Bratton, as -- you know, the exemplary

20   police chief of the year -- and extol his qualifications to

21   such an extreme that it would be fair to allow this

22   cross-examination, I will.  But merely stating his expertise

23   in police chases -- which is what he's testing about.

24   Correct?

25           MR. MONTGOMERY:  Yes.

1      THE COURT:  Yeah.  That doesn't have anything to do

2  with pulling over a -- it doesn't have anything to do with the

3  facts in these newspaper articles or opinions in these

4  newspaper articles.

5      And so under 608(b), I'm barring it.  If his

6  qualifications are restricted to expertise and experience in

7  police chases, that doesn't open up the door.  But if they

8  start -- they, being plaintiffs -- start pumping him up, as I

9  said, as the, you know, greatest police chief of all time or

10  in Florida history or Boca Raton history, then I may -- that

11  may very well open the door to these questions, which he can

12  then respond to if he wants to point out why they're not true.

13  But barring that under 608(b), I'm not allowing that

14  cross-examination.

15      All right.  I have -- I want to talk about the joint

16  enterprise issue.  Plaintiffs filed a motion for judgment as a

17  matter of law under 50(a), arguing that defendant's assertion

18  of a joint enterprise between the plaintiffs in connection

19  with the alleged robbery lacks legal and evidentiary support.

20      The Court's going to deny the plaintiffs' motion and

21  will issue a more detailed written ruling shortly.

22      The motion turns on two primary issues:  Can the

23  joint enterprise rule be extended to an extensively criminal

24  enterprise under Illinois law, or is it limited to legal

25  commercial enterprises?  And two, would the evidence, taken in

1   the light most favorable to defendants, allow a reasonable

2   jury to find that a joint enterprise existed between

3   Jimmie Malone, Ronald Arrington, Isiah Stevenson, and

4   Michael Cokes in relation to their involvement with the

5   alleged robbery that preceded the crash at issue here?

6           As to the first point, the case law does not clearly

7   foreclose the application of the joint enterprise rule to an

8   alleged criminal enterprise.  While Illinois cases often use

9   terms like business enterprise or legitimate, those terms are

10   not always defined and are often just reflective of the facts

11   at hand.  Other cases say the enterprise must be for

12   commercial or profit-making purposes, only to distinguish it

13   from a social purpose.

14           Neither the parties nor the Court have found a case

15   clearly stating that a criminal purpose cannot constitute a

16   joint enterprise.  And the policy underpinning the doctrine is

17   equally applicable to a joint criminal enterprise as to a

18   joint business enterprise and, in many ways, more so.

19           As to the second point, after a more thorough review

20   of the evidence during the final pretrial conference, the

21   Court finds that a jury could reasonably conclude that

22   Arrington, Stevenson, and Cokes shared a common purpose with

23   Malone in carrying out the alleged robbery and that each had a

24   shared interest in the subsequent flight from police.

25           The relevant evidence includes testimony and video

1    depicting the lead-up to the robbery, evidence that at least
2    Stevenson knew of Malone as a getaway driver and the fact that
3    plaintiffs had an opportunity to exit the vehicle before the
4    chase but did not do so.

5         Plaintiffs have not met their burden under Rule 50 to
6    show that a reasonable jury "would not have a legally
7    sufficient evidentiary basis" to find that a joint enterprise
8    existed.

9         So that's the ruling.  You'll get a written ruling
10   before the trial, and that's the ruling.

11        All right.  I think we're on, then, to the motions *in*
12   *limine*, unless there are any other residual issues we should
13   deal with.

14        MR. MONTGOMERY:  The only -- this is in regard to a
15   motion *in limine*, as -- well, in regard to a motion *in limine*.
16   The plaintiff did file its brief in support of its motion
17   regarding the Dead Man's Act as it relates to the limited
18   State claims.

19        THE COURT:  I've read that, and I'm -- I'm not going
20   to give you a final ruling on the Dead Man's Act today.  But
21   I'm skeptical that it would apply in Federal Court because of
22   the cases, mainly the *Chlopek* case and the *Horton* case.

23        Now, I've read your reply brief, which distinguished
24   them from the current facts -- attempted to distinguish them.
25   But nonetheless, this -- well, what is it exactly that you are

1  trying to exclude from evidence under the Dead Man's Act that
2  you expect to be presented by your co-plaintiff -- maybe by
3  the other plaintiff or by the defendants?

4          MR. MONTGOMERY:  Yes.  The only -- Your Honor, my
5  client -- I mean, I -- I don't mean to be Captain Obvious in
6  saying this, it's just a predicate to the rest.  My client is
7  deceased.

8          THE COURT:  Uh-huh.

9          MR. MONTGOMERY:  He cannot contest what some of these
10  witnesses have said already.  It is very easy for these
11  interested witnesses to -- to exonerate themselves and point
12  the finger at my client, who is no longer here.

13          I don't have animus to these lawyers for it, but
14  it's -- it's -- that's the underpinning of the Dead Man's Act.
15  And in particular, conversations about who was the driver,
16  conversations about who did what in the car, conversations
17  about there was some -- there was some indication that money
18  was thrown at Arrington.  And the jury can -- the jury can go
19  several different ways with that.

20          Those are events that pertain only to the State
21  claim.  And I will tell you, Judge, there are several federal
22  cases that were -- you have Federal and State claims -- where
23  under 60 -- Federal Rule 601, the Dead Man's Act has applied.

24          And -- and the only cases where there's been
25  limitation has been where the testimony is -- not the claim,

1  where the testimony in question overlaps the -- the Federal
2  and State claim.  The testimony I'm talking about here does
3  not.
4          THE COURT:  Well, first, is the testimony you're --
5  you're attempting to preclude what you think they're going to
6  say?  Or is this something they have already said in their
7  depositions or in the police reports?
8          MR. MONTGOMERY:  Sure.  Sure, they've said it.  They
9  said that -- that Arrington was the driver.  Well, it's easy
10  for them to say that because he's not here to say, no, I
11  wasn't.
12          They've said that -- that -- you know, things about
13  getting out of the car at some point and switching drivers
14  and -- you know, from Arrington to somebody else.  I don't
15  know.  The Estate doesn't know, and the Estate can't know; but
16  these live witnesses have said that because -- and have a
17  green light to say that in the absence of Arrington being
18  here.
19          THE COURT:  Well, there's no question Malone was the
20  driver when the reckless driving took place.  Correct?
21          MR. MONTGOMERY:  That is -- that is the Federal
22  claim.  And we don't have a question -- we're not questioning
23  that at all.  That's the Federal claim, and that -- that
24  begins at 123rd and Halsted once Dean Ewing started receiving
25  the Zone 9 radio dispatch.

1        THE COURT:  Is there any independent evidence other

2  than Cokes and Stevenson that Arrington was the driver until

3  Malone took over?

4        MR. MONTGOMERY:  No.

5        THE COURT:  It's only those two that have it?

6        MR. MONTGOMERY:  Yes.

7        THE COURT:  Nothing from the State Police as to who

8  the driver was and nothing from any eyewitnesses who the

9  driver was?

10        MR. MONTGOMERY:  That's right, Your Honor.

11        THE COURT:  All right.  Parties agree with that?

12        MR. BARNETT:  Yes, Your Honor.

13        MS. BOUDREAUX:  Yes.

14        THE COURT:  And then there's testimony that money was

15  thrown around in the car?

16        MR. MONTGOMERY:  Yes.  At -- at 127th Street, there

17  was testimony -- there was testimony that Malone threw money

18  in the back seat in the direction of Arrington.

19        THE COURT:  Well, there was two people in the

20  backseat, weren't there?

21        MR. MONTGOMERY:  Well, but the testimony -- there's

22  only one deceased; and so the testimony was it was thrown at

23  Arrington.  I mean, you -- I'm sure the Court can appreciate

24  my concern about that, having -- Arrington can't say, well,

25  no, no, no, that's not how it happened.

1      THE COURT:  Well -- okay.  Well, that -- and those
2   are the two pieces -- I'm not limiting you, but those are the
3   key parts of what you're trying to prohibit?

4      MR. MONTGOMERY:  Yeah.  And -- and any testimony
5   about -- particularly now that the Court is allowing the jury
6   to hear joint enterprise.  Any testimony about what happened
7   in Tinley Park in the presence of Arrington, testimony what
8   happened in the car, what these guys allegedly did or saw, or
9   any of that falls within the Dead Man's Act.

10      THE COURT:  All right.  Well, I haven't really gotten
11   any opposition from the Stevenson/Cokes defendants [sic].

12      Are you opposing this?

13      MR. TERRACINA:  Well, it's a precarious position.
14   We -- we don't necessarily oppose it, although we do think
15   that certain aspects of it might frame the issue for Stevenson
16   and Cokes in such a light where the inability to explain would
17   leave this blank open questioning; that on cross-exam, they
18   would be asked questions that they wouldn't be able to answer.

19      But we don't oppose the motion.  We just hope that a
20   limiting instruction were -- were to apply it to prevent two
21   individuals from being put on the stand in open court and then
22   being cross-examined about things that they are bound from
23   saying.

24      THE COURT:  Yeah.  I mean -- well, I'm not going to
25   speculate how -- I'm going to rule and -- but a limiting

1    instruction is also a possibility.

2           Obviously, the defendant says -- you put in your

3    briefs, oppose this.  Correct?

4           MR. BARNETT:  Yes, Your Honor.

5           And I would also point out that the Dead Man's Act

6    also has an exception that if the -- if the party of the

7    decedent introduces any evidence of an event, the adverse

8    party can introduce evidence of that same event.

9           So if they start introducing evidence of any aspect

10   of the car, such as Mr. Arrington attempting to exit the

11   vehicle as shown on the in-dash camera recording, we are

12   then -- per the Dead Man's Act, 735 ILCS 5/8-201, Section A,

13   if they introduce evidence of an event that favors their case,

14   we are then allowed to introduce evidence that disfavors it.

15          THE COURT:  Is there going to be evidence introduced

16   through -- or suggestion or argument that the dashcam

17   indicates Arrington tried to get out of the car?

18          MR. MONTGOMERY:  That was the -- that's under the

19   Federal claim.  I don't know why counsel brings that up.

20   That's under the Federal claim.

21          And yes, they actually have shown that video to

22   Your Honor where the left side rear door opened.

23          THE COURT:  Yeah, I missed that, but I -- you've all

24   studied this more than I have.

25          MR. MONTGOMERY:  And that isn't anything -- I mean,

1    the way the act reads is if we asked -- we introduce testimony

2    regarding a specific event -- not all events, but a specific

3    event, the door is open for them to -- to present evidence

4    about that specific event, not all events.

5              THE COURT:  All right.  Well, I'm --

6              MR. MONTGOMERY:  But that one is federal.  And so

7    that -- that's not subject to our motion.

8              THE COURT:  These are overlapping State and Federal

9    claims.  You brought the claim in Federal Court.  You didn't

10   have to.  You could've brought it in State Court and excluded

11   the federal claim.  You could drop the federal claim now if

12   you wanted, but there's reasons you don't want to, I'm sure.

13             But when you mix federal and State claims in

14   Federal Court, you often have to live with the -- with the

15   federal rule that applies to the case.  And it's very

16   difficult to apply a doctrine of state law to exclude evidence

17   as to certain claims or defenses when you have -- the claims

18   all relate to the same incident.

19             MR. MONTGOMERY:  Your Honor, I don't disagree with

20   you, in general; but the cases are fairly clear that the

21   overlap is not the claim.  The overlap is the testimony or

22   events underlying the claim.

23             So it -- it's not the fact that there are both State

24   and Federal claims.  We agree that the testimony regarding

25   willful, wanton, and negligence are coextensive with the

1   Federal claim.  And we -- we adamantly suggest to Your Honor
2   that the -- the affirmative defenses are anything but.  They
3   have no overlap in testimony whatsoever.
4           THE COURT:  All right.  Well, I'll read the briefs
5   again, give you a ruling, but I will -- that's all I can
6   promise you.  So I'll reserve ruling on the Dead Man's Act
7   issue.
8           MR. BARNETT:  Thank you, Your Honor.
9           THE COURT:  Okay.  We went through last time
10  Plaintiffs' Stevenson and Cokes motions *in limine.*  And I
11  think we ruled on or reserved on -- ruled on most of them,
12  reserved on a couple.  And I've just given you the ruling on
13  the joint enterprise issue and reserved on the Dead Man's Act.
14          So let's go on to Plaintiff Arrington's motions *in*
15  *limine*.
16          Have I correctly stated what we did last week?
17          MR. MONTGOMERY:  Yes, Your Honor.
18          MR. BARNETT:  Yes, Your Honor.
19          THE COURT:  I've never had this many motions *in*
20  *limine* in a case, but I'm not criticizing.  I'm just telling
21  you, so bear with me if I repeat myself.
22          All right.  Motion *in limine* No. 1, to bar any
23  evidence or testimony relating to eight cell phones found in
24  the gold Pontiac.  I believe I already ruled that testimony
25  about the parties having cell phones is admissible, but

1    there's nothing about eight because that suggests some other
2    crime.
3              And if I'm giving you a ruling at any point that is
4    inconsistent, you believe, with what I ruled last week, point
5    it out and I'll make sure I can resolve the inconsistency.
6              MR. MONTGOMERY:  Just a point of query, Your Honor.
7    There's no testimony that Arrington, to my knowledge, had a
8    cell phone in this case.  I'm assuming we're not attributing
9    anything to him.
10             THE COURT:  Well, are you -- is the evidence going to
11   be just cell phones were found in the car?
12             MR. BARNETT:  Your Honor, I proposed a stipulation to
13   plaintiffs' counsel that Mr. Arrington, Mr. Stevenson, and
14   Mr. Cokes had access to multiple cell phones while inside of
15   the Pontiac prior to the --
16             THE COURT:  Take out multiple; say several.
17             MR. BARNETT:  Yes, Your Honor.
18             THE COURT:  But you can either agree to that stip, or
19   they're going to put in evidence of what was found.
20             MR. MONTGOMERY:  So what, eight cell phones?  I
21   mean --
22             THE COURT:  Well, if you won't agree to a fairly
23   neutral stipulation, I can't -- I'm not going to manufacture
24   evidence and mislead the jury.
25             They either -- you know, that is a stipulation that

1    is imminently fair to the plaintiff. I can't force a

2    stipulation, but I certainly am not going to have evidence

3    presented to the jury that's false.

4           So consider the stip. Otherwise, I'll put it in and

5    I'll give a limiting instruction there's no allegation that

6    any -- the access to eight phones was evidence of criminal

7    conduct.

8           MR. MONTGOMERY: Well, Your Honor, we have to accept

9    that stipulation or the alternative. I mean, it --

10          THE COURT: Well, that is an alternative way of

11    resolving the issue. Otherwise --

12          MR. MONTGOMERY: May we --

13          THE COURT: -- factually -- let me finish.

14          MR. MONTGOMERY: Okay.

15          THE COURT: Factually, the officers who inventoried

16    that car are going to talk about the phones. And if you want

17    to cross them on where they were found, whether any of them

18    were registered to Mr. Arrington, you're free to do that.

19    Whether his prints were found on it, whether they were found

20    on his body, whether they were loose in the car, you can cross

21    about all that.

22           But this seems like a cleaner way to do it, with the

23    stipulation. Believe me, I can't force stipulations; and I

24    don't intend to. But I'm telling you the consequence; I'm

25    going to allow evidence.

1    Because under the joint enterprise claim or theory,
2  there are -- it is acceptable for defendants to argue that an
3  unwilling participant in a joint enterprise had a mechanism of
4  getting out of it.  Whether it's calling someone, calling
5  9-1-1, calling a family member, saying, I've -- I'm in the car
6  and Malone's driving crazy, if they want to suggest that, they
7  can.  And, you know, I'm --
8    MR. MONTGOMERY:  Your Honor, and we don't deny that.
9  And in particular, Stevenson was on the phone doing exactly
10 that.  So we're not trying to deny that or whitewash a jury.
11   I'm just -- I'm just saying, here again, the
12 deceased -- and this is -- has been my concern from the
13 beginning of this case -- the deceased, who is not in the
14 position to stand up and say, regardless of what the defense
15 says, "it wasn't my cell phone and I didn't have access to
16 it," now I have to -- he has to -- we have to live with that.
17   THE COURT:  Well, you have to live with the facts.
18 And the facts are eight phones were found there.  If --
19 there's plenty of cross -- fodder for cross-examination that
20 they can't attribute any of them to Arrington, if that's the
21 truth.
22   But I'm not going to, you know, force the
23 defendant -- it is relevant that there were phones in the car.
24 If there's a stipulation that removes the number eight and it
25 just says several, that seems fine to me, but I'm not the

1    lawyer.  You've got to try your case.

2           But I'm not going to change evidence.  So if you can

3    stipulate to it, great; otherwise, eight phones comes in.  And

4    if you can reach a stipulation there's no evidence that

5    Arrington or any particular occupant other than apparently

6    Stevenson, who was on the phone, no evidence of who owned

7    those phones, that's fine too.

8           All right.  Bar evidence or argument that

9    Ronald Arrington went to an alternative high school.  That's

10   agreed.

11          Bar evidence or testimony or argument about Facebook

12   photos of Arrington and/or Malone.

13          These are the ones with the person showing the money?

14          MR. BARNETT:  Yes, Your Honor.

15          THE COURT:  Yeah.  I already barred that because --

16   unless you can show that that photograph was taken during --

17   between the robbery and the crash, it's barred.

18          MR. BARNETT:  Yes, Your Honor.

19          THE COURT:  No. 4, bar any evidence, argument, or

20   innuendo alleging Arrington's nickname correlates to gang

21   affiliation.  That's been agreed.

22          Motion No. -- and by agreed, I mean granted by

23   agreement.

24          Motion No. 5, bar any evidence, argument, or innuendo

25   regarding Arrington's alleged parole status.

1    Who would that be brought out through, his mother?

2    MR. BARNETT:  Your Honor, we can -- we can bring it

3 in through his mother.  Or I believe one of the other

4 plaintiffs was aware that Mr. Arrington was on either parole

5 or probation.  And the conviction -- the certified conviction

6 shows that he was on probation for a felony conviction, and it

7 was subsequently terminated as unsatisfactory.

8    THE COURT:  All right.  Well, you may argue that it

9 provided a motive for him to run.  The motive for running was

10 the robbery, not parole status.  The more salient relevance of

11 this is, depending on the testimony of the plaintiff, the --

12 his mother or one of the mothers of his children, if -- it

13 depends on what they say about Mr. Arrington's prospects, his

14 life, what -- what it would -- whatever is going to be

15 testified to on that.

16    I don't know what it is.  But if they testify to loss

17 of companionship, the society of Mr. Arrington, it may very

18 well be under the *Cobige* case that -- where Judge St. Eve was

19 reversed for not allowing such evidence, that that will come

20 in.  It depends on the testimony.  And I am not going to rule

21 in advance on that.

22    MR. MONTGOMERY:  And, Your Honor, I understand with

23 respect to *Cobige* -- and that's fair; absolutely.

24    The -- the notion -- counsel brought up Stevenson,

25 which is not a *Cobige* issue, he -- Stevenson made some comment

1   that presumably was based on some level of hearsay that -- I

2   don't know if they intend to try to draw that out, but --

3         THE COURT:  Well, maybe I should have read this -- I

4   should be more careful.

5         Who's got the parole status?  Both Stevenson and

6   Arrington?

7         MR. BARNETT:  I believe Mr. Arrington, and I believe

8   that Mr. Malone was also on some type of probation at the time

9   of the event.

10         But right now, we're just focusing on Mr. Arrington

11   and if -- if this does become admissible as to damages,

12   Your Honor, we would likely then bring it out through the

13   damages witness.  And we wouldn't seek to elicit it through

14   Mr. Stevenson or anybody else.

15         MR. MONTGOMERY:  And I will tell you, Your Honor, I

16   read what they submitted.  I don't see anything about parole;

17   but, you know, maybe they can show me something that I missed.

18   I don't even see that in the record that they submitted two

19   weeks ago or three weeks, whenever it was.

20         THE COURT:  All right.  Well, I haven't had access to

21   that, but the -- it -- Arrington's parole status, if it can be

22   established and it's accurate, may be admissible, depending on

23   the testimony of the representatives who are seeking damages

24   on behalf of Mr. Arrington's estate.

25         MR. MONTGOMERY:  Thank you, Your Honor.

1    THE COURT:  So motion *in limine* No. 6 is to bar any
2  evidence, argument, or innuendo that Arrington, Stevenson,
3  Cokes were in a gang.  That's been agreed to.  It will be
4  granted.

5    Motion *in limine* No. 7, to bar any evidence that
6  Arrington previously sustained a gunshot wound to the hand.
7  That's been agreed to.  That's granted.

8    No. 13, bar evidence of parties' financial standing.
9  I believe that's agreed to.

10    Plaintiff is not seeking any lost income -- making
11  any lost income claim.  Is that correct?

12    MR. MONTGOMERY:  That's correct, Your Honor.

13    MR. BARNETT:  And, Your Honor, I just want to make
14  sure, because the motion says one thing, and then opposing
15  counsel said something different during the last status -- the
16  last hearing.

17    Are they seeking punitive damages?  Because then
18  Mr. Ewing's financial condition is relevant.

19    THE COURT:  Well, I understand you are seeking
20  punitive damages.  Is that correct?

21    MR. MONTGOMERY:  Your Honor, that's what -- that's
22  what we discussed with respect to -- in the last conference.

23    THE COURT:  On the record, there may be a mistake in
24  the motion itself.  They are seeking punitives.  And what I
25  said is if Mr. Ewing gets up and says I can't pay punitives,

1   it'll put me in the poorhouse, then his own financial status
2   of course becomes relevant.  They can examine him about what
3   his assets are and his income, et cetera.

4           But the jury also will learn that the City is going
5   to pay the compensatories.

6           MR. BARNETT:  Yes, Your Honor.

7           THE COURT:  If Mr. Ewing does not mention --
8   you know, even if punitives are sought, if he doesn't get up
9   and mention anything about his own financial status in an
10  effort to decrease punitive damages, the jury does not learn
11  that the City pays compensatories.

12          That's the rule I've applied in other cases.  If the
13  parties want to say that -- that's the rule I've applied in
14  other cases.  And absent hearing argument otherwise, that's
15  how it's going to go.

16          MR. BARNETT:  Yes, Your Honor.

17          THE COURT:  Motion *in limine* No. 15, bar evidence of
18  unrelated litigation.  That is -- I don't think there's any
19  civil litigation.  I don't know if that relates to the COPA
20  investigation, which I've already ruled on.

21          MR. MONTGOMERY:  There's -- the only other civil
22  litigation I'm aware of, and there might be some I'm not, is
23  the claim Stevenson and Cokes made against the Illinois State
24  Police and --

25          THE COURT:  Oh.

1          MR. MONTGOMERY:  -- Tinley Park.

2          THE COURT:  Are you going to be offering that?

3          MR. MONTGOMERY:  No.  No -- oh, I'm sorry.

4          MR. TERRACINA:  Oh, no.  At this point in time, those

5     parties have settled out.

6          THE COURT:  So there's -- this is granted, No. 15.

7          Motion *in limine* No. 22, bar argument that

8     plaintiffs' damages request is shocking.  That's denied.  I

9     just said that you can't offer personal opinions or invoke the

10    Golden Rule when you're arguing to a jury, but I'm not going

11    to wordsmith how you all make your openings and closings.

12    That's not the role of a judge.

13         Motion *in limine* No. 23, bar argument that

14    plaintiffs' damages request is excessive in light of the facts

15    not before the jury.  That's been agreed to; granted.

16         26, bar evidence of witnesses' prior arrests.  That's

17    been agreed to.  That's granted.

18         Bar any affirmative defense not raised by defendants

19    in their answer.  That's been agreed to, so that's granted.

20         No. 28, bar evidence of seat belt usage.  I think the

21    defendants said if they're going to offer that, they're going

22    to give notice before they do.

23         MR. BARNETT:  Yes, Your Honor.

24         THE COURT:  I don't know the relevance of that.  It

25    seems like cases say you can't raise it.  It's kind of

1    surprising, given the fact there was a law saying you should
2    wear a seat belt.  But the law is what it is.

3           But if you're going to raise the fact that the
4    occupants of the car were not wearing seat belts, you're going
5    to have to give me notice first.  And I'll hear argument at
6    sidebar or one way or another outside the presence of the
7    jury.

8           MR. BARNETT:  Yes, Your Honor.

9           THE COURT:  So that's granted without prejudice to
10   defendants reraising it.

11          Motion *in limine* No. 29, bar evidence or testimony of
12   conversations under the Dead Man's Act of Arrington.  That's
13   reserved.

14          Motion *in limine* No. 30, bar evidence of the criminal
15   history of Plaintiff Decedent Arrington.  Again, I think the
16   criminal history of the decedent comes in, depending on what
17   the testimony of his mother and the wives of his -- and as the
18   mothers of his children.  Depending on how they phrase their
19   requests for damages, his criminal history may almost
20   certainly end up being relevant.

21          And so I'll -- that's denied without prejudice.  And
22   if you're going to raise it, we'll do it in the fullness of
23   the direct examination of those witnesses.  You can raise it
24   with me at sidebar if you're going to do it.

25          Bar evidence of the criminal history of Plaintiffs

1  Stevenson and Cokes.  Well, their criminal history, if they

2  testify, if they -- this is Arrington's request to bar their

3  criminal history.  A jury will know that it's not Arrington's

4  fault that Cokes and Stevenson have felonies that fall within

5  the rule under 609 to allow them to be offered.

6          Under 609, as I said before, if there's felonies

7  within ten years or a misdemeanor that deals with

8  truthfulness, I'm allowing in the cross-examination because it

9  goes to the credibility of the witnesses.

10         MR. MONTGOMERY:  I believe Your Honor also had

11  indicated previously that we could offer a limiting

12  instruction with respect to those.

13         THE COURT:  Yeah, absolutely.  But I'm putting it on

14  the parties on both sides.  Where I say I'm going to offer a

15  limiting instruction, you think of it, you remind me, because

16  it may very well be you don't think a limiting instruction is

17  necessary because it may highlight something you'd just prefer

18  it come in in one ear, out the other, and not be highlighted

19  by a limiting instruction.

20         But if you want one on prior convictions to remind

21  the jury that that is only to be used to determine -- at least

22  for under 609 -- only to be used to determine credibility of

23  the witness, I'm happy to give such an instruction.  Some of

24  these, though, arrests, parole status, convictions, may be

25  relevant for another purpose if they're used to cross-examine

1   the damage witness.

2           But strictly for credibility purposes of Stevenson
3   and Cokes, I'll give you such a limiting instruction if you
4   request it.

5           MR. MONTGOMERY:  Thank you, Your Honor.

6           MR. TERRACINA:  Your Honor, can I make one note for
7   the record?

8           THE COURT:  Yes.

9           MR. TERRACINA:  So at our last status conference, I
10  believe I had stated that one of the offenses of Mr. Stevenson
11  was assault.  That was actually incorrect.  It's actually
12  armed violence.  That's another possession charge.

13          In fact, I believe the entirety of what we've been
14  provided by the defendants in this case has -- they're all
15  possession charges.  And so I would just --

16          THE COURT:  Assault with -- possession of what?

17          MR. TERRACINA:  So there's an armed violence which
18  was possession of drugs and gun -- or -- and a firearm, and
19  then there is a series of UUWs.

20          MR. BARNETT:  So not possession of narcotics,
21  Your Honor.  They are violent felony weapons involving a
22  firearm.

23          THE COURT:  Did you reach agreement, by the way, on
24  what the scope of cross on a prior conviction can be?  What --
25  how you would phrase it?  I had asked the parties to see if

1   they could agree on that.

2          MR. BARNETT:  I provided a stipulation to the

3   plaintiffs.  I have not -- it has not been agreed to yet,

4   Your Honor.

5          And before we move on, I do have to make a

6   correction.  It does appear that Mr. Cokes might not have been

7   convicted of a felony forgery.  I think it was bumped down to

8   a Class A misdemeanor.  So I just wanted to -- to be

9   incredibly, you know, candid with the Court and opposing

10  counsel.  That was my mistake.

11         When opposing counsel pointed it out, I did -- I did

12  agree that it was my mistake.  So I just wanted to make sure

13  that it is clear so, you know, the Court is fully informed of

14  that.

15         THE COURT:  All right.  Well, let's -- let's be

16  straight on.

17         Stevenson, what felonies, if any, and misdemeanors do

18  you intend to cross-examine him on under 609?

19         MR. BARNETT:  Yes, Your Honor.

20         So we would -- first, Mr. Stevenson had a 2019 felony

21  UUW, unlawful use of a firearm, conviction in 2019; and a 2013

22  felony armed violence.  And so we would seek to cross-examine

23  Mr. Stevenson on both of those.

24         THE COURT:  All right.  And other than the general

25  objection to cross on felonies, are you objecting to any other

1  aspect of it?

2          It seems to fall within the 609 rule, provided they
3  make a finding that it's more probative than prejudicial,
4  which I do.  I think convictions within ten years of a witness
5  whose credibility is central to a case are fair game for
6  cross.

7          MR. TERRACINA:  Our one particular concern is that
8  there's going to be an attempt to draw out that examination so
9  that it's more so aimed at the character of Mr. Stevenson,
10 rather than his character for truthfulness.

11         THE COURT:  Well, I'll interrupt you.  That's why I
12 asked if you could reach a stipulation, because at least they
13 get out the fact of the conviction, when it occurred,
14 generally what the conviction was for.

15         I don't know if there's other parts of this that you
16 want.  Some judges allow the sentence to come out.  Sometimes
17 the -- or attorneys for the witness want to bring out the
18 sentence because the sentence may sound a lot less serious
19 than the name of the crime.

20         But I certainly have allowed when it occurred and
21 what the crime is and the fact that it's a felony.  If you
22 want to -- that's why I asked if you can reach agreement, you
23 should get back to them about what it is.  And if you can't
24 reach agreement, I'll tell you what can be allowed to be
25 crossed on that.

1   They can't draw it out.  They can only ask, you know,

2   were you convicted of a felony?  You may ask it on direct now

3   that's it's coming in, but they can't draw it out.  They can

4   just add the fact of a conviction.

5   Mr. Montgomery.

6   MR. MONTGOMERY:  Your Honor, I just -- I understand

7   where you're going.  I just have to say this for the record.

8   These -- the -- the risk with these convictions,

9   particularly how they're sounding, particularly since the

10  Court seems to have approved joint -- I don't know if the

11  court approved joint criminal enterprise or joint enterprise

12  or what; but either way, when you put the two together, now we

13  have -- in my mind, we have a 404 issue.

14  Whether this is suggesting to the jury that because

15  these guys had these convictions in the past, they're likely

16  to have been part of a joint enterprise here.

17  THE COURT:  Fashion an instruction that says that the

18  evidence of the felonies of Mr. Stevenson and Mr. Cokes --

19  we'll get to him in a minute -- Mr. Stevenson is not evidence

20  against Arrington or Cokes.  It only -- and it's not even

21  evidence against Stevenson other than it affects -- it's to be

22  used to evaluate his credibility.  It is not to be used to

23  determine whether or not a joint enterprise exists.

24  Fashion such an instruction.  I'm happy to give it

25  because you're -- that's true, this comes in for such a

1   limited purpose, I'm happy to read an instruction that reminds

2   the jury that it doesn't apply to other aspects of the case.

3          But that's the only way to cure it, and it's routine.

4   That happens all the time.  That's how you cure any residual

5   prejudice from it.

6          Criminal defendants are cross-examined about prior

7   convictions, and that's allowed.  And I can't think of

8   anything potentially more damaging when a criminal defendant

9   is denying a crime and admitting to prior felonies.  And

10  that's been allowed.

11         So in a civil case, it's even less risk.  But I'll

12  give you the instruction I just stated.  I'll rely upon you to

13  draft it, run it by the other side to see if it's by

14  agreement.  If it's not, I'll resolve the differences.

15         MR. MONTGOMERY:  Thank you, Your Honor.

16         MR. BARNETT:  Your Honor, I did propose a limiting

17  instruction to the plaintiffs on this issue.

18         THE COURT:  All right.  Well, good.  Then you're

19  halfway there, both of you.

20         MR. MONTGOMERY:  It was unacceptable, but we'll see

21  if we can figure something out.

22         THE COURT:  No, that's fine.  You can work it out.

23         I've given you at least the guidelines of what I

24  think the rule is, and you can try and work it out in light of

25  that.

1    MR. TERRACINA:  Can I make one last statement on
2  this?
3    THE COURT:  Go ahead.
4    MR. TERRACINA:  And I might be getting ahead of
5  myself because it is subject to one of the defendants' motions
6  *in limine*.
7    But insofar as Mr. Cokes is concerned, as was noted
8  by counsel, that the -- the forgery that was charged was
9  actually dropped to attempted possession of a --
10    THE COURT:  Well, let me interrupt --
11    MR. TERRACINA:  -- instrument.
12    THE COURT:  I will interrupt you on this.
13    Let's -- I asked them to say first what it is they --
14  what is it they want to cross-examine Stevenson on.  We've
15  dealt with that.
16    What is it you want to cross-exam Cokes on under
17  Rule 609?
18    MR. BARNETT:  Yes.  Under Rule 609, Your Honor, it
19  would be the -- what we had initially believed was a felony
20  forgery.  But it is a Class 1 misdemeanor, which was the
21  attempt to commit forgery.  It was a misdemeanor.
22    We believe that an attempt to commit forgery or
23  possession of a forged instrument is an inherently dishonest
24  act because forgery is a dishonest act.  So the attempt to
25  possess forged documents is dishonest and does weigh on his

1  credibility.

2       He also has a misdemeanor theft, a conviction for
3  theft or stealing.  In his deposition, he stated that he was
4  a -- it was counterfeiting, was the specific charge.  And that
5  was per his deposition, Your Honor.  Counterfeiting is a
6  dishonest charge because it is making something and then
7  holding it out for something that it is not.

8       That is -- that requires deceit and dishonesty.  So
9  we would be seeking to bring in the 2014 misdemeanor attempt
10 of -- for a forged instrument and the 2013 conviction for
11 misdemeanor theft or stealing, which Mr. Cokes said was for
12 counterfeiting.

13      THE COURT:  So there's no felonies by Mr. Cokes?

14      MR. BARNETT:  No, Your Honor.  And like I said, I
15 apologize.  That was a mistake on my part.

16      MR. TERRACINA:  Your Honor, if I may correct one
17 thing that was stated by opposing counsel.  He said it was
18 attempted forgery.  That's actually 20 -- I believe that's
19 28-603 within the Nebraska compiled statutes.

20      In fact, Mr. Cokes was attempted under -- or
21 convicted under 28-1 -- or 201, with an adjoinment to 28-602,
22 which is attempted possession of a forged instrument, not
23 attempted forgery.

24      THE COURT:  Okay.  Well, these are misdemeanors, so
25 they have to relate to a dishonest act or false statement.

153

1 The one that is the attempt to possess a -- not manufacturing,
2 but you said it's an attempt to possess a false -- a forged
3 document?
4         MR. TERRACINA:  So in the state of Nebraska, there is
5 an attempt to forge; there is also attempt to possess with
6 intent to -- or there is an attempt to possess with intent to
7 utter.  Both of those, I believe, occur 603, 28-603.
8         Where Mr. Cokes was convicted is under 28-602, which
9 was just attempted possession of a forged instrument, a
10 Class 1 misdemeanor.
11         THE COURT:  All right.  That's not coming in.
12         What was the other one?
13         MR. TERRACINA:  It was -- so what counsel's referring
14 to with regard to the -- it was simple theft.  And what he's
15 referring to with the statement under deposition is
16 Mr. Cokes's -- a layperson not understanding what his attorney
17 had actually been able to have him ultimately -- or plea out
18 to.
19         He referred to it as a, quote/unquote, counterfeit --
20 or instance.  However, the facts of the actual conviction and
21 the underlying conviction don't support that.  It's just
22 simple theft.
23         THE COURT:  Well, simple theft is a dishonest act.
24 Theft is, I believe.  And I believe that -- possession of
25 an -- attempted possession of a forged document, I don't

1  believe implicates a dishonest act or false statement.  In a
2  broad sense, it might; but not, I think, as contemplated under
3  the spirit of 609.
4          But the -- the other one, which is -- was it
5  possession -- I'm confused on this because --
6          MR. TERRACINA:  It was -- I'm sorry; I interrupted
7  you.  Can you repeat that?
8          THE COURT:  What exactly was the count -- or what was
9  the name of the crime he pled guilty to?
10          MR. TERRACINA:  He pled guilty to theft of property
11  under $500.
12          THE COURT:  That's a dishonest act, and I -- that's
13  going to be allowed.  Candidly, it would be shocking to me
14  that the jury would find a theft of property under $500 to be
15  a significant detriment or significant impediment to the
16  credibility of Mr. Cokes.
17          But I think the rule allows it.  And I will allow
18  cross on that -- or put it out on direct, if you want.  It's
19  not the -- it's what the name of the crime is, typically, that
20  is allowed for this.
21          And it's whether -- the rule says if the Court can
22  readily determine that establishing the elements -- elements
23  of a crime require proving or the witness admitting a
24  dishonest act.
25          MR. TERRACINA:  On this point, Your Honor, under the

1    Nebraska statutes, I believe that the element here is with
2    intent to deceive or to harm.  And they're -- it's unclear
3    whether or not the plea agreement would've established any
4    deceit.
5              THE COURT:  Well, but he did it using a -- well,
6    theft of property is the name of the crime.  And it's a little
7    hard to know what -- do you have a transcript or anything from
8    the guilty plea?
9              MR. BARNETT:  None has been provided to us,
10   Your Honor.
11             THE COURT:  Well, do you have one?
12             MR. BARNETT:  No, I do not.
13             THE COURT:  Yeah, I'll allow that cross --
14             MR. TERRACINA:  Yes, Your Honor.
15             THE COURT:  -- for that crime, and I won't allow it
16   for the other.
17             MR. BARNETT:  Yes, Your Honor.
18             THE COURT:  So -- and if you want to revisit this if
19   you think there is some more information about the actual
20   crime that would allow me to revisit it, you're free to do so.
21   But presently, I'm going to allow it in.
22             Okay.  Back to -- that dealt with motion *in limine*
23   31.
24             Motion *in limine* 32, bar evidence of armed robbery
25   transmission on the Zone 9 radio messaging.  I'm going to deny

1    that.  But I also will tell the jury there was no armed
2    robbery; it was a robbery, but not an armed one.
3              I asked you to attempt to get a stipulation on that.
4    If you don't, I'm just going to flat-out tell them that.
5              Have you arrived at a stipulation on language on
6    that.
7              MR. BARNETT:  I believe that we have exchanged and
8    the parties will continue to work to reach those stipulations.
9              THE COURT:  All right.  It comes in, but the --
10   because that's what -- that's what Ewing heard.  But it's
11   unfair to the defendants to throw out the idea -- to the
12   plaintiffs to throw out the idea there was an armed robbery
13   when it clearly was a mistake and there was no -- a mistake in
14   the transmissions.
15             All right.  Motion *in limine* 33, bar evidence or
16   argument that Arrington committed a crime.  That's denied.
17   Even under the Dead Man's Act, they can argue that he
18   committed a crime if that's under the joint enterprise theory.
19   There's evidence -- they could suggest to the jury that he was
20   engaged in a crime, so that -- 33 is denied.
21             Motions *in limine* 34, bar evidence of post-accident
22   events or conversations occurring during Juanita Arrington's
23   travel to the hospital.
24             Do you intend to offer it?
25             MR. BARNETT:  We don't know what they're seeking to

1    bar, Your Honor.  That's -- that's -- it's likely we don't
2    intend to offer any evidence, but we don't know exactly what
3    they're seeking to bar, what conversations --
4              THE COURT:  All right.
5              MR. BARNETT:  -- if she was told any information at
6    the hospital.
7              THE COURT:  What is this about, Mr. --
8              MR. MONTGOMERY:  Oh, it was the questions that they
9    asked Mrs. Arrington at her deposition that she had with -- I
10   believe Mr. Arrington's father on the way to the hospital.  It
11   was their questions.  I -- to me, they're completely
12   irrelevant, and I don't know why they were asking them then,
13   and that's the only reason for this.  It's just so far out of
14   the realm of reasonableness that we -- we included it as a
15   motion.
16             THE COURT:  With that explanation, do you intend to
17   offer such conversations?
18             MR. BARNETT:  Likely not, but we will review her
19   transcript and inform plaintiffs' counsel of any questions
20   that we intend to ask her on that point.  But probably not,
21   Your Honor.
22             THE COURT:  If you do, inform plaintiffs' counsel and
23   come to me before you ask them.
24             MR. BARNETT:  Yes, Your Honor.
25             THE COURT:  Motion *in limine* 35, bar evidence or

1  argument related -- referring to actions or inactions of the
2  Pontiac to imply conduct or omissions on the part of
3  plaintiffs.
4       That's denied.  I don't know -- the joint enterprise
5  ruling makes that a relevant inquiry.
6       Bar evidence or argument that Ewing's crash was
7  caused by a radio transmissions delay.  I think I dealt with
8  that, but that's denied.
9       Ewing can explain why he did what he did.  And if he
10  is going to blame radio transmission delays on it, that's --
11  he can do so.  His knowledge of radio transmission delays also
12  is a two-edged sword because it would seem plaintiffs can
13  exploit that even more than defendants can.
14       But Ewing can explain what his state of mind was when
15  he engaged in his driving, whatever it was, chase, whatever
16  we're going to call -- or you're going to call it, and what
17  knowledge he had about how current the information was that he
18  was hearing on the radio.
19       Bar evidence -- so that's denied.
20       Motion *in limine* No. 37, bar evidence or argument of
21  guilty pleas, theft convictions of Stevenson and Cokes and
22  hearsay declarations made during such proceedings as imputed
23  to Arrington.
24       I'm going to give limiting instructions on
25  credibility cross, as I've said.  And these -- these pleas and

1   even the theft conviction of Stevenson and Cokes in this case

2   for this robbery can come in.

3          But the theft convictions of Stevenson and Cokes

4   don't relate to Arrington.  He didn't plead guilty, of course;

5   he was deceased.  And I'll give a limiting instruction if

6   requested.

7          MR. MONTGOMERY:  Thank you, Your Honor.

8          THE COURT:  Bar evidence of hearsay statements made

9   in Stevenson's Tinley Park interview.  Stevenson's statements

10  come in as admissions.

11         Are there hearsay within hearsay -- are they hearsay

12  statements?  Because his statement itself is not hearsay.

13  That's outside the definition of hearsay.  It's an admission

14  offered --

15         MR. MONTGOMERY:  I understand, Your Honor.  This is

16  one of those issues where the consolidated case is harming

17  Arrington, 'cause obviously if the -- if he were not part of

18  the -- if we were not consolidated with Stevenson, this --

19  this is something that just would not come in.

20         And there are some -- some of the statements are

21  hearsay within hearsay, but we'll raise those with the Court

22  at the appropriate time.

23         THE COURT:  All right.  Well, this is denied.  And

24  again, an appropriate limiting instruction that Stevenson's

25  statements are attributable to Stevenson only would be --

1    should -- would be entertained by me and given, if requested.

2          Motion *in limine* 39 deals with the COPA findings, and

3    that's already been ruled on.  And that is denied.

4          Motion *in limine* 40 to bar evidence of whether any

5    witness or survivors blame anyone for Arrington's death.

6    That's been agreed.  So that's granted.

7          Motion *in limine* 41, bar evidence of pursuit and

8    other facts not known to Ewing.  I -- that's denied.  I think

9    under the joint enterprise ruling, the -- what happened comes

10   in during the chase.

11         And it's going to be very easy for the jury to know

12   what Ewing knew and what Ewing didn't know.  His knowledge is

13   going to be a big part of the case on direct examination and

14   cross-examination.  But I -- I've already ruled on this in

15   part at the last final pretrial conference.  So No. 41 is

16   denied.

17         Motion *in limine* 43, bar evidence of Illinois State

18   trooper riding 99.  That is denied if it is something Ewing

19   knew, which I understand from arguments earlier is he -- that

20   went into his thought process.

21         MR. MONTGOMERY:  He didn't know it was ISP, Judge.

22   It could not have gone into his thought process.  If anyone

23   said that to you, they misrepresented the facts.

24         MR. BARNETT:  Your Honor --

25         THE COURT:  Believe me, I wouldn't accuse anyone of

1  misrepresenting the facts.  I mean, it is much more likely I
2  misunderstood the argument.
3          MR. MONTGOMERY:  Okay.
4          THE COURT:  So I will put that one aside.
5          What is the -- did Ewing know it was Illinois State
6  Police?
7          MR. BARNETT:  He did not know it was Illinois State
8  Police, but he knew it was an outside agency is when the
9  pursuit happened.  So he assumed based on the transmissions
10 that he received that an outside agency was in pursuit.
11         And he knew that both the Illinois State Police or
12 Tinley Park, who were the likely pursuing law enforcement
13 entities, rode 99.  And so it did factor into his
14 determination that, hey, this outside agency, they'll --
15 they'll be riding 99; it's an armed robbery; we're going to go
16 and assist.
17         THE COURT:  Is 99 a phrase used in all law
18 enforcement or just State Police?
19         MR. BARNETT:  I think that that's just what -- what
20 CPD uses, Your Honor.  But we can -- we can have him write --
21 we can have him change it from 99 to solo or something else if
22 that would be too confusing.
23         MR. MONTGOMERY:  And I would say, Your Honor, most of
24 that is -- how counsel phrased it is correct, with some --
25 I -- I would modify it to say he -- he did not limit his

1   speculation about which outside agency could be to Tinley Park
2   or, I guess -- or -- yeah, the ISP.  I believe he even talked
3   about Calumet -- either Calumet Park or Calumet City was a
4   possibility and some other outside agencies.
5           So I mean, this -- this 99 stuff is just a convenient
6   speculation to be able to say, well, you know, they might have
7   been riding alone; so therefore, I might have had an
8   opportunity to help them if something else might have happened
9   toward the end of the chase.
10          THE COURT:  If that's what was in his mind, he can
11  testify to it.  And if you think that's false, you can
12  cross-examine and impeach him with it.
13          MR. MONTGOMERY:  All right.
14          THE COURT:  But I'm not going to bar it outright.
15          MR. MONTGOMERY:  Thank you, Your Honor.
16          THE COURT:  So that motion is denied, but subject to
17  cross.
18          The bar evidence of disciplining child by burning
19  Halloween costumes.  That's granted, unless one of the three
20  plaintiff witnesses who are seeking damages for
21  Mr. Arrington's Estate raised something that is so contrary
22  and where this would become impeaching that I'm not going to
23  put a peculiar form of discipline of a child in front of the
24  jury as something that's relevant.  So absent something really
25  wide opening the door, that's out.

1   Motion *in limine* No. -- so that's granted, by the
2   way, No. 44.

3   Motion *in limine* 45, bar evidence of state trooper
4   dashcam videos of the Pontiac.  That's denied.  I've already
5   ruled on that.

6   Motion *in limine* 46, bar evidence of Stevenson's
7   statement regarding Jimmie Malone being the getaway driver.
8   It's relevant as to Stevenson.

9   MR. MONTGOMERY:  This -- this may be one of those
10  hearsay in hearsays, but I guess we can -- we can determine
11  that when the moment comes.

12  THE COURT:  Yeah.  I mean, if he says he's the
13  getaway driver, it's certainly attributable to Stevenson.
14  That is some evidence of Stevenson's involvement in the joint
15  enterprise, and it's an admission by Stevenson.

16  MR. TERRACINA:  Your Honor, he didn't say he's the
17  getaway driver.  He says -- I believe the entire quote is:
18  "That's what he do.  He a getaway driver."  And it was in
19  questioning whether or not he knew why he was in holding, and
20  he was somewhat putting it together that, okay, if I'm -- I've
21  been arrested now for four days, that something must have gone
22  on.

23  And so I think that it -- to take it out of its
24  context or to remove it from its context might perhaps be more
25  prejudicial than what the actual statement is.

1        THE COURT:  Well, the actual statement can come in.
2   And you can impeach him and have him explain why he said what
3   he did.  Or if it's brought out and offered by defense, you
4   can cross-examine that.  Stevenson's available to cross.  He
5   can explain exactly what he meant when he said this, so I'm
6   not going to bar it.  That's his perception of Malone.  And if
7   it's based on factors unrelated to the events of that day, he
8   can say it.  But that's denied.

9        47, bar evidence of -- bar argument that 124th Street
10  was a preferred road at Union Avenue.  That's been agreed to,
11  so that's granted.  A preferential road, not preferred.
12  Sorry.

13       Motion *in limine* 48, bar evidence or argument of
14  joint criminal enterprise and joint enterprise as against
15  Plaintiff Arrington.  I've ruled on that.  The jury will be
16  instructed.  They could find that there was no joint
17  enterprise.  They could find that anyone of the three
18  plaintiffs was not a member of that joint enterprise, even if
19  they find there is a joint enterprise.

20       But those are fact questions.  They'll be given the
21  requirements of what a joint enterprise requires, and you can
22  each argue that your client is not part of that joint
23  enterprise.  And if they find that a particular person was not
24  part of a joint enterprise and they're not, then any
25  contributory negligence of Malone wouldn't be attributable to

1    that plaintiff.

2            On the contrary, if they find there was joint

3    enterprise, then Malone's contributory negligence is

4    attributable also to the other three members of the -- or less

5    of that joint enterprise.

6            Motion *in limine* No. 50, bar evidence of unreliable,

7    misleading, and clearly altered Taco Bell video.  I've already

8    ruled on that.  If a proper foundation is laid, the Taco Bell

9    video comes in and it's relevant as evidence of a joint

10   enterprise.

11           Motion *in limine* 51, bar any argument, evidence, or

12   innuendo that the one-way driving of Malone was the sole

13   proximate cause of the death or -- and injuries to plaintiff.

14   That's denied.  That's a fact question for the jury.

15           And if the jury concludes that Malone was the sole

16   proximate cause, then there'll be a plaintiff -- or a defense

17   verdict.  If they don't and he's contributorily negligent and

18   there's a joint enterprise, then that'll affect the award.  If

19   they find that Ewing was one of the causes of that crash, then

20   it may very well be a plaintiffs' verdict.  But I'm not going

21   to bar defense from arguing Malone was the sole proximate

22   cause of the crash.

23           Motion *in limine* 52, bar any argument, evidence, or

24   innuendo of any criminal history of Ayesha Battle.

25           And she is one of the mothers.  Correct?

1           MR. BARNETT:  Yes, Your Honor.

2           MR. MONTGOMERY:  That's correct, Your Honor.

3           THE COURT:  And what was her -- was it a UUW?

4           MR. MONTGOMERY:  It was.  It was.

5           THE COURT:  And you told me the facts of this before.

6   Can you relate that again?

7           MR. MONTGOMERY:  Yes.  She was -- she was in a nearby

8   park, two males were fighting, one pulled out a gun during the

9   fight, it hit the ground, and she grabbed it to keep it away

10  from them.  And then, of course, the --

11          THE COURT:  Keep it away from what?

12          MR. MONTGOMERY:  Keep it away from the -- the

13  fighting.

14          THE COURT:  Okay.

15          MR. MONTGOMERY:  And the police came, and she's the

16  one who got arrested for that.  And she pled guilty to it.

17          THE COURT:  Well, she didn't use it.  Correct?

18          MR. MONTGOMERY:  That is correct.

19          THE COURT:  She was in possession of it?

20          MR. MONTGOMERY:  Yes, Your Honor.

21          THE COURT:  All right.  I'm going to allow --

22  unlawful use of a weapon implies she was shooting it.  There's

23  no reasonable person that would hear that conviction without

24  thinking she was shooting it.

25          Does defense agree with the characterization?  You've

1    probably seen the police report.

2           MR. BARNETT:  I have not seen the police report.  I'm

3    not sure exactly where that information that Mr. Montgomery

4    just said came from.  I don't recall if it was -- if it was in

5    her deposition.

6           THE COURT:  Well, take a look at her dep.

7           MR. BARNETT:  We can call it possession of a firearm,

8    Your Honor.

9           THE COURT:  Fine.  I think that's a fairer way of

10   dealing with it, because use implies she was shooting and --

11   call it possession of a firearm.

12          MR. TERRACINA:  On the same point, for Stevenson's

13   prior convictions, can we also refer to those as possession of

14   a firearm?  He has several UUWs, and it's --

15          THE COURT:  Were they -- were there shooting or was

16   it possession?

17          MR. TERRACINA:  No, it was just possessions.

18          THE COURT:  If the defense agrees that that's what

19   the reports say or that's what he described in the deposition,

20   you can do the same.  I think that's patently unfair in this

21   environment to tag someone with use of a weapon when it wasn't

22   being shot 'cause they -- the true germ of the offense is

23   possession of the weapon.

24          But that has to be the facts, so check with defense

25   counsel on that.  But that's a fair argument -- fair

1   compromise, I think.

2          Motion *in limine* 53, bar any argument, evidence, or
3   innuendo of any nicknames of Ronald Arrington.

4          Does -- did you intend to use Malone's [sic]
5   nicknames?

6          MR. BARNETT:  No, Your Honor.

7          THE COURT:  I think it was some race car driver,
8   Jeff Boyd or something?

9          MR. BARNETT:  No, no, no.  That was -- that's
10  Jimmie Malone.

11         THE COURT:  Oh, okay.

12         MR. BARNETT:  Jimmie Malone had a nickname of a --
13  that was akin to a race car driver.

14         Mr. Arrington had a nickname of Flacca or Flacco or
15  something along those lines.  We are not seeking to introduce
16  Mr. Arrington's nickname of Flacca.

17         THE COURT:  So that motion is granted by -- by
18  agreement.

19         MR. MONTGOMERY:  Your Honor, so I do want to alert
20  you to one thing.  I'm -- one of the things Stevenson said in
21  that interview was he didn't even know Ronald Arrington's
22  name, but he did know the nickname.

23         If I ask him if he knew Ronald Arrington's name and
24  he says no, does that open -- does that -- do we get into a
25  discussion about nicknames at that point?

1          THE COURT:  Why don't you just say did you know him

2     by a nickname?  The jury is not going to -- I mean, that's

3     not --

4          MR. MONTGOMERY:  Okay.  All right.

5          THE COURT:  You don't have to raise the nickname.

6     None of these actually are anywhere close to the horrible

7     nicknames I've seen in a number of cases.  So...

8          MR. MONTGOMERY:  Thank you.

9          THE COURT:  But just ask him if he knew him by a

10    nickname.

11         MR. MONTGOMERY:  Okay.

12         THE COURT:  All right.  Motion *in limine* 54, bar any

13    argument, evidence, or innuendo that Amyrah visited

14    Ronald Arrington in jail.

15         Is Amyrah one of the children?

16         MR. MONTGOMERY:  Yes.

17         THE COURT:  Did you intend to raise any issue about

18    the -- his daughter visiting him in jail?

19         MR. BARNETT:  No, Your Honor.

20         THE COURT:  All right.  That is granted by agreement,

21    then.

22         MR. MONTGOMERY:  Thank you, Your Honor.

23         THE COURT:  Motion *in limine* No. 55, bar any argument

24    or evidence or innuendo about a certified copy of conviction

25    of Arrington, a highly irrelevant disclosure.  That's denied.

1           You've got it.  Correct?  You've got the certified
2   copy?
3           MR. MONTGOMERY:  Yeah, a couple of weeks ago, we
4   did -- or a few weeks ago.  I'm not sure when we got it.
5           THE COURT:  But there is no question you knew of his
6   conviction, I assume.
7           MR. MONTGOMERY:  Oh, I did not, actually.
8           THE COURT:  You did not?
9           MR. MONTGOMERY:  No.  No.  It wasn't in any of the
10  documents produced, so I did not know about it.
11          THE COURT:  All right.  Well, Arrington's conviction
12  is only coming in as it relates -- because he's not
13  testifying, of course -- but it comes in depending on the
14  testimony of the three people claiming damages.  Correct?
15          MR. MONTGOMERY:  Yes, Your Honor.
16          THE COURT:  What is his conviction?
17          MR. MONTGOMERY:  It's criminal damage to property
18  less than $500.
19          THE COURT:  So it's a misdemeanor?
20          MR. MONTGOMERY:  Well, I don't -- I don't -- I think
21  it's -- I'm not sure.  I think it's -- the first document --
22  the first indication I got of it was three weeks ago in this
23  document, and I'm not clear from it what it is.
24          THE COURT:  Does defense know?  Is it a felony or
25  misdemeanor?

1    MR. BARNETT:  Your Honor, I'm -- I'm looking it up
2  right now, but I do believe his conviction was also apparent
3  on the -- his criminal history, which I do believe was
4  produced in discovery.

5    MR. MONTGOMERY:  I've never seen it, and I've looked
6  for it.

7    THE COURT:  Okay.  Well, here's the way it's going to
8  be resolved.

9    The -- this is only coming in through the
10  testimony -- if it does -- through the cross-examination,
11  presumably cross, of the three people claiming damages for
12  Mr. Arrington.  That's broader than convictions.  It can also
13  apply to arrests.  It can also apply to parole status.  It can
14  apply to a lot of things where a jury may -- depending on the
15  direct, may find that to be a -- impeaching or diminishing the
16  damages that are being claimed.

17    So whether it's strictly a misdemeanor or a felony
18  may be irrelevant ultimately if -- depending on the testimony
19  of the plaintiff, whether that would impeach the request for
20  damages because Mr. Arrington had a -- you know, a crime-free
21  life or something.

22    But the fact that you got the certified copy of the
23  conviction recently, I think I'm not going to bar it for that
24  reason.

25    MR. MONTGOMERY:  How does it get used in that

1   circumstance, Your Honor?  Because these people, if they -- if
2   they're asked was he convicted of X or they put it in a -- you
3   know, in a leading way, he was convicted of X and they say, I
4   don't know, I mean, you can't hand them a piece of paper and
5   have them suddenly know.

6          THE COURT:  No, but they -- a certified copy is
7   independently admissible.  It may not -- they can say I don't
8   know on cross, but it may -- because of the fact that they
9   didn't know, it may be substantive evidence they can offer in
10  rebuttal through the fact it was certified.

11         That's just a foundation issue.  If the -- if the
12  witness doesn't know, so be it.  The witness knows, they have
13  a good faith basis to ask it, then the witness knows.  I don't
14  know how much of this is admissible on cross.

15         I think the -- I'm going reread the *Cobige* case, but
16  it seemed pretty clear that an awful lot about a person's
17  history that normally would not be admissible under 609 is
18  admissible if it relates to a reasonable juror modifying or
19  reducing the amount of damages.

20         MR. MONTGOMERY:  Well, *Cobige* is a 403 inquiry, and
21  it's an open the door as -- as our illustrious
22  Judge Easterbrook --

23         THE COURT:  Careful, you're on the record.

24         MR. MONTGOMERY:  Well, I mean it in a good sense.  I
25  don't --

1          THE COURT:  Okay.

2          MR. MONTGOMERY:  I mean in the best sense.

3          THE COURT:  All right.

4          MR. MONTGOMERY:  As he laid out, it was --

5          THE COURT:  Off the record for a minute.

6      (Off-the-record discussion.)

7          THE COURT:  Back on the record.

8          MR. MONTGOMERY:  In any event, so what he did is he

9  had a scenario where the plaintiff -- and you, this Court has

10  alluded to it -- tried to show how sterling in character the

11  decedent was.  And he said under 403, the door was open to

12  balance things out.  And so I --

13          THE COURT:  Fair.  Okay.

14          MR. MONTGOMERY:  -- I don't disagree with that

15  either.

16          THE COURT:  I'll reread *Cobige*.  It may very well be

17  that the request and the testimony about Mr. Arrington's life,

18  the prior bad acts, whether they're bad acts or convictions or

19  arrests, may not be relevant; they may very well be.

20          I need to hear that direct testimony first, and I

21  can't preview to you what will be allowed in and what won't be

22  other than I'll be rereading *Cobige* very carefully and looking

23  at the direction of the Seventh Circuit on the issue.

24          MR. MONTGOMERY:  Thank you, Your Honor.

25          THE COURT:  Same ruling, denied for 56 and 57 on the

1   certified copy of convictions of Malone, Stevenson, and Cokes.
2           How is it you're going to bring in the certified --
3   what relevance does a conviction of Malone have?  Or do you
4   know yet?
5           MR. BARNETT:  We don't know yet, Your Honor.  If --
6   to be frank, in all likelihood, it would not be -- be
7   relevant; but we did not want to completely foreclose
8   ourselves.  To the extent it does become relevant, the
9   certified conviction would be admissible because it is
10  certified, Your Honor.
11          THE COURT:  Okay.  All right.  That leaves
12  defendant -- defendants' motions *in limine*.
13          Does anyone need a break?
14          Elia, do you need one?
15          COURT REPORTER:  I'm good.
16          THE COURT:  Okay.  Do the parties need one?
17          MR. BARNETT:  No, Your Honor.
18          THE COURT:  Okay.  Plaintiffs?
19          MR. MONTGOMERY:  No.
20          MR. TERRACINA:  Nope.
21          THE COURT:  All right.  Defendant No. 1, to bar any
22  evidence, argument, et cetera, that the City can be liable for
23  any actions other than those of Ewing.  That's granted, I
24  think by agreement.
25          MR. MONTGOMERY:  Yes, Your Honor.

1       THE COURT:  No. 2, bar reference to any publicized
2   events concerning allegations of police misconduct.  That's
3   granted, as agreed.

4       No. 3, bar any testimony, et cetera, that any
5   nondefendant police officers engaged in misconduct.  That's
6   granted.

7       If you're -- I -- I really think the Tinley Park
8   matter is a sideshow.  Whether or not a police officer
9   intentionally said it was an armed robbery or not, it's what
10  Ewing heard; and we're going to correct the inaccuracy of that
11  on the record.

12      We're not going to try whoever that police officer
13  was in Tinley Park.  Whatever caused the pleas to be changed
14  from one offense to the one that Stevenson and Cokes pled to
15  is, in my mind, irrelevant.  The only relevance is what they
16  pled to.  And so 3 is granted.

17      MR. TERRACINA:  Your Honor, on this point, the
18  defendants have identified -- or Detective Stan Tencza,
19  somebody who they do intend to call and place on the stand,
20  and that is the individual who made those statements that you
21  were alluding to.  And so I think that given that possibility
22  that it be -- the bell be rung --

23      THE COURT:  Oh, let's -- I'll stop you right there.
24      Do you intend to call him?
25      MR. BARNETT:  Your Honor, if we can agree -- his

1  testimony -- everyone was already in custody, so his testimony
2  would likely just have been for the electronically recorded
3  interview and to lay foundation.

4          Any -- any investigation of the underlying robbery
5  would come through either the eyewitness or the officers who
6  collected evidence.  We would not be calling Detective Tencza
7  to opine on the investigation itself.

8          THE COURT:  He's just to lay a foundation for two
9  videotapes that the jury would probably --

10         Are you stipulating to the foundation?

11         MR. TERRACINA:  I'd be willing to talk about it,
12 yeah.

13         THE COURT:  All right.  Why don't you do that, then
14 you don't have to call -- it's one witness off the list.

15         But we're not going to try the Tinley Park case or
16 misconduct case that's been alleged in this courtroom.
17 It's -- I don't think it's relevant, given the limiting
18 instruction I'm giving on armed robbery.

19         No. 4, bar any reference to the fact that a Chicago
20 police officer's on duty and being paid to prepare for trial.
21 That's denied.  They -- you want to cross him about the fact
22 that they're getting paid to come to court and testify?  I
23 think that's not -- that's true.  I don't know what the
24 prejudice is.  So that's denied.  That's not overly
25 prejudicial.

1    And the fact that they met with attorneys to prepare

2    for testimony is -- the jury gets instructed it's proper for

3    witnesses to meet with lawyers.  So there's nothing wrong with

4    that.  Everyone should be careful if you're talking to someone

5    that's not a client.  Those aren't privileged communications,

6    but -- so that's denied.

7    No. 5, bar plaintiffs' counsel from requesting

8    defendants produce any information in the presence of the jury

9    and implying that there was no discovery requests -- there was

10   no compliance with discovery requests.  That's granted.

11   MR. MONTGOMERY:  So, Your Honor, I just have one

12   thing, and I don't know that we have an issue here.

13   There -- on Officer Ewing's vehicle, there was no

14   GPS.  And the City has produced, you know, all the GPS other

15   than his.  And they haven't made an affirmative statement one

16   way or another other than doing that.

17   And if we get into the context of GPS, if -- if Ewing

18   raises that, I don't know, they could've known where I was,

19   you know, through GPS, then now it's an issue.

20   THE COURT:  Well, you can raise the fact that -- I

21   think it's no different than a body cam.  Some officers wear

22   them, some don't; some don't turn it on, some do.

23   MR. MONTGOMERY:  Fair enough.

24   THE COURT:  You can raise the issue of whether or not

25   there was GPS on it and whether he knows why there wasn't, but

1  that's different than accusing defense counsel of hiding
2  evidence or misleading -- you know, or of not producing
3  anything.
4          If the fact is that some police cars have GPS on them
5  and this one didn't, Ewing may have to just explain why.  If
6  he knows.  If he doesn't know, then so be it.  That's fine.
7          This motion addresses, which I'm granting, addresses
8  the issue of blaming defense counsel for not producing
9  evidence.  That's a discovery dispute to bring to me, not to
10 the jury.
11         MR. MONTGOMERY:  Thank you, Your Honor.
12         THE COURT:  So that's granted.
13         No. 6, bar reference to dismissed parties.  It's not
14 relevant.  That's granted.
15         Bar any reference or mention of the disclaimer police
16 officers provide during their IPRA/COPA interviews.  That is
17 granted, because I'm already keeping COPA out.
18         Now, you can use COPA statements to -- they're
19 admissions by Ewing, if the plaintiff wants to raise them --
20 offer them.  They're impeaching, if you want to cross him with
21 it.  And there's a number of other witnesses.  I read the COPA
22 report.  There's a lot of witness that appear in this case who
23 were interviewed.  That's proper impeachment.
24         MR. MONTGOMERY:  I think the way they phrased their
25 question may be misleading the Court as to what this is

1    referring to.

2         MR. BARNETT:  Your Honor --

3         THE COURT:  Let me -- let me finish my -- the outline

4    of my ruling, which I think was in the COPA ruling we made.

5         I don't want to hear any reference to the word -- the

6    acronym COPA or IPRA.  Some jurors may know what that means.

7    You can say did you give a statement to an investigatory body

8    or some other language you can come up with.

9         But I think the acronyms of COPA and IPRA refer to

10   internal -- there's a lot of people that know what that means

11   or at least know it's some type of disciplinary process for

12   police.  Every time there's an incident report, the police

13   says that COPA is investigating.

14        By keeping COPA out, I don't want it brought in

15   through the side door of you gave a statement as part of a

16   COPA investigation.  Then the juror will be left to speculate

17   what happened during that investigation.  You can simply say

18   he gave a statement to an investigatory body or he gave a

19   statement in the -- related to this incident.  That's probably

20   even more benign, which is my goal, to make it benign as to

21   where the statement was.

22        If you want to indicate that the statement -- if the

23   person who made the statement and it's an officer said, well,

24   you know, I didn't tell the truth or something or that's

25   misleading or some other -- that may open the door to what the

1    obligations are of an officer to be truthful in a COPA

2    investigation.  But in general, these come in as admissions or

3    for impeachment.

4          Now, back to what you were raising, Mr. Montgomery,

5    'cause I -- I was going to grant this motion unless the door

6    is opened to a witness disclaiming the accuracy of a statement

7    or the importance of being truthful for that statement.

8          MR. MONTGOMERY:  Yeah.  And that's exactly where it

9    comes in.  The -- invariably, maybe this is -- maybe all

10   plaintiffs' lawyers do this, but Jim Montgomery, Jr. does this

11   all the time with these statements and uses them to impeach

12   officers.

13         Because suddenly, they're on the witness stand and

14   their statement varies from what they actually told the

15   investigatory body.  And then, you know, you go through your

16   list.  In that statement, you were offered the opportunity to

17   add more.  Yes.  You said it was -- you were asked if your

18   statement was complete.  Yes.  And in fact, at the time, you

19   stated to this body that your statement you were making was

20   under duress, didn't you, sir?  Yes.

21         So that's what they're talking about, the duress

22   part.

23         MR. BARNETT:  Your Honor, the specific statement

24   we're seeking to exclude is that the Fraternal Order of Police

25   instructs all officers to give a disclaimer at the beginning

1   of the COPA investigation that the statement is being given

2   under direct order or under duress, pursuant to *Garrity,* so

3   that the statement cannot be used against them in a criminal

4   proceeding, because it is under duress because they'll be

5   terminated if they don't give it.  That's the specific

6   statement that we're seeking to exclude as it -- it's not

7   relevant.

8          THE COURT:  Are you trying to put in that part of the

9   statement?

10         MR. MONTGOMERY:  Certainly not anything about the

11  Fraternal Order of Police because I don't know anything about

12  that.

13         THE COURT:  Well, about -- about being under duress?

14  'Cause the duress is a result of the *Garrity* case.  That's all

15  that means.  And that's a sideshow for the jury.  They're

16  not -- duress, they're not under physical duress.  They're not

17  under -- you know, they're not being sweated out to make a

18  statement.  They're just being told to make a statement and

19  they get fired if they don't.  That's what *Garrity* says makes

20  it a coercive statement.

21         So I don't think that aspect of it, given the fact

22  duress is misleading as to what was actually going on with

23  that statement should be used to impeach him.  The rest of it,

24  Mr. Montgomery, is fine.  You know, the fact they were given

25  the opportunity to correct the statement, to, you know, review

1    it, to make sure it's accurate, things like that, that's fine

2    cross if it turns out someone disclaims something they said.

3         So -- but the part about the duress, I have -- I'm

4    granting the motion *in limine* as to that and, also, adding to

5    it the acronyms IPRA and COPA, which I think was in the -- the

6    ruling on COPA -- on the internal investigation.  But if it

7    wasn't, it's now added to.

8         Bar any undisclosed witnesses.  That's granted.

9         Bar any argument that the jurors are guardians of the

10   community or otherwise they are tasked with protecting the

11   public.  That's denied.  But again, I'm not going to wordsmith

12   any of you.  Just don't violate the Golden Rule.  Don't tell

13   the jury to put yourselves in our shoes.

14        But you all will creatively find a way to get that

15   across on both sides without violating that particular rule.

16   But I'm not advocating you do it, and I'm not going to

17   wordsmith you.  So that is denied.

18        Bar testimony, evidence, or argument of the

19   generalized police code of silence.  That is granted.  But you

20   can always -- that's a generalized code of silence, but you

21   can always cross on bias about partners -- the three other

22   people in the car having allegiances or some type of

23   particular fondness for the other people in the car.  But you

24   can't just do, you know, cops always cover for cops.

25             MR. MONTGOMERY:  We have specific -- you know, in

1 this case, I don't remember the -- any conversation in the
2 car...
3            THE COURT:  Pardon me?
4            MR. MONTGOMERY:  We have in this case testimony along
5 the lines of I don't remember any conversation in the car.
6            THE COURT:  All right.  Well, I'm just saying that
7 you can always cross on bias with -- with partners, but not a
8 generalized all cops cover for cops.
9            MR. MONTGOMERY:  Thank you.
10            THE COURT:  So that is granted, with the exception I
11 just spoke of.
12            No. 11 is bar any evidence that Ewing violated CPD
13 general orders, rules, or regulations.  That's denied.  But I
14 will give a limiting instruction under *Thompson* that
15 violations of rules are not -- are not a violation of the
16 constitutional right.  But I'll request that you give me that
17 limiting instruction or request it at the appropriate time.
18            It's going to come in as the final instructions.  But
19 if you need it during testimony, I'm happy to give it.
20            MR. BARNETT:  Yes, Your Honor.  That does raise one
21 issue, and that is which general orders are the plaintiffs
22 going to seek to introduce?  Is it going to be pursuits or
23 emergency driving?  Because in their pleadings, the -- the
24 plaintiffs have both pled that Mr. -- that Officer Ewing was
25 not executing and enforcing the law, which means he was not in

1    a pursuit.  Because under Illinois law, being in a pursuit and
2    operating as an active participant of the pursuit, you're
3    executing and enforcing the law.
4              So we believe that because they have, you know,
5    asserted that Officer Ewing was not enforcing any law, that
6    the act of pursuit -- that the pursuit general order is not
7    relevant, that it should be only the emergency driving.
8              THE COURT:  Well --
9              MR. MONTGOMERY:  Alternative pleading.
10             THE COURT:  Go ahead.
11             MR. MONTGOMERY:  Alternative pleading, Your Honor.
12   And it's -- and it's a question of fact under the facts of
13   this case.
14             THE COURT:  Yeah.  I mean, the jury may very -- we
15   may have a special interrogatory that deals with whether or
16   not he was pursuing or was -- what's the other alternative?
17   Just --
18             MR. BARNETT:  He was responding to an emergency call,
19   so it was emergency driving.
20             THE COURT:  Yeah.  'Cause if the jury finds he was
21   pursuing and there's a special interrogatory on it, that may
22   very well put him -- immunize him under the Tort Immunity Act.
23             And that may be a special interrogatory we put into
24   the verdict form, but I think right now it's a fact question.
25   If they're going to do both, they run the risk of -- I'm

1    warning you right now, that will likely be a special

2    interrogatory, and you run the risk of that.  I think you're

3    aware of that.

4                   MR. MONTGOMERY:  Absolutely.

5                   THE COURT:  Okay.  But I'm not going to limit them on

6    what they cross on.  Ewing could admit to or deny violations

7    of either one of those regulations or general orders.

8                   MR. BARNETT:  Yes, Your Honor.

9                   THE COURT:  No. 12 is to bar evidence or mention of

10   any civilian complaints, lawsuits, or disciplinary proceedings

11   against Defendant Ewing or other officers.

12                  Is there anything else in Ewing's background?

13                  MR. MONTGOMERY:  There's a whole lot in his

14   background, Your Honor.  But I don't --

15                  COURT REPORTER:  Speak into the mic, please.

16                  MR. MONTGOMERY:  I'm sorry.

17                  There's a whole lot in his background, and it

18   probably would take us quite a while to get through it.  But I

19   don't have any plans to put that in unless somehow he opens

20   the door by saying he's got a great background of some sort.

21                  THE COURT:  He's -- he opens the door by saying what?

22                  MR. MONTGOMERY:  That he's had a, you know --

23   you know, a clean career or something -- you know, something

24   along the lines of *Cobige*, where he opens the door to

25   impeachment on his statements.

1      THE COURT:  All right.  All right.  So the -- and the

2  other officers, are you intending to cross-examine them about

3  any sustained disciplinary complaints?

4      MR. TERRACINA:  Well, yes, Your Honor.  So actually,

5  one of the witnesses is going to be unavailable by trial.  And

6  that is Sergeant Dawn Love.  And we have had a video evidence

7  deposition of her, which obviously will need to undergo

8  review.  We do have transcripts for you if you would like

9  that.

10      THE COURT:  She was -- again, remind me.  You told me

11  before.  What is she?

12      MR. TERRACINA:  She was his supervisor the day in

13  question.

14      THE COURT:  Okay.

15      MR. TERRACINA:  And in that examination, the question

16  was brought up as to what was her opinion of Officer Ewing.

17  And then the follow-up question to her answer was whether or

18  not she had filed any reports against him.  She lied to me,

19  and she was impeached over that.  That is currently within the

20  transcripts.

21      And so for purposes of impeachment, I do believe that

22  that is salient.  I do agree for purposes of merit, it -- it

23  would probably be subsequent remedial measure.  But where

24  other officers are seeking to paint his picture as some

25  sterling officer and that can be impeached, I do believe that

1   it does have some relevance being brought in.

2            THE COURT: She was talking about Ewing. Correct?

3            MR. TERRACINA: Yes.

4            MS. BOUDREAUX: Judge, if I may?

5            THE COURT: Go ahead.

6            MS. BOUDREAUX: This evidence dep, for lack of a

7   better term, happened yesterday morning at 10:00 a.m.

8   Plaintiffs' counsel asked Sergeant Love what her opinion of

9   sergeant -- of Officer Ewing was. She said, I think he's a

10   good officer. That was it.

11            And then he asked, have you ever filed a misconduct

12   report or a disciplinary report against Officer Ewing? She

13   said no. She had been advised of these motions -- this is an

14   agreed motion *in limine* that none of this should come in.

15            And then she said no. And then Mr. Terracina whipped

16   out a copy of a civilian complaint that had been called into

17   the station. And by virtue of her being Officer Ewing's

18   supervisor, something she had to forward to COPA. And then --

19   you know, so he attempted to impeach her by -- you know, he

20   brought up an agreed motion *in limine* and basically forced her

21   to violate it.

22            So we have a lengthy colloquy of the impropriety of

23   that question, and it was just --

24            THE COURT: Was it a sustained complaint?

25            MS. BOUDREAUX: No.

1           THE COURT:  Oh.

2           MR. TERRACINA:  Well, Your Honor, I believe that

3   there's a mischaracterization.  I asked her if she had ever

4   filed a report against him, not a misconduct or a disciplinary

5   report.  I just asked if it was a report.  She stated no.

6           She knew -- I asked her whether or not she knew what

7   she had said was false.  She fought me on that and then

8   eventually, begrudgingly, accepted that yes, she had filed the

9   report.

10          But further, I also want to point out the fact that

11  insofar as any agreed motions *in limine* with

12  Plaintiffs Stevenson and Cokes, there are no such agreements.

13  And there was a complimentary history agreement, but there was

14  no complaint history agreement.

15          MR. BARNETT:  Your Honor, I would direct opposing

16  counsel to Docket 356, defendants' motion *in limine* No. 12,

17  bar civilian complaints, lawsuits, or --

18          THE COURT:  You're going to have to -- I can't

19  understand you.

20          MR. BARNETT:  I would direct opposing counsel to

21  Docket 356, page 8, their response to defendants' motion

22  *in limine* No. 12 to bar this evidence.  Plaintiffs agree.

23          THE COURT:  Well, let me cut off the argument.

24          This is a witness who was going to testify live, and

25  she's going to be unavailable for trial?

1          MR. TERRACINA:  Yes, Your Honor.

2          MR. MONTGOMERY:  No, no, no.

3          THE COURT:  Off the record.

4       (Off-the-record discussion.)

5          THE COURT:  Back on the record.

6          Apparently, this is a witness who will be unavailable

7    for trial.  The parties agree?

8          MR. MONTGOMERY:  Yes, Your Honor.

9          MR. BARNETT:  Yes.

10         THE COURT:  So her deposition was taken and

11   memorialized her testimony.  Was it a video dep?

12         MS. BOUDREAUX:  Yes.

13         THE COURT:  So it can be played to the jury at the

14   appropriate time during the trial.

15         Asking her for a good opinion of whether she -- what

16   her opinion of Ewing was, I assume you're hoping she'd say he

17   was a bad officer.  She had said -- and maybe you can bring

18   that in for character evidence.  She instead said he was a

19   good officer.

20         Then you asked her if she transmitted a complaint

21   with a nonsustained complaint to a -- to some other supervisor

22   or something, wherever she sends complaints to.  She denied

23   it, and then later she admitted that she did transmit it.

24         Did she admit she lied or just was mistaken?

25         MR. TERRACINA:  I asked her if she knew that she had

1  answered me falsely, and she tried to fight me on that.  And
2  then I asked her again if she was the one who filed that
3  report, and she said yes.

4          THE COURT:  That's not the same as someone admitting
5  they lied.  People can admit they testified falsely by
6  mistake.  I -- it would shock me that -- and maybe I'm -- it
7  would be surprising if this officer didn't deal with many
8  complaints such as this.

9          Was she given prior notice of this complaint?  In
10  other words, told I'm going to ask you about a complaint which
11  you forwarded?  Now I'm going to ask you now what you did with
12  it?

13          MR. TERRACINA:  Well, I did show it to opposing
14  counsel, and then opposing counsel showed it to her.  We went
15  on a break, and then she was able to review the actual
16  document before we proceeded with further questioning.

17          THE COURT:  Did she initial it?

18          MR. TERRACINA:  And that's also correct.  The
19  document itself is something that was produced to us within I
20  think the end of the June, and so it was something that was
21  known to opposing counsel to exist.

22          THE COURT:  Sure.  Complaints -- I'm not surprised
23  you got copies of civilian complaints against Ewing.  It's a
24  nonsustained complaint.  It was impeachment done in response
25  to a question about what the -- her opinion of Ewing was.  I

1    don't see how that's relevant.

2           If you -- you were hoping she'd say -- I assume you
3    were hoping she'd say she had a bad opinion of him, then you'd
4    use her as a character -- basically an anti-character witness.

5           I'll look at the transcript, but this doesn't look
6    like something that we ought to be showing to the jury, this
7    portion of the video.  I'll look at the transcript if you want
8    to provide it to me and see how it reads.  But I'm assuming
9    the -- so this motion is granted, to bar evidence of civilian
10   complaints against Defendant Ewing.

11          Because the other part is, an unsustained complaint
12   shouldn't come in as to Ewing.

13          MR. TERRACINA:  Communicate any of the actual
14   contents of that report?  The question was whether or not she
15   had actually had any prior interactions or second thought in
16   relation to his character.  And so what the nature of the
17   question was, was more so if she was aware of these instances,
18   not -- had nothing to do with the actual contents of the
19   report.

20          THE COURT:  Well, but you referenced them as being
21   complaints.  Correct?

22          MR. TERRACINA:  I asked her if she had filed any
23   reports -- I used the term "report" -- against Ewing, and
24   there is no mention of the word discipline, there is no
25   mention of the word -- there is -- it's simply report.

1      THE COURT:  Well, I'll -- I'll read the context, but

2  that sure doesn't seem like it's relevant to me.  And it will

3  open up the issue of an unsustained complaint against Ewing,

4  which is not admissible, absent him opening the door as to

5  being the greatest policemen of all time.

6      It's -- it's an alternative way of getting that in.

7  Whether you intended to or not, it nonetheless puts it before

8  the jury, which is impermissible.

9      But you can provide me the transcript, but this is

10  granted without prejudice to me being convinced otherwise when

11  I see the transcript.  But you ought to be in a position where

12  you -- who's calling her?

13      You are?  Make sure your videographer is in a

14  position to excerpt parts of this deposition 'cause he is

15  likely to have to be.

16      MR. TERRACINA:  Yes.

17      THE COURT:  No. 13 is bar any testimony or evidence

18  regarding indemnification.  This has already been dealt with,

19  indemnification by the City.  You are privately agreeing, but

20  it's not going to be mentioned to the jury, absent

21  Mr. Ewing -- Officer Ewing opening the door himself.

22      14, bar any evidence or reference to the IPRA/COPA

23  investigation and any conclusions.  That's been granted by

24  written order.

25      15, bar any mention during jury selection of a

1   specific amount of money as improper.

2           Do you intend to raise that?  I've never seen that,
3   but --

4           MR. MONTGOMERY:  No, Your Honor.  I simply would ask
5   if they were uncomfortable with any awards in the millions of
6   dollars.

7           THE COURT:  Well, that is a specific amount of money.
8           Any objection to that?

9           MR. BARNETT:  Yes, Your Honor.  It's improper
10  conditioning.  They should just be asked if they have any
11  objection to finding in favor of the plaintiff if the evidence
12  warrants it or a finding in favor of the defendant.
13  Conditioning to them as to potentially millions and millions
14  of dollars is improper.

15          MR. MONTGOMERY:  This is -- so, Your Honor,
16  curiously, we submitted this as one of the questions in the
17  questionnaire that was not objected to by the defendants.  And
18  now today, they object.

19          THE COURT:  Is it in the questionnaire?

20          MR. MONTGOMERY:  It was taken out because several of
21  the questions that were agreed to were taken out by the
22  Court --

23          THE COURT:  Yeah.  Well --

24          MR. MONTGOMERY:  -- but not because of an objection
25  by the defense.

1  THE COURT:  Yeah, I'm not supposed to bar lawyers
2  from asking questions as follow-ups, but I think a mentioning
3  of millions of dollars is -- turns into argument.  I think
4  you -- you -- you're certainly allowed to say if the evidence
5  supports a finding of liability and damages are -- our damage
6  request is substantial because there's evidence of substantial
7  damages, would you be comfortable awarding it?

8  You can use the word "substantial," but I think
9  mentioning dollar amounts is a slippery slope.  And we've
10  already put in a question on the jury questionnaire, No. 33,
11  which closely tracks that:  You know, if the evidence supports
12  a finding for the plaintiff and there's damages that have been
13  proven, could you award money to the plaintiff?  They said
14  yes.  Most of them had no problem with that concept.

15  I don't know how it was phrased, whether it was a yes
16  or a no, but that is in there in form.  If you want to add the
17  word "substantial" to it, but I think dollar figures is
18  conditioning.  It's --

19  MR. MONTGOMERY:  This is really -- it's not intended
20  that way, Your Honor.  This, as Your Honor probably knows, at
21  least from a plaintiff's perspective, it is important
22  information to know if juries come armed with tort reform
23  bias.  And then -- and that's where the question goes, more
24  than anything else.

25  THE COURT:  Well, you can ask that -- well, that's a

1  tough question to ask directly.  I -- I sympathize with your
2  position there.

3           Let me think about this.  But currently -- and you
4  can ask me to revisit it, you can ask me again before we
5  question jurors -- but right now, you can use the word
6  "substantial"; but I don't want dollar figures thrown out
7  there.

8           MR. MONTGOMERY:  All right.

9           THE COURT:  And I'll revisit that --

10          MR. MONTGOMERY:  Gotcha.

11          THE COURT:  -- when I do what I usually do, talk to
12 some other judges here who are more experienced than me.

13          All right.  16, bar plaintiff from calling any
14 nonparty City of Chicago employee as an adverse witness.
15 That's denied.  I think I dealt with that already.

16          You can call them as adverse witnesses, and you can
17 cross them.  And they're City employees; and the City is an
18 ostensible defendant in this case, even if they've been
19 dismissed for purposes of the trial.

20          17, bar entry into evidence or publication to the
21 jury of any police accident reports.  It depends on what part
22 of the report you're offering.  We'll have to deal with this
23 at trial.  The *Jordan* case goes through exhaustive detail
24 about a very complicated police report where, in fact,
25 Judge Tinder had to set up a flowchart to show who said what

1    and by who.

2        So -- and there's a number of exceptions that allow

3    police reports in under the federal rules as nonhearsay,

4    but -- and hearsay within hearsay is sometimes admissible.

5    But you're going to have to tell me what in particular you

6    want to offer, and I'll hear particular objections as we

7    get -- as that's being offered.

8        MR. BARNETT:  Yes, Your Honor.

9        THE COURT:  Bar the use of any statistics relating to

10   police pursuits in general.  That's denied if Ewing knew it or

11   it's coming in as expert testimony, but it has to be tethered

12   to a witness.

13       Either Ewing knew it, or the expert is testifying to

14   it; but otherwise, you can't just offer it up without it

15   having any relation to a witness who's going to testify.

16       So that's granted with those exceptions-- or it's

17   denied, rather, if it comes in with someone who knows about

18   it.  Granted, otherwise.

19       Bar testimony and questioning about the risks and

20   dangers of police pursuits in general.  That's denied.

21       Again, the testimony and questioning is -- it's

22   common sense police pursuits are dangerous.  There's risks

23   involved.  And Ewing's been trained on it; he can talk about

24   what his training was and what his knowledge of it is.  And

25   then the experts, I'm sure, have views on both sides of this.

1          MR. BARNETT:  Your Honor, there is one caveat on this

2     motion *in limine*, is that is some of the other officers may

3     have been involved in other pursuits and Officer Ewing.  Those

4     should be inadmissible because it's other incidents, it's not

5     related to this particular pursuit.

6          THE COURT:  Is there going to be cross-examination of

7     Ewing about -- or the officers in his car about other pursuits

8     where Ewing was the driver?

9          MR. MONTGOMERY:  No, no, Your Honor.  There -- there

10    isn't.  There's no intention of that.

11         THE COURT:  Okay.  Then you've got an agreement.

12    So...

13         MR. BARNETT:  Thank you, Your Honor.

14         THE COURT:  All right.  No. 20 is bar the testimony

15    from any of Arrington's family members other than the direct

16    heir regarding his or her relationship with the decedent.

17         I didn't see an opposition to this.  Are you agreeing

18    to this or --

19         MR. MONTGOMERY:  Oh, no, we -- if there wasn't, it

20    was a mistake because we -- I mean, there's no basis for this.

21    The mother is -- is coming in to testify.

22         THE COURT:  Sure.  This is denied.  I didn't see a

23    written opposition.  It may have just been an oversight, which

24    is easy, given the number of motions *in limine* involved here.

25    But anybody can testify about their relationship with the

1   decedent:  a neighbor, a friend, a family member.  They all --

2   if they provide relevant evidence of the damages through --

3   that are incurred because of his death, that comes in.  It

4   doesn't have to be a family member.  It can be anybody.

5              21 -- so that's denied.

6              21, bar use or reference to other pursuits contained

7   in police training videos.  It's denied if Ewing saw it or

8   there's an expert to testify to it.  But it's denied.  If

9   Ewing was involved in training, he can -- they can refer to

10  it.

11             MS. BOUDREAUX:  Judge, there is going to be no

12  foundation that the witnesses saw these videos.  These are

13  purported training materials that have been produced by

14  Mr. Montgomery and there's --

15             THE COURT:  Off the record.

16         (Off-the-record discussion.)

17             THE COURT:  All right.  Let's go back on the record.

18             What is the foundation?  If you have some police

19  training videos that you're going to play, what is their

20  foundation 'cause they need to either come in through an

21  expert because the expert is familiar with them and it forms

22  the basis of their opinion or this is something where you

23  can -- even if Ewing denies seeing them, if you have evidence

24  that it was part of the training of Ewing, you can put it in.

25             MR. MONTGOMERY:  I have evidence -- first of all,

1    they all come from the City of Chicago; and the City of

2    Chicago's aware of it.  Ewing simply -- his testimony -- and I

3    think this is what counsel is referring to -- when he's asked

4    about a specific, well, you know, it was a long time ago, I'm

5    not so sure.  And yet, he's got -- in his training, he's got

6    the specific courses and refreshers on pursuits.

7                But I do -- to the Court's point, no matter what he

8    says, I do plan to have the expert testify that -- given that

9    these are part of the training of the police officers,

10   you know, here it is.

11               THE COURT:  Well, it's got to be -- Ewing was trained

12   at some point in his career or maybe he was trained at

13   multiple points in his career.  It's got to be something, I

14   would think, that your expert can at least tie -- even if

15   Ewing doesn't remember it, he can tie it to time periods Ewing

16   would have been trained.

17               MR. MONTGOMERY:  Absolutely, Your Honor.

18               MS. BOUDREAUX:  And, Judge, that's my point.

19   These -- one of the videos, for example, is from 1993 or 1996.

20   Dean Ewing was at the police academy in 2007.  These are

21   materials --

22               THE COURT:  Was he an officer in '93 or '97?

23               MS. BOUDREAUX:  No.

24               MR. MONTGOMERY:  No, no.

25               THE COURT:  Did they play videos in -- the fact that

1  these were videos made in the '90s, is there evidence they
2  were used as part of the training in -- when Ewing was at the
3  academy?
4          MR. MONTGOMERY:  I asked --
5          MS. BOUDREAUX:  No.
6          MR. MONTGOMERY:  -- Dawn Love about it and she says,
7  yes, they're -- I don't know which one she's referring to.
8  But the oldest one that I'm aware of that Dawn Love clearly
9  knew -- that's the supervisor -- was safely clearing the
10  intersection.
11          The other videos were produced in 2003 through
12  Superintendent Hillard.  And all these guys, including Ewing,
13  saw these videos, and he remembers Hillard.  And the videos,
14  he just can't say I remember that specific one.
15          THE COURT:  Well, that all goes to a fact question of
16  whether he -- as long as there's a foundation that makes it
17  something that he either recalls seeing or you can lay a
18  foundation that he should have seen it.  Just 'cause he
19  doesn't remember now doesn't matter.  It's what he was
20  actually shown at that time.
21          And the precision needed for that goes to the
22  foundation.  And you're going to have to lay a foundation for
23  it or give me an offer of proof before the witness comes, and
24  I'll rule on it accordingly.  But I've kind of told you the
25  strictures of what makes it relevant.  And if those are met,

1    then -- and you've laid a foundation, then they get played
2    whether Ewing remembers it or not.

3              MR. MONTGOMERY:  Thank you, Your Honor.

4              THE COURT:  Okay.  So that's denied, 21, with the
5    conditions I've just attached.

6              22 is admit Stevenson and Plaintiff Cokes'
7    convictions for Class A theft relating to the robbery that
8    precipitated the police pursuit by the Illinois State Police.
9    That is granted.  Those convictions will come in as part of
10   the joint enterprise -- as proof of a joint enterprise.  They
11   were involved in the robbery.  It's proof as to them, not as
12   to Arrington.

13             And I'll give an instruction that that is only
14   relating to the two that pled guilty.  But it is nonetheless
15   proof that it is admissible under -- given the fact that I
16   believe there's enough evidence for the jury to consider the
17   joint enterprise issue.

18             No. 23, admit Stevenson's prior criminal conviction
19   of felony unlawful use of a firearm, convicted in 2019, and
20   felony armed violence, convicted in 2013, as each were
21   punishable by imprisonment for more than one year and occurred
22   within ten years of this.

23             I think we've dealt with this.  And some of these
24   convictions are -- were not -- I thought -- I think we agreed
25   the unlawful use would be a possession.  Correct?

1       MR. BARNETT:  Your Honor, we'll take a look at the --
2   at the actual criminal charges and the -- and the factual
3   basis.  And then if it is just a possession, based on
4   Your Honor's ruling, we would agree that it would be a
5   possession of a firearm.
6       THE COURT:  And the felony armed violence, again, if
7   there's no shooting -- it depends on how it was used.  It's
8   pretty prejudicial.  Armed violence sounds like he -- you
9   know, shooting somebody.  If that's not what happened, I'm
10  willing to modify what the conviction is.
11      The point is it's a felony to affect his credibility,
12  but I don't want the spillover of shooting to be implied by
13  the conviction if it's not true.
14      So 23 is -- I'm admitting those convictions, but the
15  language is something you're both going to discuss, both
16  sides.
17      24, admit Cokes' prior criminal conviction for felony
18  forgery, which I believe now is a misdemeanor.  I've ruled on
19  24 already.  The ruling stands.
20      25, bar any evidence that COPA recommended Ewing be
21  disciplined.  That's already been granted by written order.
22      26, bar Plaintiff Stevenson from testifying to
23  inadmissible hearsay that an unknown officer stated he should
24  have died in the accident.
25      Do you intend to offer that?

1          MR. TERRACINA:  No, Your Honor.

2          THE COURT:  All right.  That's granted by agreement.

3          Bar Juanita Arrington from testifying to inadmissible

4  hearsay that an unknown officer stated he had been attempting

5  to arrest Malone for a long time and we're glad that he was

6  deceased.

7          Do you intend to offer that through

8  Juanita Arrington.

9          MR. MONTGOMERY:  No, Your Honor.  The defense brought

10  that out in her deposition, and it's --

11          THE COURT:  Okay.

12          MR. MONTGOMERY:  We don't.

13          THE COURT:  So that's granted by agreement.

14          And finally, 28, bar Ms. Arrington from testifying

15  that unknown officers had firearms drawn during a candlelight

16  vigil.

17          Do you intend to offer that?

18          MR. MONTGOMERY:  No, we won't offer it, Your Honor.

19          THE COURT:  That's granted by agreement.

20          29, bar Juanita Arrington from testifying as to her

21  opinion that the officer involved in the accident should have

22  been fired as irrelevant.

23          Do you intend to elicit from her that?

24          MR. MONTGOMERY:  No.  But if -- obviously if the

25  defense were to ask this question, as they did at her

1  deposition, we would -- we would expect to -- somehow that
2  subject to come in.

3       THE COURT:  Sure.  Well, that's granted by agreement.
4  But the defense can open the door if they ask a question that
5  would elicit her opinion as to what should happen to
6  Officer Ewing and his employment here.  If you ask such a
7  question, you're going to get this answer.

8       No. 30, bar evidence or testimony that
9  Defendant Ewing or other police officers had no training or
10  outside agency communication system or that they should have
11  such training.

12       MR. MONTGOMERY:  So -- so, Your Honor, from the
13  plaintiffs' standpoint, this -- while it's coached as a Monell
14  thing, this has nothing to do with Monell.  This has to do
15  with the delay issue, what -- where Your Honor said we, the
16  plaintiff, would have the ability to build into Ewing's
17  knowledge of the radio system and the radio delays and how it
18  all works.

19       THE COURT:  Yeah.  I -- I'm going to deny this
20  motion, but it -- it doesn't -- you can't raise issues about
21  the institutional failures of the Chicago Police Department.

22       MR. MONTGOMERY:  Oh, absolutely not.

23       THE COURT:  It is the fact of what Ewing knew and
24  what his capabilities were and what his limitations were.
25  That's all relevant.

1    MR. BARNETT:  And that's what we wanted, Your Honor.
2    We didn't want them to attack that, oh, Officer Ewing should
3    have knew -- should have had this training, or he knew he
4    needed this training and he decided not to get it.  We don't
5    want any arguments like that, Your Honor.
6        THE COURT:  Right.  Okay.  That, I think, deals with
7    the motions *in limine*, with the exception of my reservation on
8    the Dead Man's Act and a number of different stipulations
9    you're all going to try and reach which deal with some of the
10   other motions *in limine* we dealt with.
11       Are there any others on the motions *in limine* front,
12   of which there have been many from both sides, that I have not
13   dealt with or given you a specific reservation to consider?
14       MR. MONTGOMERY:  Well, if I might kind of add to the
15   pile, Your Honor, since we've spoken of Sergeant Dawn Love, in
16   her deposition, the defense went into an area -- so I'd like
17   to consider this an oral motion *in limine*.
18       They went into --
19       THE COURT:  Before you get there, let's take a
20   ten-minute break.  I think we can all use it.  And we'll come
21   back -- it's 4:03, so let's come back about 4:15.
22       (A recess was had from 4:03 p.m.  to 4:15 p.m.)
23       THE COURT:  Back on the record.
24       Mr. Montgomery, you had mentioned on the
25   Dead Man's Act that you had -- were aware of a number of cases

1  where judges have applied the Dead Man's Act in Federal Court,
2  and you cited cases to that effect.

3          MR. MONTGOMERY:  Yes.

4          THE COURT:  The cases we looked at that you cited all
5  only had State Court claims in them.  Whether they were
6  originally federal claims that got dismissed or they were here
7  on diversity, at least the cases we saw that you cited had no
8  overlapping Federal and State claims relating to the same
9  incident.

10         If you've got cases that we missed or we misread or
11  something along those lines, I'd like you to take a look at
12  this and send an email to Dan, my law clerk, say, by -- you
13  know, before the end of the day, by midnight tonight.

14         Take a look at the -- we didn't see it in the briefs.
15  We saw a number of cases -- not a number.  There's a few cases
16  where the Dead Man's Act was applied in Federal Court; but the
17  only thing that was being considered at that point, the only
18  claims that were there, were all State claims without the
19  overlapping Federal and State claims.

20         If we're misreading it, I'd like to have it pointed
21  out.

22         MR. MONTGOMERY:  Well, Your Honor, it may be -- it
23  may be syntax; I'm not sure.  But over -- overlapping -- what
24  I understand the cases mean by overlapping is that the
25  testimonial evidence for those claims is the same.  And so in

1  this case, for the affirmative defenses, the testimonial

2  evidence does not overlap the Federal claim in this case.

3  THE COURT:  I see.  Okay.  I think I understand your

4  argument.  But I have not seen any cases where there is a

5  Federal claim and a State claim where -- and you're dividing

6  up the events, it looks like.  You're dividing up the crash

7  where you say that Ewing acted intentionally, which is what he

8  has to do to be guilty of a constitutional tort.  You're

9  dividing that up with the State claims; but the State claims

10  include negligence.  And negligence goes to the --

11  MR. MONTGOMERY:  No, only the State claims -- only

12  the State claims of -- under the affirmative defenses.

13  The State claims that we bring, they are coextensive

14  with the Federal claims.  And we don't -- we don't mean to

15  apply to that.  And the truth is there isn't any -- isn't any

16  or much testimonial evidence from Stevenson and Cokes on that

17  because that's during the -- during the chase.  So that's --

18  you know, that's them trying to get out of the car or

19  Arrington trying to get out of the car, and that was about it.

20  But before -- before the events that gave rise to the

21  State -- the Federal claim, the willful/wanton claim, and the

22  negligence claim, before those events even began, the State

23  affirmative defenses events occurred.  And those were separate

24  events at a separate point in time and a separate place and

25  have no bearing whatsoever.

1      THE COURT:  What are those?  So I'm clear, what are

2  those separate affirmative defenses that you say they've

3  alleged?

4      MR. MONTGOMERY:  Well, it is -- it is the joint

5  enterprise that the defendants claim to prove a robbery, that

6  all these guys were there on the scene at a robbery, that --

7  who did what at the scene.  And the testimony of Cokes and

8  Stevenson about what was going on in the car at that point,

9  what happened in the car.

10     There's been some testimony by one or the other of

11 them that the car stopped on a highway.  I mean, and so that's

12 part of it.  That has nothing to do with the Federal claim.

13 That's all part of the State affirmative defenses.

14     And then -- and then all the way through -- to the

15 point and past the point where the officer -- the Illinois

16 State Police stopped the Pontiac at the top of the ramp at

17 127th Street and I-57, none of that has anything to do with

18 our claims, whether it's State or Federal, against Ewing.

19     THE COURT:  Okay.  I'll briefly hear a response, and

20 then we'll be done with this issue until I rule.

21     MR. BARNETT:  Yes, Your Honor.

22     So plaintiff admits that the -- the claim -- the

23 First -- the Fourth Amendment and the willful and wanton and

24 negligence claims are all intertwined and that the

25 Dead Man's Act would not apply to the -- to the willful and

1   wanton and negligence claims to bar any conduct of

2   Mr. Arrington.

3           The affirmative defenses are defenses to those

4   claims.  You can't separate them like that.  I've found no

5   case law that says that an affirmative defense to a claim is a

6   complete and different event, thereby removing it from the --

7   from the intertwinement of all of the other facts.

8           That would -- that -- I have found no cases that have

9   said that.  Opposing counsel has provided none of it.  It's

10  one event.  Those affirmative defenses are defenses to the

11  claims that plaintiffs' counsel has admitted are intertwined

12  with the Federal one.  And so the Federal Rules of Evidence

13  apply.

14          And the Federal Rules of Evidence, as set forth in

15  the opinions that we have provided to the Court, say that when

16  there are conflicting rules, the Federal Rules of Evidence,

17  which generally permit more evidence, are to be accepted.

18          THE COURT:  All right.

19          MR. BARNETT:  And we believe based on the facts of

20  this case and the case law that we have provided to

21  Your Honor, that the Dead Man's Act doesn't apply at all

22  because the Plaintiff Arrington does have both Federal and

23  State cases.  Thank you.

24          THE COURT:  All right.  I've heard enough argument.

25  You've briefed the issues on both sides, unless there's

1    something that directly you want to reply to right now.

2    Otherwise, I've heard -- I've got briefs on this issue, I've

3    got supplemental briefs, and I've heard argument.

4               MR. MONTGOMERY:  Well, it -- there is one small

5    point, but it's small and -- and probably isn't worth it, but

6    I guess for the record, I have to say it.

7               The affirmative defenses of negligence are separate

8    claims.  They are claims, and counsel suggested they weren't

9    but...

10              THE COURT:  How can they be claims?  They're

11   defenses.

12              MR. MONTGOMERY:  They are claims of negligence,

13   Your Honor, and they have to be proven by the defense, just --

14   just -- they have the burden of proving those, just like we

15   have the burden of proving our claims of negligence against

16   Ewing.

17              THE COURT:  Well, I think it's nomenclature, but an

18   affirmative claim -- people list affirmative defenses to give

19   notice to the other side of -- the federal rules require some

20   notice of particular affirmative defenses.

21              This is a situation Judge Shadur would love because

22   he was always very meticulous about characterizing something

23   as an affirmative defense or not.  And I'm going to have to go

24   back to read some -- some of the opinions of Judge Shadur on

25   this.  But I understand your point --

1          MR. MONTGOMERY:  Thank you, Your Honor.

2          THE COURT:  -- and you'll get a ruling at some

3    point --

4          MR. BARNETT:  Yes, Your Honor.

5          THE COURT:  -- before opening so that you can make

6    sure your openings are consistent with any ruling I make.

7          MR. BARNETT:  Thank you, Your Honor.

8          THE COURT:  Okay.  Let's go off the record.

9        (Off-the-record discussion.)

10         THE COURT:  You had an additional motion *in limine* --

11   so let's go back on the record.

12         Go ahead.

13         MR. MONTGOMERY:  Yes.  And it's related to a

14   discussion we've had already.  We took the deposition --

15   evidence deposition for what it -- if that's the right

16   discussion, of Dawn Love, Sergeant Dawn Love, who was the

17   supervisor of Dean Ewing.

18         On cross-examination, her testimony was taken to --

19   you know, the fact that she came on the scene after the event,

20   so didn't know much about the event at all; and then went

21   into, well, I went to the hospital, and I visited the

22   officers.

23         And then tears start coming down her eyes.  And then

24   she identifies 20 photos of, you know, a head injury on the

25   deceased Officer Barango and scars and -- and welts under his

1    arm and welts on his other arm and then abrasion on his
2    left arm.  And then more tears come out.

3          And there were about 20 photos of him that she
4    tearfully -- tearfully testified to as though it was a
5    prove-up of damages in a plaintiff's case.

6          And even in the plaintiffs' case, it was kind of over
7    the top; but the -- but the point is I think, you know, the
8    Court said in regard to the chase videos that the spillover
9    to -- where the officers came out and they were obviously
10   injured was fair game.  We respect that.

11         But frankly, Judge, I -- this whole I went to the
12   hospital and everything after that, I don't know what the
13   purpose is, but it's not relevant.  It doesn't go to any issue
14   in the case.  And 20 photos of this gentleman's injuries...

15         THE COURT:  Okay.  And he's the one who's deceased
16   now so he can't testify as Ewing and the other two will
17   testify to their injuries?

18         MR. MONTGOMERY:  Correct.

19         THE COURT:  Okay.  Do you intend to offer that?

20         MS. BOUDREAUX:  Yes.  And it was not 20 photos.

21         THE COURT:  Okay.  Why do you intend to offer it?

22         MS. BOUDREAUX:  To rebut the plaintiffs' theory of
23   the fact that this was an intentional ramming of the car, the
24   same way the other live officers will testify to their
25   injuries.  So the only reason I did this with Sergeant Love is

1    because this officer is deceased and she was actually at the
2    hospital, so she could lay the foundation for the photos.

3            THE COURT:  Is there -- would you agree that -- I
4    think the injuries of the officers, as you've -- as I've ruled
5    already, are relevant because there's an argument that Ewing
6    wouldn't intentionally put his own health and that of his
7    partners in jeopardy.  So the injuries are relevant.

8            But would you agree that these photos can come in by
9    stipulation, rather than have a crying police sergeant?  I
10   mean, they're coming in; his injuries are relevant.

11           MR. MONTGOMERY:  But 20 -- 20 -- I don't know the
12   number.  Counsel says they aren't 20; but I mean, it's the
13   same -- it's the same photos over and over and over.

14           THE COURT:  Well, that's a different issue.  I will
15   exclude repetitive evidence.  That's like, you know, autopsy
16   photos.  You know, if they're not helpful and they're
17   repetitive and they're overly prejudicial, they'll get
18   excluded.  I haven't seen these photos.

19           Injuries to -- what was this officer's name?
20           MR. MONTGOMERY:  Barango, B-A-R-A-N-G-O.

21           THE WITNESS:  Injuries to Barango are relevant.  I
22   don't think a police officer -- there is a sergeant that's
23   crying.  She may be crying not because of his injuries,
24   because he's dead now.  Who knows?  And they -- she can't be
25   asked questions about that.  So that's not fair.

1    But I think the injuries can come in.  And whether
2  it's through a medical -- someone, a medical personnel, or the
3  person who took the photographs, or -- frankly, put them in
4  through one of the other officers to say, yeah, Barango was
5  hurt and these are the injuries.
6    Or reach a stipulation:  The following -- not all the
7  photographs -- the following photographs represent the
8  injuries to Officer Barango.
9    I -- I understand your point, Mr. Montgomery, that a
10  crying police sergeant is not necessarily relevant 'cause she
11  may be crying for other reasons relating to Barango's
12  passing -- Barango's passing.
13    But they can get them in somehow, at least
14  nonrepetitive ones.  And I think it's in your best interest to
15  reach a stipulation to allow them in or a testimonial stip.
16  If Photographer Jones were called, he'd testify these were the
17  photographs he took of Barango right after the accident or
18  right at the hospital.  It's that simple.
19    MR. MONTGOMERY:  We'll reach a -- we'll -- we'll work
20  with counsel, Your Honor, to try to reach a stipulation.  I
21  don't know that -- do I have them?  I have never seen them
22  before, so I don't know if I've --
23    (Counsel conferring.)
24    THE COURT:  All right.  Why don't you try and work
25  it -- let's go off the record.

1        (Off-the-record discussion.)

2            THE COURT:  Back on the record.

3            So the parties are going to attempt to work out a

4   stipulation or some other way to allow for the introduction of

5   nonrepetitive, nonoverly prejudicial injury photographs for

6   reasons I've already stated are relevant.  But I believe that

7   the testimony of a crying police sergeant about

8   Officer Barango, the crying may be caused by something other

9   than the injury, given the fact that he's deceased.

10           I don't know if they were close personal friends, but

11  she's not available to be cross-examined about that.  And I

12  think it would be unfair to play that part of it.  There ought

13  to be another way to lay a foundation for this, and the

14  parties should try to reach agreement on that.

15           MS. BOUDREAUX:  Yes.  And just for the record, there

16  were eight photographs used.

17           THE COURT:  Okay.  Well, nonrepetitive, nonoverly

18  prejudicial photographs that fairly shows injuries are

19  relevant.

20           Okay.  Anything else from plaintiffs?

21           MR. MONTGOMERY:  Nothing, Your Honor.  Thank you.

22           THE COURT:  And --

23           MR. TERRACINA:  Not at this time, Your Honor.

24           THE COURT:  And from defendants?

25           MS. BOUDREAUX:  No, Your Honor.

1          THE COURT:  Okay.  Then I think we have enough to do

2   between now and Monday.

3          And Mr. Montgomery, you're now going to be sending us

4   by midnight any cases where it's all state law claims where --

5   I'm sorry -- where there's a state law and a Federal claim

6   where the Dead Man's Act did apply?

7          MR. MONTGOMERY:  Okay.  I'll -- I'll do that,

8   Your Honor.  I'll --

9          THE COURT:  If you've got it, send it to us tonight.

10         MR. MONTGOMERY:  Okay.

11         THE COURT:  We're going to work on some of this over

12  the weekend.  And if you didn't -- if it's not there, I

13  understand your argument that there are -- in your mind, this

14  is a separable set of facts that -- that would make

15  application of it appropriate.

16         MR. MONTGOMERY:  Thank you, Your Honor.

17         THE COURT:  Okay.  Very good.  I will see you all

18  Tuesday morning.  I think we start at 9 o'clock, and we'll be

19  up on 23.  And I'm almost certain we'll be communicating by

20  email or a quick phone call on Monday sometime about other

21  issues.  So have a good weekend.  Thank you.

22         MS. BOUDREAUX:  Thank you.  You, too.

23      (Proceedings concluded at 4:38 p.m.)

24

25

1                                   CERTIFICATE

2           I certify that the foregoing is a correct transcript from

3    the record of proceedings in the above-entitled matter.

4    /s/ Elia E. Carrión              14th day of August, 2022

5    Elia E. Carrión                            Date
     Official Court Reporter
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25